# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA DROVER-MUNDY and ZACHARY MUNDY, each individually and as representatives of THE ESTATE OF L.M., on behalf of themselves and all others similarly situated; and REBECCA DROVER, on behalf of herself and all others similarly situated, | Civil Action No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| FISHER-PRICE, INC.; MATTEL, INC.; and AMAZON.COM, INC.; | |
| Defendants. | |

Plaintiffs, by undersigned counsel, bring this Class Action Complaint against Defendants Fisher-Price, Inc. ("Fisher-Price"); Mattel, Inc. ("Mattel"); and Amazon.com, Inc. ("Amazon") (collectively "Defendants"), on behalf of themselves and all others similarly situated.

## I.     INTRODUCTION

1.      For nearly a decade, Fisher-Price marketed the Rock 'n Play Sleeper (the "Rock 'n Play") as a safe and convenient baby product.  Millions purchased the product expecting that it would be appropriate for their infant children.  Yet the Rock 'n Play was defective and dangerous from the beginning, frequently causing injury and death to children who sat or slept in it.  Fisher-Price and its parent company, Mattel, knew about this risk – and about actual deaths and injuries which had occurred – but continued to sell millions of units of the product and insist that it was safe until they were finally forced to recall it on April 12, 2019.

2.      That recall came too late to prevent the tragic September 2018 death of L.M., the nearly three-month-old daughter of named Plaintiffs Samantha Drover-Mundy and Zachary

Mundy.  L.M. died *just a few minutes* after being placed in a Rock 'n Play.  L.M.'s death was a shattering event which would not have occurred if the Rock 'n Play's design was safe.  Nor did the recall come soon enough for dozens of other children who have died in the Rock 'n Play.  Many more have been seriously injured.

3.      Even from the introduction of the Rock 'n Play, Fisher-Price and Mattel knew or should have known that it was not a safe environment for infants.  At the time that the Rock 'n' Play went to market in 2009, Fisher-Price and Mattel had already disregarded recommendations from the American Association of Pediatrics ("AAP") as to appropriate infant sleep position.  Over time, Fisher-Price and Mattel would lobby the Consumer Product Safety Commission ("CPSC") to let the companies avoid regulations that would have kept the product off the market.

4.      All the while, children were being harmed by the unsafe design of the product. Fisher-Price, in conjunction with the CPSC, confirmed in a joint statement on April 5, 2019, that at least ten deaths of infants over the age of three months had been attributed to the Rock 'n Play since 2015.[1]  In fact, as Consumer Reports disclosed on April 8, 2019, the Rock 'n Play contributed to at least thirty-two deaths since its release.[2]

5.      After the AAP, lawmakers, consumer groups, and members of the public continued to pressure Fisher-Price to withdraw the ill-designed Rock 'n Play from the market, the product

---

[1] *CPSC ALERT: CPSC and Fisher-Price Warn Customers About Fisher-Price Rock 'N Play Due to Reports of Death When Infants Roll Over in the Product* (Apr. 5, 2019), https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last accessed Apr. 18, 2019).

[2] *Fisher-Price Rock 'n Play Should Be Recalled, Consumer Reports Says* (originally published Apr. 8, 2019), https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last accessed Apr. 18, 2019) (the "Consumer Reports Investigation Article").

was finally recalled on April 12, 2019.  Approximately 4.7 million Rock 'n Plays were subject to the recall.[3]  The CPSC acknowledged, and Fisher-Price confirmed, the existence of more than 30 deaths of infants using the Rock 'n Play and "urg[ed] parents to stop using this product immediately."[4]

6.      This recall was too late to save the lives of more than 30 infants and to prevent the injuries of numerous other infants caused by the Rock 'n Play.  The Rock 'n Play causes death or injury to infants because its defective design enables them to move into positions in which they cannot breathe.  The Rock 'n Play's defective design also causes injuries including torticollis (which limits an infant's ability to turn his or her neck), plagiocephaly (which is the flattening of an infant's head on one side), and brachycephaly (which is the flattening of the back of an infant's head).  These injuries require costly medical treatment and can cause life-long damage, including permanent deformities and developmental delays.

7.      Nothing can bring L.M. back to her family and no lawsuit can alleviate her family's anguish in the wake of this tragedy.  Nevertheless, this class action seeks relief in the form that legal proceedings can offer and does so on behalf of children who were injured or died as a result of the Rock 'n Play's defective design, the parents of these children, and consumers who purchased this dangerous product.

---

[3] *Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Death* ("CPSC Recall Statement") (Apr. 12, 2019), https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-rock-n-play-sleepers-due-to-reports-of-deaths (last accessed Apr. 18, 2019).

[4] CPSC Fisher Price Recall Alert (Apr. 12, 2019),
https://www.youtube.com/watch?v=9ZunvBHkGdE (last accessed Apr. 18, 2019).

## II.   PARTIES

8.     Plaintiffs Samantha Drover-Mundy and Zachary Mundy reside in Delaware.  Their daughter L.M. died due to injuries resulting from the defective design of the Rock 'n Play.

9.     Plaintiff Rebecca Drover resides in Pennsylvania.  She purchased a Rock 'n Play for her daughter, Samantha Drover-Mundy, as a gift, with an understanding that the Rock 'n Play was a safe product.

10.     Defendant Fisher-Price is a corporation organized under the laws of the State of Delaware with its principal place of business at 636 Girard Avenue, East Aurora, New York 14052, and is a subsidiary of Mattel.

11.     Defendant Mattel is a corporation organized under the laws of the State of Delaware with its principal place of business at 333 Continental Boulevard, El Segundo, California 90245.

12.     Defendant Amazon is a corporation organized under the laws of the State of Delaware with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.  Amazon has been one of the primary sellers of the Rock 'n Play since its release.

## III.   JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because there are at least 100 class members, at least one class member is a citizen of a state that is diverse from at least one defendant, and the amount in controversy exceeds $5 million exclusive of interest and costs.  This Court also has jurisdiction over Plaintiffs' claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et. seq.*, pursuant to 28 U.S.C. § 1331.

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

4

15.     This Court has personal jurisdiction over Defendants because they have availed themselves of the benefits and protections of New York by doing substantial business in New York.  Also, Fisher-Price has its principal place of business in New York.

16.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this district, Defendants regularly conduct business in this district, and a substantial part of the property that is related to the action is situated in this district.

## IV.     FACTUAL BACKGROUND

### A.     The Rock 'n Play Product

17.     The Rock 'n Play is an inclined sleeper product first introduced to the U.S. market by Fisher-Price and Mattel in October 2009.[5]

18.     The Rock 'n Play was designed as a flexible folding frame with a fabric hammock suspended between the legs.  The product has high sides and sits at an incline, causing the infant placed in it to also sit at an incline.

19.     The Rock 'n Play comes with padded inserts that go behind and up to the sides of the infant's head and body.  The shape of the Rock 'n Play's hammock includes an additional angle that pushes up the legs where the infant's torso meets the legs, causing the infant to lay in a semi-seated position.  *See* Figures 1 and 2 below.[6]

---

[5] Decl. of Michael F. Fenn ("Fenn Declaration") ¶ 6, *Butler v. Mattel, Inc., and Fisher-Price, Inc.*, No. 2:13-cv-00306-DSF-SS (C.D. Cal. Jan. 17, 2014).

[6] Photos of Newborn Rock 'n Play Sleeper – Luminosity, https://fisher-price.mattel.com/shop/en-us/fp/newborn-rock-n-play-sleeper-luminosity-bmm97 (last accessed Apr. 18, 2019).

 

Figure 1.                                      Figure 2.

20.     The Rock 'n Play was designed to rock forward and back and was advertised for both sleep and playtime.

21.     Since the release of the Rock 'n Play, approximately 4.7 million units have been sold.[7]  Versions of the Rock 'n Play have retailed for between $40 and $149 at various times.[8]

22.     The Rock 'n Play was manufactured overseas and sold throughout the United States.  As of January 2014, Fisher-Price sold 80% of its Rock 'n Plays through Target, Walmart, Amazon, and the now-defunct Toys 'R Us/Babies 'R Us.[9]  Fisher-Price also sold the Rock 'n Play directly to consumers through its own website.

23.     The Rock 'n Play was, and is, a defective and unsafe product which has caused numerous deaths and injuries throughout the United States, including L.M.'s death, because: (1) its shape permits infants to move themselves into a position in which they are unable to breathe

---

[7] CPSC Recall Statement.

[8] Tiffany Hsu, *Fisher-Price Recalls Rock 'n Play Sleeper Linked to Infant Deaths*, Apr. 12, 2019 (*available at* https://www.nytimes.com/2019/04/12/business/fisher-price-rock-n-play-recall.html) (last accessed Apr. 17, 2019).

[9] Fenn Declaration ¶ 5.

against the padded surface of the Rock 'n Play; and (2) the degree of incline of the sleep environment causes infants' heads to pitch at angles which impair breathing and increase the risk of neck and head injuries.

### B.      Defendants' False Representations of Safety

24.     Fisher-Price advertised the Rock 'n Play as a place for infants to sleep, specifically marketing it as a "Sleeper," and touted it as a miracle product that could give exhausted parents of newborns some much-needed rest.  Fisher-Price's public statements include:

- o   "The inclined seat helps your baby sleep all night."[10]

- o   "This sleeper helps give your little one the customized soothing motions he or she loves, so you both can get some much-needed shut-eye."[11]

- o   "Whether they just need a quick snooze or are ready to settle in for the night, the Rock 'n Play sleeper's comfortable, restful environment and dual auto-rocking settings help teeny-tiny ones wind down and relax with a consistent routine."[12]

- o   "Inclined sleeper designed for all-night sleep"[13]

- o   "Baby can sleep at a comfy incline **all night long**!"[14]

---

[10] Wayback Machine Archive of Newborn Rock 'n Play Sleeper Fisher-Price page (Mar. 29, 2017), https://web.archive.org/web/20170329030329/https:/fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/newborn-rockn-play-sleeper-bct91 (last accessed Apr. 18, 2019).

[11] Google Cache Snapshot of Fisher-Price Auto Rock 'n Play Sleeper Amazon page (Mar. 29, 2019), https://webcache.googleusercontent.com/search?q=cache:GGgqXs--6UAJ:https://www.amazon.com/Fisher-Price-Auto-Rock-Play-Sleeper/dp/B01K7VHP90+&cd=2&hl=en&ct=clnk&gl=us (last accessed Apr. 18, 2019).

[12] *Id.*

[13] Consumer Reports Investigation Article.

[14] *See* Dr. Natasha Burgert, *Dear Fisher-Price…*, https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price (last accessed Apr. 18, 2019) (emphasis in original).

25.     To market the Rock 'n Play, Fisher-Price determined that the most effective form of advertising for its baby-related products was through word-of-mouth and through 'mommy bloggers,' as the company was aware that consumers rely on these websites.[15]  In service of this strategy, Fisher-Price provided Rock 'n Plays to 'mommy bloggers' in exchange for their reviews.[16]

26.     Fisher-Price and Mattel also have direct contact with consumers through the Fisher-Price website.  In response to consumers' concerns regarding the safety of the Rock 'n Play, Fisher-Price and Mattel have repeatedly responded publicly that the Rock 'n Play is safe.

27.     For example, approximately one year ago, a user of a Rock 'n Play with the handle Cassidy720 asked: "Should I stop using this product once my baby can roll over?"[17]  Mattel Consumer Services responded, in part: "This sleeper can be used from birth until your child is able to grasp side and pull upward or sit unassisted."  That same limitation appeared on Rock 'n Play

---

[15] Fenn Declaration ¶¶ 9-10.

[16] *See e.g.*, *A Solution For Baby's* [sic] *That Need to Sleep Upright!!!*, Must Have Mom (Feb. 24, 2010), https://musthavemom.com/solution-for-babys-that-need-to-sleep/ (last accessed Apr. 18, 2019) (stating in a review of the Rock 'n Play provided by Fisher-Price that the Rock 'n Play "is the only infant seat that meets industry standards for bassinets" and that "you finally have a way to allow your baby to sleep with their head elevated").

[17]  My Little Snuggabunny Deluxe Newborn Rock 'n Play Sleeper, https://fisher-price.mattel.com/shop/en-us/fp/my-little-snugabunny-deluxe-newborn-rock-n-play-sleeper-bhv62 (last accessed Apr. 18, 2019).

product pages[18] and in some manuals, giving an age of about five months.[19]  The Rock 'n Play

also included a twenty-five-pound weight limit.[20]

28.     Another consumer, with the handle "Jcdobz," asked about a year ago:

Is this rock n play safe and approved for actual nighttime sleep?  It says on the box
'naps and bedtime' but when researching I find mixed answers.  Is this approved
for unsupervised (defined as myself the parent sleeping at the time) nighttime
sleep?[21]

Mattel Consumer Services responded: "The Rock [']N Play sleeper is safe for overnight use."

29.     Just six months ago, another concerned consumer with the handle Dax1977

inquired whether "the [R]ock [']n [P]lay [was] approved for overnight sleep for infant" because

the consumer was "finding mixed reviews."[22]  Mattel Consumer Services responded:

We can assure you that the Rock 'n Play Sleeper is safe for inclined sleep, including
overnight sleep, when used according to the instructions. And we understand it can
be confusing to hear an American Academy of Pediatrics recommendation that may
seem to conflict with a product designed for inclined sleep. But maybe this will
help clarify: what the AAP states is that sitting devices—car seats, strollers, swings,
infant carriers and infant slings—are not recommended for routine sleep in the
hospital or at home. The Rock 'n Play Sleeper is not a sitting device—it is a product
specifically designed for inclined sleep. As such, it meets all applicable industry
safety standards, including those of the international standards organization known

---

[18] *See, e.g.*, Newborn Rock 'n Play Sleeper – Luminosity, https://fisher-price.mattel.com/shop/en-us/fp/baby-gear/newborn-rock-n-play-sleeper-luminosity-bmm97 (last accessed Apr. 18, 2019) ("Developmental Statement: Use only with a child unable to sit up unassisted or grasp side of seat and pull upward").

[19] *See, e.g.*, Manual for Fisher-Price Deluxe Newborn Auto Rock 'n Play Sleeper with Smart Connect, https://service.mattel.com/instruction_sheets/DNK64-SP.pdf (last accessed Apr. 18, 2019).

[20] Wayback Machine Archive of Newborn Rock 'n Play Sleeper Amazon page (Jul. 21, 2010), https://web.archive.org/web/20100721233902/http://www.amazon.com/Fisher-Price-Newborn-Rock-Play-Sleeper/dp/B002M77N22 (last accessed Apr. 18, 2019).

[21] My Little Snuggabunny Deluxe Newborn Rock 'n Play Sleeper, https://fisher-price.mattel.com/shop/en-us/fp/my-little-snugabunny-deluxe-newborn-rock-n-play-sleeper-bhv62 (last accessed Apr. 18, 2019).

[22] Question Regarding Auto Rock 'n Play Sleeper, https://fisher-price.mattel.com/shop/en-us/fp/auto-rock-n-play-sleeper-ftx92 (last accessed Apr. 18, 2019).

as the ASTM. We hope that clears up any confusion you may have had. Of course, we encourage you to talk with your pediatrician about what's right for your child.

30.     In marketing the Rock 'n Play as a safe sleep device, Defendants emphasized the product's angled and seated positioning and soft backing and padding.  These representations misled consumers into believing that those features contributed to the safety of the Rock 'n Play. In fact, those features of the product's design rendered the product dangerous.

31.     For example, the product page for the 'Newborn Rock 'N Play Sleeper, Luminosity,' which caused L.M.'s death, touts dangerous features as selling points:

- "Comfy *incline* helps baby sleep"

- "Sleeper & playtime seat in one"

- "*Soft fabric* & a supportive seat back help keep baby elevated & secure"[23]

**C.      Medical Professional and Governmental Organizations Apprised Fisher-Price and Mattel that Products Like the Rock 'n Play Were Unsafe**

32.     Fisher-Price and Mattel made public statements that the Rock 'n Play was safe even though they had previously learned of (and continue to learn of) warnings which alerted them to the product's dangerous nature.

33.     For decades, there has been a medical consensus that an infant should sleep on his or her back.  The AAP has recommended that infants be placed to sleep on their backs since 1991.[24]

---

[23] Newborn Rock 'n Play Sleeper – Luminosity, https://fisher-price.mattel.com/shop/en-us/fp/newborn-rock-n-play-sleeper-luminosity-bmm97 (last accessed Apr. 18, 2019).

[24] *Positioning and SIDS*, AAP Task Force on Infant Positioning and SIDS, Pediatrics Vol. 89, No. 6 (June 1992) (*available at* https://pediatrics.aappublications.org/content/pediatrics/89/6/1120.full.pdf).

34.     In 2005, the AAP updated its safe sleep recommendations to reflect continued research in the field.[25]   The recommendations reaffirmed that infants should be placed on their backs to sleep and that firm sleeping surfaces be used.   "A firm crib mattress, covered by a sheet, is the recommended sleeping surface."   To "[a]void the development of positional plagiocephaly," the AAP recommended that caregivers alter the infant's head position during sleep and not allow infants to spend excessive time in bouncers, carriers and car seats.

35.     In 2011, following updated research, the AAP expanded its safe sleep recommendations to include a "firm sleep surface."[26]   The AAP also warned that "[c]ar seats and other sitting devices are not recommended for routine sleep."   In addition, the AAP at the same time recommended that infants not sleep next to "soft objects," including "pillows," "bumper pads" and "positioners."[27]

36.     The 2011 AAP recommendations also recognized the particular risk to very young infants: "Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."[28]   The AAP further noted: "If

---

[25] *The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider in Reducing Risk*, American Academy of Pediatrics, Pediatrics Vol. 116, No. 5 (November 2005) (*available at* https://pediatrics.aappublications.org/content/116/5/1245) (last accessed Apr. 18, 2019).

[26] *AAP Expands Guidelines for Infant Sleep Safety and SIDS Risk Reduction* (Oct. 18, 2011), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Expands-Guidelines-for-Infant-Sleep-Safety-and-SIDS-Risk-Reduction.aspx (last accessed Apr. 18, 2019).

[27] *Id.*

[28] *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for Infant Sleeping Environment* (Nov. 2011), https://pediatrics.aappublications.org/content/128/5/1030 (last accessed Apr. 18, 2019).

an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practicable."[29]

37.     Internationally, Fisher-Price and Mattel faced opposition to bringing the Rock 'n Play to market.  For example:

    a.   Around January 2011, Australian regulators found that the Rock 'n Play was *not safe for infant use as a sleeper* because it was contrary to safe sleep recommendations and the angle allowed babies' airways to be blocked.[30]  Australia never permitted the sale of the Rock 'n Play.

    b.   Canadian authorities also took issue with the Rock 'n Play being sold as a "sleeper," opting to allow the product to be sold only as a "soother" because of Canadian safe sleep recommendations raised by Health Canada in February 2011.[31]

    c.   Also in February 2011, organizations in the United Kingdom told Fisher-Price that the product was not safe as a sleeper and safe for only short periods of use for play. In fact, a Consumer Reports investigation revealed internal Fisher-Price communications which acknowledged negative findings from the United Kingdom's Royal College of Midwives and stated: "I'm afraid the findings don't have good implications for a UK launch."[32]

---

[29] *Id.*

[30] Consumer Reports Investigation Article.

[31] *Id.*

[32] *Id.*

**D.      Fisher-Price and Mattel Exerted Strenuous Efforts to Avoid Compliance with Infant Safe-Sleep Recommendations**

38.      Rather than heed the foregoing information and warnings, Fisher-Price and Mattel actively resisted any constraints on their sale of the Rock 'n Play or the profits they would make from those sales.

39.      Despite international objections to the Rock 'n Play, in the United States, Fisher-Price and Mattel successfully lobbied to avoid specific regulations that would have kept the Rock 'n Play off the market.  When first released, the Rock 'n Play was marketed as a bassinet.  However, in 2010, in light of the developing safe sleep recommendations, the CPSC started making changes to the requirements for bassinets and cradles, including a limitation on the incline of such products.[33]

40.      The CPSC submitted proposed rules for changes to the regulations on bassinets and other infant sleep products in October 2012.[34] Changes to the requirements for angles of sleeping surfaces were proposed to address incidents of "suffocation/positional asphyxia due to excess mattress pad angle" and "suffocation due to excess rock/swing angles."[35]

41.      In 2013, at the urging of Mattel, the CPSC officially adopted the proposal excluding the Rock 'n Play and products like it from mandatory compliance with the regulations applicable to bassinets and cradles that required a near flat surface: "A sleep product that only has inclined sleeping surfaces (intended to be greater than 10° from horizontal while in the rest (non-rocking) position) does not fall under the scope of this standard." 16 C.F.R. § 1218.2(b)(1).

---

[33] *Id.*

[34] Proposed Rule on Safety Standards for Bassinets and Cradles, 77 Fed. Reg. 64055 (Oct. 18, 2012).

[35] *Id.* at 64060.

42.     By 2012, Fisher-Price turned to a voluntary standard-setting organization, ASTM International, to create guidelines specific to inclined sleepers due to the proposed regulation changes that would require bassinets and cradles to have inclines of less than 10 degrees.  Despite objections from certain ASTM International members that the mere existence of such a standard would indicate to consumers that the product is safe,[36] ASTM International promulgated voluntary standards on inclined sleep products in May 2015.[37]  One of the primary Rock 'n Play designing engineers at Fisher-Price served as the chairperson for the committee that developed those standards.[38]

43.     In April 2017, the CPSC announced that it was in the process of reviewing the ASTM standard and determining whether the CPSC would promulgate its own standards for infant inclined sleep products.[39]  In its notice, the CPSC detailed hundreds of reported incidents, injuries, and deaths associated with inclined sleeper products.

44.     During the comment period which closed on June 21, 2017, the CPSC received public comments from consumer groups, healthcare professionals, and the AAP urging more stringent requirements.  One such letter, sent on behalf of several child-safety consumer groups, stated that their "organizations have concerns about the entire product class of infant inclined sleep products, especially hammocks that have no discernable bottom support and may lead to posture

---

[36] *Id.*

[37] ASTM F3118–17, *Standard Consumer Safety Specification for Inclined Sleep Products*.

[38] Consumer Reports Investigation Article.

[39] Notice of Proposed Rulemaking, Safety Standard for Infant Inclined Sleep Products, 82 Fed. Reg. 16963 (Apr. 7, 2017).

or positioning that compromises infant safety."[40]  The letter further stated that the voluntary ASTM standard did not do enough to address the hazards posed by inclined sleepers like the Rock 'n Play:

> Like bassinets, infant inclined sleep products can be used for the most vulnerable infants by the most inexperienced and sleep-deprived caregivers. These products are used in a variety of settings by a variety of individuals. Infants using these products sleep intermittently throughout the day and night. Safety should be paramount – particularly because these products do not align with the trusted safe sleep recommendations advised by both medical practitioners and other safety experts.[41]

45.    The AAP similarly argued against the proposal to incorporate the ASTM standard into the CPSC's regulations:

> While we appreciate the effort to impose a safety standard upon this category of products [infant inclined sleep products], the AAP has concerns about all inclined sleep products and the hazards they may pose to infants, and we are concerned that a safety standard could give parents and caregivers the mistaken impression that these products have been proven safe.[42]

46.    To date, the CPSC has not issued any regulations specific to infant inclined sleep products.

47.    However, in May 2018, without naming any specific product, the CPSC issued a warning to consumers regarding inclined sleepers.[43]  The CPSC stated that it was aware of infant deaths from rolling over in such sleep products.

---

[40] Consumer Group Comments on Inclined Infant Sleep Products at 2 (June 21, 2017), https://www.regulations.gov/contentStreamer?documentId=CPSC-2017-0020-0006&attachmentNumber=1&contentType=pdf (last accessed Apr. 18, 2019).

[41] *Id.* at 6.

[42] Comments from AAP at 1 (Jul. 5, 2017), https://www.regulations.gov/contentStreamer?documentId=CPSC-2017-0020-0008&attachmentNumber=1&contentType=pdf.

[43] *CPSC Consumer Alert: Caregivers Urged to Use Restraints With Inclined Sleep Products* (May 31, 2018), https://www.cpsc.gov/content/cpsc-consumer-alert-caregivers-urged-to-use-restraints-with-inclined-sleep-products (last accessed Apr. 18, 2019).

48.     In response to that warning, several consumer groups wrote a letter to the CPSC stating that, as CPSC considered final rules on infant incline sleepers, CPSC should consider the deaths referenced in its warning: "If the current products that are involved in deaths would meet the rule, then it is far too weak, and CPSC and ASTM International should revisit the standard and implement revisions to make it more protective of infant safety."[44]

### E.     Parents Report Injury from the Defective Rock 'n Play Design

49.     Almost as soon as the Rock 'n Play came to market, parents began reporting injuries to their infant children.  For example, on July 1, 2010 – only nine months after the Rock 'n Play was released on the market – one Amazon review of the Rock 'n Play revealed such complications.[45]  According to the review, the Rock 'n Play "worked like a dream" at first.  The reviewer stated that she used the product for sleeping as was indicated on the packaging.  At her son's two-month checkup, he was diagnosed with torticollis and plagiocephaly and was seeking treatment with the hope that he could avoid a corrective helmet.  The reviewer ended her review by stating, presciently, that she believed the Rock 'n Play would "be recalled or, at the very least they will reclassify it as an infant seat rather than a sleeper."

50.     Another Amazon review, dated October 11, 2018, reported that an infant that used the Rock 'n Play almost exclusively for sleeping experienced plagiocephaly, requiring a helmet

---

[44] Letter to The Honorable Ann Marie Buerkle of the CPSC at 2 (June 13, 2018), https://advocacy.consumerreports.org/wp-content/uploads/2018/06/Inclined-Sleep-Products-CPSC-June-13-2018-1.pdf.

[45] Wayback Machine Archive of Newborn Rock 'n Play Sleeper Amazon page (Jul. 21, 2010), https://web.archive.org/web/20100721233902/http://www.amazon.com/Fisher-Price-Newborn-Rock-Play-Sleeper/dp/B002M77N22 (last accessed Apr. 18, 2019).

and physical therapy appointments to correct the deformity.[46]   That reviewer stated that her "physical therapist admitted that the [R]ock [']n [P]lay is keeping her in business."

51.     Another Rock 'n Play product review complained that the reviewer's "son was diagnosed with severe brachycephaly and moderate plagiocephaly," requiring "a $3,800 helmet that he [had] to wear 23 hours a day."[47]

**F.     Lawsuits Against Fisher-Price and Mattel Further Apprised Them of the Dangers of the Defective Rock 'n Play Design**

52.     As a result of placing their defective product into the marketplace, Fisher-Price and Mattel have been sued on multiple occasions regarding the dangers of the Rock 'n Play and injuries and deaths the product has caused.

53.     On July 21, 2015, the parents of a two-month-old infant in Texas sued Fisher-Price, Mattel, and another manufacturer for the death of their infant daughter caused by the Rock 'n Play.[48]   In that case, an infant asphyxiated while lying in the Rock 'n Play in 2013.

54.     On July 25, 2016, the parents of a seven-week old infant in Georgia sued Fisher-Price for injuries to the infant while using the Rock 'n Play.[49]   There, the infant stopped breathing and became nonresponsive when his head tilted to the side while in the Rock 'n Play.  The injured infant's pediatrician subsequently concluded that the Rock 'n Play's defective design caused

---

[46]   Customer Review of Fisher-Price Auto Rock 'n Play Sleeper, (Oct. 11, 2018), https://www.amazon.com/gp/customer-reviews/R3IUCH2LOOYK02?ASIN=B01K7VHP90#wasThisHelpful (last accessed Apr. 18, 2019).

[47]   *See* Burgert, *Dear Fisher-Price…*, *supra* n.14.

[48]   *Torres v. Imperial Manufactory Ltd.*, No. 7:15-cv-00444 (S.D. Tex.) (removed to Federal District Court Oct. 23, 2015).

[49]   *Goodrich v. Fisher-Price, Inc.*, No. 1:16-cv-03116 (N.D. Ga.) (removed to Federal District Court Aug. 24, 2016).

"Upper Airway Obstruction from Head Being in a Flexed Position." The infant required long-term monitoring and will be evaluated for developmental delays as he grows.

55.     Also in 2016, parents of an infant in Tennessee sued Fisher-Price for plagiocephaly the Rock 'n Play caused to their son.[50]  In November 2012, the infant's pediatrician diagnosed him as having extremely severe plagiocephaly because the infant's "skull, face and jaw were all distorted as a result of positional plagiocephaly." The pediatrician opined that the product's defective design forced the infant's head into a particular position, thereby preventing the even distribution of pressure on the infant's head and causing it to be permanently deformed.

### G.     The Standards-Setting Process Further Apprised Fisher-Price and Mattel of the Dangers of the Defective Rock 'n Play Design

56.     Through their participation in the standards-setting process, Fisher-Price and Mattel learned of injuries from infant inclined sleep products, including the Rock 'n Play. In an April 7, 2017 announcement regarding proposed rulemaking for standards applicable to infant inclined sleep products, the CPSC detailed hundreds of injuries that it had discovered or that had been reported to the CPSC between January 1, 2005 and September 30, 2016, relating to inclined sleep products such as the Rock 'n Play. The CPSC stated that it was aware of 657 incidents, including 14 fatal incidents, related to inclined sleep products.[51]

57.     The CPSC provided these further details:

- Eight of the fourteen deaths were from "rocker-like inclined sleep products," with at least five of those deaths stemming from a child that rolled over into a face-down position.

- Of the 643 non-fatal incidents identified by the CPSC, 301 involved a confirmed injury to an infant during the use of an inclined sleep product.

---

[50] *Hart v. Fisher-Price, Inc.*, No. 3:17-cv-00008 (M.D. Tenn.) (removed to Federal District Court Jan. 5, 2017).

[51] *See* Notice of Proposed Rulemaking, Safety Standard for Infant Inclined Sleep Products, 82 Fed. Reg. 16963, 16965 (Apr. 7, 2017).

- Of those 301 injuries, 151 required treatment for plagiocephaly (flat head syndrome), torticollis (twisted neck syndrome), or both, with an additional three infants that suffered from flat head syndrome or fall injuries, along with respiratory problems.  One infant had stopped breathing and required hospitalization.

- The remaining 342 reports of non-fatal incidents either stated that no injury occurred or did not detail the injury, but "many of the descriptions indicated the potential for a serious injury or even death."

The CPSC concluded that 75% of incidents were due to design problems.  Specifically, the CPSC identified as a "major design issue[]": "infants reportedly developed physical deformations such as *plagiocephaly* (flat head syndrome) and/or *torticollis* (twisted neck syndrome) from extended use of the product."[52]

58.     An investigation by Consumer Reports revealed additional details regarding injuries and deaths of infants using the Rock 'n Play, including a one-month-old girl and a nine-day-old boy.[53]

**H.      12-Week-Old L.M. Dies in a Rock 'n Play**

59.     Despite all of the foregoing, Defendants' continued to sell the Rock 'n Play.  By 2015, and even before that time, Defendants were fully aware that the Rock 'n Play's defective design had caused and were causing injuries and deaths to infants.

60.     On November 18, 2015, Rebecca Drover purchased a Rock 'n Play (the Fisher-Price Newborn Rock 'n Play Sleeper, Luminosity) in new condition from Amazon for her daughter Samantha Drover-Mundy to use for her children.  Mrs. Drover lived in Pennsylvania at the time but had the Rock 'n Play shipped directly to her daughter in Delaware.

---

[52] Another "major design issue" identified by the CPSC was the tendency for the inclined sleepers to develop mold.  *Id.* at 16965-66.

[53] Consumer Reports Investigation Article.

61.     Ms. Drover believed that the Rock 'n Play she purchased would be safe and helpful to her daughter, Ms. Drover-Mundy.

62.     L.M. was born on June 30, 2018.  On September 25, 2018, while at her home in Selbyville, Delaware, Ms. Drover-Mundy placed L.M. in the Rock 'n Play on her back while she prepared her other two children for bed.

63.     L.M. was swaddled before being placed in the product.  She had not previously been able to roll over completely on a flat surface.

64.     After only about ten minutes, Ms. Drover-Mundy returned to check on L.M. to discover that she was face down in the Rock 'n Play.  L.M. was non-responsive.

65.     Ms. Drover-Mundy and her husband, Mr. Mundy, immediately contacted paramedics.  Neither their attempts to revive L.M. nor those of the arriving paramedics were successful.

66.     L.M. was rushed to the hospital, where she was later pronounced dead.  At the time of her death L.M. was not quite three months old.

67.     The Rock 'n Play's defective design caused L.M. to be unable to breathe while lying in the product, leading to her death.

68.     L.M.'s death not only ended her life, but utterly devastated her parents.  Her death could have been prevented had the Rock 'n Play not been designed in an unsafe fashion or had been taken off the market earlier.

### I.     April 2019 Warning and Recall

69.     On April 5, 2019, the CPSC, in conjunction with Fisher-Price, issued a warning to consumers regarding the safety of the Rock 'n Play.[54]  The CPSC stated that it was "aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained.  All 10 infants were 3 months or older."  In that warning the CPSC recommended that "consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities."

70.     This warning was inadequate and incorrect:  L.M. had died in a Rock 'n Play before she was three months old and despite the fact that she had not previously been able to roll over on a flat surface.

71.     Despite the April 5, 2019 warning urging parents to stop using the Rock 'n Play at three months or when their infants could roll over, Fisher-Price doubled down on its message that the Rock 'n Play was safe to use.[55]  Fisher-Price acknowledged that "[p]arents have trusted [them] for almost 90 years to provide safe products for their children."  However, without referring to the recommendations for safe infant sleep or requirements applicable to infant sleep devices under which the Rock 'n Play had previously been regulated, Fisher-Price stated only that "the Rock 'n Play Sleeper meets all applicable safety standards, including those of the international standards

---

[54] *CPSC ALERT: CPSC and Fisher-Price Warn Customers About Fisher-Price Rock 'N Play Due to Reports of Death When Infants Roll Over in the Product* (Apr. 5, 2019), https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last accessed Apr. 18, 2019).

[55] Wayback Machine Archive of Fisher-Price Safety Statement (Apr. 7, 2019), https://web.archive.org/web/20190407101800/https://fisher-pricesafety.com/ (last accessed Apr. 18, 2019).

organization, known as ASTM International, and is certified by the Juvenile Products Manufacturing Association (JPMA)."[56]

72.    On April 8, 2019, Consumer Reports published an article entitled *Fisher-Price Rock 'n Play Sleeper Should Be Recalled, Consumer Reports Says*.[57]   Consumer Reports stated that Fisher-Price had confirmed that the Rock 'n Play was, in fact, "tied to at least 32 infant deaths." Consumer Reports' investigation further revealed "deaths of babies even younger than the 3-month threshold cited in the [CPSC and Fisher-Price] April 5 warning, and go beyond the risk of rollover."   Consumer Reports identified several infants below the three-month threshold – like L.M. – that had died related to injuries from the Rock 'n Play.  Consumer Reports identified infants as young as nine days old that had died where the Rock 'n Play was involved.

73.    The next day, April 9, 2019, the AAP called for a recall of all Rock 'n Plays and "urge[d] parents to stop using the product immediately," calling the product "deadly" and citing its inherent dangers and its failure to meet the AAP's recommendations for safe sleep products.[58] The President of the AAP stated:

> When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies.[59]

---

[56] *Id*.

[57] Consumer Reports Investigation Article.

[58] *AAP Urges U.S. Consumer Product Safety Commission to Recall Fisher-Price Rock 'n Play Sleeper* (Apr. 9, 2019), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last accessed Apr. 18, 2019).

[59] *Id*.

74.     On April 12, 2019, Senator Richard Blumenthal wrote to the CPSC, requesting that further action be taken and that it immediately recall all Rock 'n Plays.[60]  Senator Blumenthal referenced the American Academy of Pediatrics' stance on the Rock 'n Play and stated that, "[i]n their current form, these products are inherently unsafe and swift action must be taken to prevent additional tragedies."

75.     Later, on April 12, 2019, Fisher-Price announced a recall of "All Models of Rock 'n Play Sleeper," admitting that infant fatalities had occurred in the Rock 'n Play.[61]  This recall applied to all Rock 'n Plays – about 4.7 million products.  The CPSC recall page stated that "[c]onsumers should immediately stop using the product" and that "over 30 infant fatalities have occurred in Rock 'n Play Sleepers."

76.     In recalling the Rock 'n Play, Fisher-Price is not offering full refunds to the vast majority of Rock 'n Play purchasers and owners.[62]  Nor have Fisher-Price and Mattel addressed how they will educate the public regarding the dangers of the Rock 'n Play or how they intend to keep the Rock 'n Play off of the secondary market.

**J.     Class Allegations**

77.     Plaintiffs bring this action, pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of the following class ("Class"):

> **The Consumer Class**
> All persons in the United States and its territories who purchased or received a defective Rock 'n Play manufactured and/or sold by a Defendant.

---

[60] Letter from Senator Rosental to The Honorable Ann Marie Buerkle of the CPSC (Apr. 12, 2019), https://twitter.com/SenBlumenthal/status/1116835122244923393 (last accessed Apr. 18, 2019).

[61] CPSC Recall Statement.

[62] Fisher-Price Rock 'n Play Sleeper Recall, https://service.mattel.com/us/recall/BJD57_ivr.asp (last accessed Apr. 18, 2019).

78.     Plaintiffs bring this action, pursuant to Rule 23(b)(2) and (c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of the following Subclass ("Subclass"):

> **The Injury Subclass**
> All children in the United States and its territories who experienced injury and/or death as a result of the defective design of a Rock 'n Play manufactured and/or sold by a Defendant, and the parents of such children, individually and on their behalves.

79.     Excluded from the Class and Subclass are Defendants, and any entities in which any Defendant or Defendants' subsidiaries or affiliates have a controlling interest, and Defendants' officers, agents, and employees.  Also excluded from the Class and Subclass are judges and court personnel in this case, and any member of their immediate families.

80.     Plaintiff reserves the right to expand, limit, modify or amend the Class or Subclass definitions, and the right to introduce additional Subclasses as may be desirable or appropriate.

81.     This action satisfies the requirements set forth under Federal Rule of Civil Procedure 23 to proceed with class claims and/or to certify issue classes pursuant to Fed. R. Civ. P. 23(c)(4) on the issues of (1) the defective design of the Rock 'n Play and (2) Defendants' negligence or recklessness.

82.     **Numerosity and Ascertainability.  Fed. R. Civ. P. 23(a)(1).**  The members of the Class and Subclass are so numerous that the joinder of all members is impractical.  While the exact number of Class and Subclass members is unknown to Plaintiffs at this time, the Recall affected 4.7 million Rock 'n Plays.  Further, at least 32 infants have died while using the Rock 'n Play.[63] As of 2016, more than 150 infants had suffered from other injuries from infant inclined sleep products like the Rock 'n Play.[64]

---

[63] Consumer Reports Investigation Article.

[64] *See* Notice of Proposed Rulemaking, Safety Standard for Infant Inclined Sleep Products, 82 Fed. Reg. 16963, 16965 (Apr. 7, 2017).

83.     **Commonality and Predominance.  Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).**  In this action, common issues of law and fact relating to the defectiveness of the Rock 'n Play, as well as Defendants' knowledge, conduct and duty in Defendants' formulations, designs, manufacture, research, testing, promotion, marketing, warnings, and sales regarding Rock 'n Plays predominate over any issues affecting only individual Class or Subclass members.

84.     **Typicality.  Fed. R. Civ. P. 23(a)(3).**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class members, were injured through Defendants' defectively designed product and related misconduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members.  Plaintiffs' claims and those of other Class members arise from the same operative facts and are based on the same legal theories.

85.     **Adequacy.  Fed. R. Civ. P. 23(a)(4).**  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs' interests do not conflict with the interests of the Class members.   Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, generally, and consumer protection litigation, specifically. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class.

86.     **Superiority of Class Action.  Fed. R. Civ. P. 23(b)(3).**   Defendants' actions are generally applicable to the entire Class and Subclass, thereby making relief appropriate with respect to the Class and Subclass as a whole.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all the members of the class is impracticable.  Furthermore, the prosecution of separate actions by individual Class and Subclass members would create the risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for Defendants.  There will be no difficulty in the management of this action as a class action.

87. **Classwide Equitable Relief.   Fed. R. Civ. P. 23(b)(2).**   The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for Defendants.   Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class and Subclass members and otherwise impair their interests.   Defendants have acted and/or refused to act on grounds generally applicable to the Class and Subclass, making final injunctive relief and/or corresponding declaratory relief appropriate.

88. **Issue Certification.  Fed. R. Civ. P. 23(c)(4).**  The Court is further empowered to determine the issues of (1) the existence of a design defect and (2) Defendants' negligence or recklessness pursuant to Federal Rule of Civil Procedure 23(c)(4).

**FIRST CAUSE OF ACTION**
**IMPLIED WARRANTY OF MERCHANTABILITY**
**(as to All Defendants on behalf of All Classes)**

89. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

90. Delaware's Uniform Commercial Code ("UCC") requires that for transactions in goods, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  6 Del. C. § 2–314.  For goods to be "merchantable" it is required, at minimum, that the goods "are fit for the ordinary purposes for which such goods are used."  *Id.*  The form of the UCC adopted in most states includes the same requirement.

91. Defendants are all merchants of infant-related products, including the Rock 'n Play.

92.     The Rock 'n Play was not fit for unsupervised infant sleep or use due to its incline, soft padding, and shape.

93.     The defective design of the Rock 'n Play proximately caused hundreds of infants to be injured and dozens of infants to die, including Plaintiffs' infant child, L.M., and the infant children of the Injured Class.

94.     Further, the Consumer Class paid for non-merchantable goods that they would not have purchased had they known that the Rock 'n Play was in fact not safe for the ordinary purposes for which it was used:  unsupervised infant sleep or use.

95.     As a result of Defendants' breach of the implied warranty of merchantability, the Consumer Class was injured because the members of the Consumer Class paid up to $149 for each Rock 'n Play while the Rock 'n Play in reality had no value due to its defective design and unfitness for its purpose.

## SECOND CAUSE OF ACTION
## NEGLIGENT PRODUCT DESIGN
### (as to All Defendants on behalf of All Classes)

96.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

97.     As manufacturers, distributors and sellers, Fisher-Price and Mattel have a duty to use reasonable care in designing their product so that it is safe when used in the manner intended, as well as any reasonably foreseeable use.

98.     As a distributor and seller, Amazon is subject to the same duty.

99.     The Rock 'n Play was sold as a device in which infants could safely lie and sleep. However, the Rock 'n Play was not safe for that intended use.

100.    Instead, because of the defective design of the Rock 'n Play, including the Rock 'n Play's incline, soft cushion, and seat shape, hundreds of infants have been injured and dozens have died while the Rock 'n Play was used for its intended and marketed purpose.

101.    Defendants failed to exercise reasonable care in ensuring that the design of the Rock 'n Play was free from defects and was safe for infants to lay and sleep in.  Defendants' negligent acts include failure to ensure that the design of the Rock 'n Play conformed to AAP standards or to modify or discontinue the product upon receiving reports of injuries to, and deaths of, infants in the product.

102.    The Consumer Class has been harmed by the same negligent design, in that its members were induced to purchase a product unfit for its intended use and therefore without value.

**THIRD CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(as to Fisher-Price and Mattel on behalf of All Classes)**

103.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

104.    Fisher-Price and Mattel, through their marketing materials and website and the packaging of the Rock 'n Play, consistently represented to the public throughout the period they were selling the product that it was a product safe for unsupervised infants to lie and sleep in.

105.    Plaintiffs relied on Fisher-Price and Mattel's misrepresentations in purchasing and using the Rock 'n Play product.

106.    At the time of sale of each Rock 'n Play, Fisher-Price and Mattel should have known that these representations about the safety of the Rock 'n Play product were false.

107.    Fisher-Price and Mattel's representations that the Rock 'n Play was safe were material to the purchasing decisions of Plaintiffs and the consuming public.

108.    Fisher-Price and Mattel failed to exercise reasonable care or competence in communicating information regarding the safety of the Rock 'n Play for infants.

109.    These misrepresentations were made uniformly to the consuming public, including the members of the Consumer Class and the Injured Class.  Plaintiffs, and members of the Consumer Class and the Injured Class similarly situated to Plaintiffs, relied on Defendants' representations that the Rock 'n Play was safe for unsupervised infant sleep and use, and would not have purchased a Rock 'n Play had Fisher-Price and Mattel not represented that it was a safe product for infant children.

110.    As a result of Defendants' negligent misrepresentations that the Rock 'n Play was safe for unsupervised infant use and sleep despite ample evidence to the contrary, hundreds of infants have been injured and dozens have died, including L.M. and the infant children of the Injured Class.

111.    The Consumer Class has been harmed by the same negligent misrepresentations, in that its members were induced to purchase a product unfit for its intended use and therefore without value.

## FOURTH CAUSE OF ACTION
### FRAUD
**(as to Fisher-Price and Mattel on behalf of All Classes)**

112.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

113.    As alleged above, Fisher-Price and Mattel, through their marketing materials, targeted advertising, and website, and the packaging of the Rock 'n Play, consistently and falsely represented to the public throughout the period they were selling the product – at least October 2009 through April 12, 2019 – that it was a product safe for infants to lie and sleep in.  Fisher-

Price and Mattel made these representations knowing that they were false or with reckless indifference to the truth.  These misrepresentations include without limitation:

- Selling the Rock 'n Play as a "sleeper";

- Advertising the product as safe for unsupervised sleep;

- Advertising the product as safe for overnight sleep;

- Advertising the design of the product as conducive to safe sleep, including the incline, seated shape, and soft backing;

- Stating that the product was safe for use from birth until the child is able to grasp the side of the Rock 'n Play and pull upward or sit unassisted;

- Advertising the product as safe for use up to a twenty-five-pound weight limit; and

- Stating that product is not a sitting device that falls under the AAP's safe sleep recommendations.

114.    In addition, as alleged above, Fisher-Price and Mattel, through their marketing materials, targeted advertising, and website, and the packaging of the Rock 'n Play, consistently and falsely omitted material information to the public throughout the period they were selling the Rock 'n Play – at least October 2009 through April 12, 2019.  Fisher-Price and Mattel made these material omissions knowing that the information presented was incomplete and with reckless indifference to the truth.  These material omissions include without limitation Fisher-Price's and Mattel's failure to inform buyers and users:

- That the Rock 'n Play did not conform to safe sleep standards;

- That the Rock 'n Play's inclined sleep design did not conform with accepted sleep practices;

- That the Rock 'n Play's seated design did not conform with accepted sleep practices;

- That the Rock 'n Play's padded backing did not conform with accepted sleep practices;

- That the Rock 'n Play initially fell under the same standards as federally regulated bassinets and cradles but was subsequently excluded from those regulations;

- That the "applicable" standards to which the Rock 'n Play's advertisements, marketing materials, and product packaging referred were voluntary standards that the engineers of the Rock 'n Play participated in setting;

- That the standards to which the Rock 'n Play advertisements, marketing materials, and packaging referred were not federal regulations;

- The number and types of injuries that occurred in the Rock 'n Play or in inclined sleepers like the Rock 'n Play;

- The number of deaths that occurred in the Rock 'n Play or in inclined sleepers like the Rock 'n Play;

- That the Rock 'n Play was not allowed to be called a sleeper in Canada;

- That the Rock 'n Play was excluded from the market entirely in Australia; and

- That the Rock 'n Play was not safe for infant sleep or use.

115.    Fisher-Price and Mattel made these false statements and material omissions intending that the consuming public would rely on them in purchasing and using the Rock 'n Play product.

116.    These false statements and material omissions were made uniformly to the consuming public, including the members of the Consumer Class and the Injured Class. Plaintiffs,

and members of the Consumer Class and the Injured Class similarly situated to Plaintiffs, relied on Fisher-Price's and Mattel's misrepresentations and omissions regarding the Rock 'n Play, including misrepresentations that the product was safe for unsupervised infant sleep and use, and would not have purchased a Rock 'n Play had Fisher-Price and Mattel not represented that it was a safe product for infant children.

117.    As a result of Fisher-Price's and Mattel's material misrepresentations and material omissions regarding the Rock 'n Play, hundreds of infants have been injured and dozens have died, including L.M. and the infant children of the Injured Class.

118.    The Consumer Class has been harmed by the same false statements and material omissions, in that its members were induced to purchase a product unfit for its intended use and therefore without value.

**FIFTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(as to Fisher-Price and Mattel on behalf of All Classes)**

119.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

120.    Fisher-Price and Mattel have a duty to consumers and the infant users of the Rock 'n Play to provide material facts regarding the dangers of the Rock 'n Play and the product's unsuitability for its intended use: for infants to sleep and lie in it.

121.    Fisher-Price and Mattel were aware that the Rock 'n Play did not meet recommended international or pediatric safe sleep standards when it went to market, and later, that actual injury had resulted from the use of the product.

122.    Nevertheless, Fisher-Price and Mattel, through their marketing materials, targeted advertising, and website, and the packaging of the Rock 'n Play, consistently represented to the

public throughout the period they were selling the Rock 'n Play – approximately October 2009 through April 12, 2019 – that it was a product safe for infants to lie and sleep in.  In these representations, Fisher-Price and Mattel deliberately and knowingly concealed material facts relating to safety standards concerning infant sleep and actual injury that had occurred from the use of the product.  These concealed material facts included:

- That the Rock 'n Play did not conform to safe sleep standards;

- That the Rock 'n Play's inclined sleep design did not conform with accepted sleep practices;

- That the Rock 'n Play's seated design did not conform with accepted sleep practices;

- That the Rock 'n Play's padded backing did not conform with accepted sleep practices;

- That the Rock 'n Play initially fell under the same standards as federally regulated bassinets and cradles but was subsequently excluded from those regulations;

- That the "applicable" standards to which the Rock 'n Play's advertisements, marketing materials, and product packaging referred were voluntary standards that the engineers of the Rock 'n Play participated in setting;

- That the standards to which the Rock 'n Play advertisements, marketing materials, and packaging referred were not federal regulations;

- The number and types of injuries that occurred in the Rock 'n Play or inclined sleepers like the Rock 'n Play;

- The number of deaths that occurred in the Rock 'n Play and in inclined sleepers like the Rock 'n Play;

- That due to the design of the Rock 'n Play, it was not allowed to be called a sleeper in Canada;

- That the Rock 'n Play was excluded from the market entirely in Australia; and

- That the Rock 'n Play was not safe for infant sleep or use.

123.    Fisher-Price and Mattel deliberately concealed these material facts in their representations, intending that the consuming public would rely on them in purchasing and using the Rock 'n Play.

124.    Fisher-Price's and Mattel's concealment of these material facts was uniform toward the consuming public, including the members of the Consumer Class and the Injured Class. Plaintiffs, and members of the Consumer Class and the Injured Class similarly situated to Plaintiffs, relied on Fisher-Price's and Mattel's representations that the Rock 'n Play was safe for unsupervised infant sleep and use, and would not have purchased a Rock 'n Play had Fisher-Price and Mattel not represented that it was a safe product for infant children.

125.    As a result of Fisher-Price's and Mattel's deliberate concealment and silence regarding material facts of the dangers of the Rock 'n Play for unsupervised infant use and sleep despite ample evidence to the contrary, hundreds of infants have been injured and dozens have died, including L.M. and the infant children of the Injured Class.

126.    The Consumer Class has been harmed by the same deliberate concealment and silence regarding material facts, in that its members were induced to purchase a product unfit for its intended use and therefore without value.

127.    As a function of Fisher-Price and Mattel's deliberate concealment and silence regarding the dangers of the Rock 'n Play, the Consumer Class did not discover the truth regarding

the dangers of the Rock 'n Play until at least April 5, 2019, when Fisher-Price and Consumer Reports issued a warning regarding the danger of the Rock 'n Play.

## SIXTH CAUSE OF ACTION
### FAILURE TO WARN
**(as to All Defendants on behalf of the Injured Class)**

128.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

129.     Defendants owed a duty to warn consumers about the risks of the Rock 'n Play because they knew or should have known that the product involved risk of harm when used for its intended purpose.

130.     Defendants were, or should have been, aware that the Rock 'n Play was dangerous and not suitable for unsupervised infant sleep or use, the Rock 'n Play's intended and advertised purpose.

131.     Defendants knew or should have known that consumers would reasonably rely on Defendants to warn them of the dangers posed by the Rock 'n Play.  Indeed, Fisher-Price has acknowledged that consumers rely on the company for safe children's products.

132.     The Rock 'n Play's dangerous nature is not open and obvious to consumers.

133.     Despite knowing of the Rock 'n Play's inherent dangers and defective design, Defendants continued to manufacture and/or sell the Rock 'n Play without adequate warning regarding the risks associated with it.

134.     Defendants never provided any warning to consumers regarding the risk of death or injuries such as torticollis and plagiocephaly.

135.    As a proximate result of Defendants' failure to provide adequate warnings to consumers regarding the defective design of the Rock 'n Play, dozens of children have died, including L.M., and hundreds were injured.

## SEVENTH CAUSE OF ACTION
### LOSS OF FILIAL CONSORTIUM
**(as to All Defendants by Samantha Drover-Mundy and Zachary Mundy)**

136.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

137.    As a result of the death of their daughter L.M., Samantha Drover-Mundy and Zachary Mundy have suffered and will continue to suffer the loss of consortium, care, familial relationship, companionship, services, income, and comfort from L.M.

138.    L.M.'s death occurred as a proximate result of Defendants' design and/or sale of the Rock 'n Play and the negligent and reckless breaches of duties by Defendants described herein.

## EIGHTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(as to All Defendants on behalf of the Injured Class)**

139.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

140.    Defendants sold the Rock 'n Play as a "sleeper," and with advertising and labeling that stated that the Rock 'n Play was safe for prolonged and overnight unsupervised infant use and sleep.  Therefore, Defendants sold the Rock 'n Play with the express warranty that it was safe for infant sleep and use, including unsupervised sleep, and free from defects.

141.    At the time of sale or lease of each Rock 'n Play, Defendants knew, should have known, or were reckless in not knowing, of the Rock 'n Play's defective nature and unsafe environment for infant sleep and use.  Nonetheless, until April 5, 2019, Defendants provided no

warning regarding the danger the Rock 'n Play posed to infants over the age of three months or that had shown the ability to roll over, and until April 12, 2019, Defendants continued to manufacture, market, advertise, distribute, and sell the Rock 'n Play to consumers.

142.    As a result of Defendants' breach of warranty, hundreds of infants have been injured and dozens have died, including the infant child of the named Plaintiffs and the infant children of the Injured Class.

143.    Further, the Consumer Class paid for falsely labeled products that they would not have purchased had they known about the breach of the express warranty that the Rock 'n Play was in fact not safe for prolonged and overnight unsupervised sleep and use.  As a result of Defendants' breach of the express warranty, the members of the Consumer Class were induced to purchase a product unfit for its intended use and therefore without value.

## NINTH CAUSE OF ACTION
### NEGLIGENCE
### (as to All Defendants on behalf of the Injured Class)

144.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

145.    Defendants were negligent in the designing, manufacturing, labeling, packaging, distribution, and sale of the Rock 'n Play.  Specifically, Fisher-Price and Mattel, as manufacturers have a duty to exercise ordinary care and safely design, package, and advertise their products for consumers.  Amazon also has a duty to exercise ordinary care in the promotion and sale of products to customers.

146.    Defendants breached their duties by creating a dangerous condition and/or allowing a dangerous condition to exist in permitting the Rock 'n Play to be manufactured and sold with its

defective design unsafe for infant use.  Defendants negligently allowed the defective Rock 'n Play to be purchased and used by their customers in its defective condition.

147.    As a result of Defendants' negligence, the Rock 'n Play's defective design caused severe injuries and/or death to the Injured Class, including named Plaintiff's infant daughter, L.M.

148.    Defendants and their employees, representatives, and agents knew or should have known of the potential dangers that the Rock 'n Play posed to their purchasers and/or users. Defendants knew of safe sleep standards promulgated domestically and internationally, knew of the dangers that sleeping on inclined sleep surfaces and in sitting positions posed for vulnerable infants, and knew of widespread actual injuries reported due to the use of the Rock 'n Play almost as soon as Defendants started selling the product.

149.    As a result of Defendants' negligence, hundreds of infants have been injured and dozens have died, including the infant child of the named Plaintiffs and the infant children of the Injured Class.

150.    The Consumer Class has been harmed by the same acts of negligence, in that its members were induced to purchase a product unfit for its intended use and therefore without value.

### TENTH CAUSE OF ACTION
### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### (as to All Defendants on behalf of the Consumer Class)

151.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

152.    Defendants' marketing materials, advertisements, product guides, and other materials misrepresented the Rock 'n Play's compliance with safe infant sleep standards and the nature of the Rock 'n Play as safe for infant use and sleep, in violation of the Delaware Consumer

Fraud Act, Del. Cod. Ann. Tit 6 § 2522, which prohibits unfair or deceptive merchandising practices in the conduct of any trade or commerce.

153.    Defendants also omitted material facts, including the facts that the Rock 'n Play did not comply with AAP safe sleep guidance, did not comply with certain international standards, was not subject to regulations applicable to cribs, bassinets, or cradles, and was not safe for unsupervised infant sleep or use, with the intent that their customers, end-users, and others would rely upon such concealment or omission in connection with the sale of the Rock 'n Play.

154.    Defendants disseminated these misrepresentations to and throughout the state of Delaware.

155.    As a result of these false, written, affirmative misstatements of material fact, Plaintiffs and each Consumer Class member has suffered ascertainable loss.  The Rock 'n Play was unsafe and therefore valueless.

**ELEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(as to All Defendants on behalf of the Consumer Class)**

156.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

157.    The members of the Consumer Class, including Plaintiff Rebecca Drover, paid Defendants in purchasing the Rock 'n Play, and Defendants have knowingly and willingly accepted and enjoyed these benefits.

158.    Defendants should not be able to retain the benefit of the funds paid because the members of the Consumer Class rendered payment with the expectation that the Rock 'n Play would be as represented and warranted – a safe product for infant sleep and use.

159.    Defendants made deliberate misrepresentations and omissions regarding the actual dangers of the Rock 'n Play, including that the Rock 'n Play was safe for infant sleep.  Through those misrepresentations and omissions, the members of the Consumer Class purchased the Rock 'n Play to Defendants' profit.

160.    Equity dictates that Defendants' ill-gotten gains be disgorged, and that the members of the Consumer Class, including Plaintiff Rebecca Drover, are entitled to restitution.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(as to All Defendants on behalf of the Consumer Class)**

161.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

162.    The sale of the Rock 'n Play was subject to the Magnuson Moss Warranty Act 15 U.S.C. § 2301, et seq.

163.    The Rock 'n Play is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1) et seq., because it is tangible personal property distributed in commerce and normally used for family or household purposes.

164.    All members of the Consumer Class, including the named Plaintiffs are "consumers" under 15 U.S.C. § 2301(3) because they are either buyers of the Rock 'n Play or persons to whom the Rock 'n Play was transferred (for example as a gift) during the duration of the implied and express warranties made regarding the Rock 'n Play.

165.    Defendants are "suppliers" and "warrantors" under 15 U.S.C. § 2301(4)-(5). Defendants were engaged in the business of making the Rock 'n Play available to consumers and sold the Rock 'n Play with express and implied warranties.

166.    Defendants made "written warranties" to consumers of the Rock 'n Play under 15 U.S.C. § 2301(6), through Defendants' written affirmations of fact and written promises regarding the Rock 'n Play's level of performance and nature of the product.   Specifically, Defendants represented in advertisements, online listings, and on the product packaging itself that the Rock 'n Play was safe for infant sleep and use.   These written affirmations formed the basis of the bargain between Defendants and the members of the Consumer Class.

167.    Defendants further made "implied warranties" to consumers of the Rock 'n Play under 15 U.S.C. § 2301(7) in that Defendants sold the Rock 'n Play as a "sleeper" that complied with applicable standards, indicating that the product was safe for unsupervised infant sleep.

168.    Defendants breached these warranties because the Rock 'n Play did not meet the affirmations, promises, and assertions made by Defendants regarding the Rock 'n Play.  The Rock 'n Play was, in fact, not safe for use by infants for the ordinary purpose for which it was used.

169.    Although Fisher-Price has recalled the Rock 'n Play, the refunds or gift cards offered to consumers of the Rock 'n Play do not make the consumer whole in the full amount paid by each consumer.

170.    The Rock 'n Play sold for between $40 and $149.   Therefore, the amount in controversy exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3) because each member of the Consumer Class's claim is equal to or larger than $25.   Further, Defendants have sold around 4.7 million Rock 'n Plays.   Thus, the cumulative amount in controversy excluding interest and costs exceeds $50,000.

171.    As a result of Defendants' violations of the Magnuson Moss Warranty Act, including the written and implied warranties Defendants made to consumers of the Rock n' Play,

the named Plaintiffs and all members of the Consumer Class have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

A. That the Court certify the proposed Classes;

B. That the Court appoint named Plaintiffs as Class representatives and their undersigned counsel as Class counsel;

C. That the Court award Plaintiffs damages in an amount to be determined at trial;

D. That the Court award the Consumer Class damages in an amount to be determined at trial;

E. That the Court award Plaintiffs punitive damages to the extent permitted by law;

F. That the Court award declaratory relief as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of their conduct;

G. That the Court award injunctive relief precluding any further sale of the Rock 'n Play;

H. That the Court require Fisher-Price and Mattel to review and improve their design practices to confirm that all of their products marketed as sleeping devices comply with accepted safe sleep practices, as set forth by the AAP;

I. That the Court order Defendants to engage in corrective advertising regarding the dangerous and defective nature of the Rock 'n Play;

J. That the Court order Defendants to provide and/or fund safe infant sleep awareness and education programs;

K. That the Court award restitution;

L. That the Court award pre-judgment and post-judgment interest;

M.  That the Court award attorneys' fees and costs; and

N.  That the Court grant such other and further relief as the Court deems just and proper

under federal and state law.

## **JURY DEMAND**

Plaintiffs demand a jury trial as to all issues so triable.

Dated: April 18, 2019

Respectfully submitted,

_/s/_     _Andrew J. Lorin_                    
Andrew J. Lorin
Jonathan A. Sorkowitz (admission to the bar of this
    Court to be requested)
Kristin Darr (admission to the bar of this Court to
    be requested)
Melody McGowin (admission to the bar of this
    Court to be requested)
PIERCE BAINBRIDGE BECK PRICE &
HECHT LLP
277 Park Avenue, 45th Floor
New York, NY 10172
Tel.: (212) 484-9866