UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 1:19-md-2903 Hon. Geoffrey W. Crawford This Document Relates to: ALL CASES |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, Elizabeth Alfaro, Emily Barton, Linda Black, Luke Cuddy, Rebecca Drover, Megan Fieker, Karen Flores, Nancy Hanson, Jena Huey, Samantha Jacoby, Megan Kaden, Candace Kimmel, Kerry Mandley, Cassandra Mulvey, Joshua Nadel, Melanie Nilius Nowlin, Daniel Pasternacki, Brianna Persons, Jessie Poppe, Katharine Shaffer, Emily Simmonds, Josie Willis and Renee Wray ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against defendants Fisher-Price, Inc. ("Fisher-Price") and its corporate parent Mattel, Inc. ("Mattel") (collectively, "Defendants"), and allege as follows upon personal knowledge as to matters relating to themselves and their own acts, and upon information and belief based upon the investigation by their undersigned counsel as to all other matters.

## NATURE OF THE ACTION

1.      The Fisher-Price Rock 'n Play Sleeper ("Rock 'n Play Sleeper") is an inclined infant "sleeper" that Defendants, until they were forced to recall it on April 12, 2019, marketed and sold for ten years as suitable for safe infant sleep, including prolonged and overnight sleep. As set forth below, inclined sleepers, including the Rock 'n Play Sleeper, are unsuitable for infant sleep and, in fact, are dangerous.

2.      Defendants' marketing of this product as safe for infant sleep, including prolonged and overnight sleep, was intentional and overt.  Not only is "Sleeper" in the name of

the product, but the boxes in which the Rock 'n Play Sleepers were sold, and other materials used to promote them, prominently exclaim, "Baby can sleep at a comfortable incline all night long!" and make similar statements about its fitness for nighttime sleep. This marketing was dangerously false and misleading, as the product is not safe for sleep, including prolonged or overnight sleep.

3. The Rock 'n Play Sleeper is inherently unsafe as a sleeper and unfit for its intended use. It poses a number of serious safety risks that led to many documented infant deaths and injuries. By positioning an infant at a 30-degree incline, the Rock 'n Play Sleeper significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face to become pressed against the padded fabric in the sleeper and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation. Moreover, the design of the sleepers can lull infants into a deeper sleep than normal sleep, making them less able to wake up if their airflow becomes obstructed. In addition, because Defendants advise parents to keep babies strapped in restraints overnight while sleeping on an incline, the Rock 'n Play Sleeper increases the infant's risk of developing flat head (plagiocephaly) and twisted neck (torticollis) syndromes, conditions that often require babies to wear expensive head-molding helmets and undergo costly physical therapy.

4. Defendants knew about these risks for as long as they sold the Rock 'n Play Sleeper. Among other things: (1) since long before the product was introduced to the market in 2009, the American Academy of Pediatrics ("AAP") and major consumer groups repeatedly issued warnings about the serious dangers of inclined sleepers; (2) due to these known dangers, in 2011, regulators in Canada and Australia did not allow Defendants to sell the Rock 'n Play

Sleeper in their countries as a "sleeper"; (3) Defendants were sued for at least one infant death in a Rock 'n Play Sleeper and for product liability after an infant stopped breathing in the product; (4) according to Defendants, at least 32 babies have been reported to have died using the Rock 'n Play Sleeper; and (5) over 700 injuries have been reported due to the use of inclined sleepers, including the Rock 'n Play Sleeper.  Ignoring these documented safety concerns, Defendants knowingly marketed and sold the Rock 'n Play Sleeper in the United States as an infant sleeper suitable for infant sleep, including prolonged or overnight sleep.

5.      In fact, as set forth below, the Rock 'n Play Sleeper is so inherently dangerous and has caused so many infant deaths that, on April 12, 2019, Defendants, after making an incomplete disclosure on April 5, 2019, were forced to recall approximately 4.7 million Rock 'n Play Sleepers in the United States and cease selling the product. The 4.7 million recalled Rock 'n Play Sleepers represent approximately one for every eight babies born in the United States during the period in which the product was sold.[1]

6.      On April 5, 2019, the Consumer Product Safety Commission ("CPSC") and Fisher-Price issued a statement acknowledging that ten infants had died while in the Rock 'n Play Sleeper since 2015, and recommended and warned consumers to stop using the Rock 'n Play Sleeper once the infant reaches three months of age or as soon as the infant exhibits rollover capabilities.[2]  The news release stated, in relevant part:

> The Consumer Product Safety Commission (CPSC) and Fisher-Price warn consumers about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product.  According to medical literature, infants typically begin rollover behaviors at 3 months.  **The CPSC is**

---

[1] https://www.newyorker.com/culture/culture-desk/the-life-and-death-of-a-wildly-popular-baby-sleeper (last visited October 21, 2019).

[2] https://cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited April 10, 2019).

*aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015*, after the infants rolled from their back to their stomach or side, while unrestrained. ***All 10 infants were 3 months or older.***

***Because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities.*** CPSC has previously warned consumers to use restraints in infant inclined sleep products.

Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint.

CPSC and Fisher-Price remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper:  Never add blankets, pillows, stuffed toys, or other items to the environment and always place infants to sleep on their backs.

The Commission voted to publish a finding that the health and safety of the public requires immediate notice.

(Emphasis added).

7.      Mattel issued a press release later in the day on April 5, 2019,[3] shortly after the

joint CPSC/Fisher-Price announcement, which stated in relevant part:

A child fatality is an unimaginable tragedy.

Fisher-Price has a long, proud tradition of ***prioritizing safety as the cornerstone of our mission***.  Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously.

Today, the Consumer Product Safety Commission (CPSC) and Fisher-Price have jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over. ***To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all safety warnings included with the product: always use the provided restraints, always place infants on their backs to***

---

[3] https://news.mattel.com/news/media-statement-on-the-u-s-consumer-product-safety-commission-fisher-priceR-joint-security-alert-released-on-april-5-2019 (last visited April 10, 2019).

> ***sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper. The Rock 'n Play Sleeper meets all applicable safety standards,*** including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association (JPMA).
>
> Fisher-Price and every one of our employees take the responsibility of being part of your family seriously, and we are committed to earning that trust every day.

(Emphasis added).

8.      Despite admitting that ten babies died from the use of Defendants' product and issuing a warning to consumers, Chuck Scothon, General Manager of Fisher-Price, like Mattel, asserted on April 5, 2019, that the Rock 'n Play Sleeper meets all applicable safety standards.[4]

9.      On April 8, 2019, Consumer Reports published a lengthy article entitled *Fisher-Price Rock 'n Play Sleeper Should be Recalled, Consumer Reports Says*.[5]   The article describes the results of Consumer Reports' investigation, which found the Rock 'n Play Sleeper was tied to at least 32 infant deaths.   Consumer Reports noted that the Rock 'n Play Sleeper "has not been recalled by Fisher-Price, part of the children's products giant Mattel, which had about $4.5 billion in sales in 2018.   The deaths prompted only warnings by the company and the CPSC, which does not have a mandatory safety standard for infant reclined sleep products."   The article further noted that "the number of incidents associated with the Rock 'n Play Sleeper, combined with long-standing expert medical advice that babies should sleep on firm, flat surfaces, raises serious safety concerns about the product."

---

[4] https://www.cnn.com/2019/04/05/health/fisher-price-rock-n-play-sleeper-warning/index.html (last visited April 10, 2019).

[5] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

10.     The next day, on April 9, 2019, the AAP issued a press release calling on the CPSC to recall the Rock 'n Play Sleeper and urging parents to stop using the Rock 'n Play Sleepers immediately,[6] stating in relevant part:

> AAP urges parents to stop using the product immediately. Stores should remove the Rock 'n Play Sleeper from their shelves. ***A warning issued by the CPSC and Fisher-Price on April 5 did not go far enough to ensure safety and protect infants, according to the AAP.***
>
> "***This product is deadly and should be recalled immediately***," said Kyle Yasuda, MD, FAAP, president of the American Academy of Pediatrics. "***When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies***."
>
> Last week, the CPSC and manufacturer alerted consumers to stop using the product when the infant reaches 3 months of age or is capable of rolling over, citing 10 infant deaths that occurred in the Rock 'n Play. The Consumer Reports article, published April 8, tied a total of 32 deaths to the Rock 'n Play, including the 10 noted in last week's warning.
>
> ***Consumer Reports concluded that these 32 deaths, between 2011 and 2018, included babies even younger than the 3-month threshold cited in the initial warning, which is alarming.*** The cause of death listed for some babies was asphyxia, or the inability to breathe caused by the babies' position. ***AAP urges parents of children of all ages to immediately stop using the Rock 'n Play.***
>
> "We cannot put any more children's lives at risk by keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "***The Rock 'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby***. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding."

---

[6] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited April 10, 2019).

> The AAP does not recommend inclined sleep products like the Rock 'n Play, or any other products for sleep that require restraining a baby.

(Emphasis added).

11.     Consumer Reports' finding that babies younger than three months are also at risk in the Rock 'n Play Sleeper, and the AAP's exhortation that inclined sleepers which require restraining a baby (like the Rock 'n Play Sleeper) are not safe, puts lie to Defendants' April 5, 2019 announcement that the cause of the reported infant deaths was the fault of caregivers who used the Rock 'n Play Sleeper for infants older than three months and/or did not use restraints.

12.     Finally, on April 12, 2019, after the deaths of at least 32 infants were known to Defendants, hundreds more were injured, at least 4.7 million infants were exposed to risk of death and injury, and years after the most respected association of pediatricians in the United States, as well as a multitude of other sources, warned them of the risk, Defendants were forced to recall all Rock 'n Play Sleepers (the "Recall").  The title of the Recall notice is, "Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Deaths."[7]  The announcement states:

> ***Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances***.[8]

(Emphasis added).  It advises that "[c]onsumers should immediately stop using the product."

13.     The terms of the Recall are set forth on Defendants' websites, as follows:

- If the Fisher-Price Rock 'n Play Sleeper was originally purchased new - either by you or by a prior owner of the product - on or **after** 10/12/2018, you will receive a full cash refund.  If you include your original receipt you will be reimbursed for the receipt amount including sales taxes paid.  If you do not have your receipt, please write the month and year of purchase on one of the hubs you are returning, and we will determine the refund amount for you.

---

[7] https://www.cpsc.gov/Recalls/2019/Fisher-Price-Recalls-Rock-n-Play-Sleepers-Due-to-Reports-of-Deaths (last visited April 15, 2019).

[8] *Id.; see also* https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited October 20, 2019).

- If the Fisher-Price Rock 'n Play Sleeper was originally purchased new - either by you or by a prior owner of the product - **before** 10/12/2018, you will receive a voucher for a Fisher-Price product to be selected from a list of products to be provided by Fisher-Price.  Your product choice will be determined by the original date of purchase of the product.  To establish your date of purchase, please send in your original receipt if you have it.  If you do not have your receipt, please write the month and year of your purchase on one of the hubs you are returning.[9]

(Emphasis in original).

14.     Purchasers who qualify cannot redeem their refund until they "disassemble [their] Rock 'n Play Sleeper and return the two hubs" to Defendants. That means they must complete a form on Defendants' website and obtain a shipping label from them.  Then, they must not only take the product apart, but also package the bulky components and then bring them to the post office. And, if they purchased the product within the 10 year period covered by the Recall, and their child outgrew the product before the Recall, their ability to participate in the Recall depends on them having retained the product rather than discarding it.

15.     This is practically the opposite of how an effective recall should be designed.  As noted by a study prepared for the CPSC, "Response rates for recalls that require action on the part of the consumer must make every effort to minimize the physical effort, time, cost, and inconvenience required. Recall effectiveness is potentially reduced if postage, packaging (when materials are not available at home), and a trip to the post office are required."[10]

16.     Despite voluntarily recalling the deadly product on April 12, 2019, Chuck Scothon, general manager of Fisher-Price, again claimed that the product was safe, stating:

---

[9] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited October 20, 2019).

[10] https://www.cpsc.gov/s3fs-public/pdfs/foia_RecallEffectiveness.pdf,  at 25 (last visited October  21, 2019).

We stand by the safety of our products. However, due to reported incidents in which the product was used contrary to the safety warnings and instructions, we have decided to conduct a voluntary recall of the Rock 'n Play Sleeper in partnership with the Consumer Product Safety Commission."[11]

17.     Although Defendants, in that statement, attempt to blame all deaths and injuries on caregivers using the product improperly, the product can cause death and injury even when used exactly as instructed.  Thus, long before the Recall, the AAP and numerous consumer groups wrote to the CPSC expressing concern about a prior announcement that "makes it seem, incorrectly, that inclined sleep products are safe if used with restraints."[12]  As reported by Consumer Reports, "[t]he AAP … doesn't recommend for routine use sleeping devices that require the use of restraints because a baby could roll or turn into an unsafe position and be incapable of moving, leading to suffocation or strangulation."[13]

18.     Significantly, while Defendants' April 5, 2019 press release stated that there were ten infant deaths in the Rock 'n Play Sleeper since 2015 and warned that the product should not be used for infants older than three months, in the April 12, 2019 Recall, Defendants admitted that more than 30 babies had died in the Rock 'n Play Sleeper since 2009 and directed consumers to stop using the product for their babies regardless of how old they were.

19.     After the Recall, consumer advocates expressed concern that the Recall program was too restrictive and caused confusion.  A Washington Post article about the Recall quotes Rachel Weintraub, General Counsel of the Consumer Federation of America, as stating that the

---

[11] https://news.mattel.com/news/media-statement-on-the-fisher-priceR-rock-n-play-recall-notice-released-on-april-12-2019 (last visited April 16, 2019).

[12] https://advocacy.consumerreports.org/research/joint-letter-to-cpsc-chairman-on-infant-inclined-sleep-products/ (last visited October 20, 2019).

[13] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited October 20, 2019).

Recall is "problematic."[14] It also quotes the Executive Director of Kids in Danger, Nancy Cowles, as expressing concern that the sliding scale of reimbursement under the Recall will "discourage participation."[15]   Indeed, among other things, the Recall unfairly limits full reimbursement to parents who have only owned the product for six months or less; for that category of customers, provides for reimbursement of tax only if they or the original purchaser kept the receipt; and for parents who owned the product for six months or more, provides a voucher "for a Fisher-Price product to be selected from a list of products to be provided by Fisher Price," which "will be determined by the original date of purchase of the product."

20.     Consumer advocates continued to express outrage about the egregiousness of Defendants' wrongdoing.   An April 12, 2019 press release by Consumer Reports quotes its President and CEO, Marta Tellado, as stating, "The Fisher-Price recall of the Rock n' Play is long overdue. **Fisher-Price** and the CPSC **knew about deaths linked to this product for years and could have taken steps to avoid this unnecessary tragedy**."[16]   (Emphasis added).   The press release also quotes William Wallace, Senior Policy Analyst for Consumer Reports, as stating, "While we are glad to see all Rock 'n Play Sleepers recalled, **Fisher-Price and its parent company Mattel misled parents and caregivers by marketing this product as safe for sleep, and they owe it to their customers to give them full refunds, rather than partial refunds or company vouchers.   And that should be the case regardless of how long ago the product was**

---

[14] https://www.washingtonpost.com/business/2019/04/12/after-reports-infant-deaths-nearly-million-fisher-price-rock-n-play-sleepers-recalled/?utm_term=.e67e806b8aeb&wpisrc=nl_rainbow&wpmm=1 (last visited April 15, 2019).

[15] *Id.*

[16] https://advocacy.consumerreports.org/press_release/consumer-reports-recall-of-fisher-price-rock-n-play-sleeper-long-overdue-welcome/ (last visited April 18, 2019).

*bought*."[17] (Emphasis added.)  As Consumer Reports recognizes, Defendants cannot whitewash their unconscionable wrongdoing by issuing the Recall, which, moreover, not only treats owners inequitably but is designed to discourage participation.

21.     On October 16, 2019, the CPSC issued a Draft Supplemental Notice of Rulemaking with respect to inclined infant sleep products which "proposes to limit the seat back angle for sleep to 10 degrees or less, and to change the scope of the standard to cover products intended for infant sleep that are not already addressed by another standard."[18]  This would have the effect of banning the Rock 'n Play Sleeper because it places the infant to sleep at a 30 degree angle.   The Supplemental Notice of Rulemaking notes that 59 infant fatalities were reported to the CPSC in connection with inclined infant sleep products, a product category overwhelmingly dominated by the Rock 'n Play Sleeper.

22.     Had parents like Plaintiffs been aware of the potentially fatal dangers posed by the Rock 'n Play Sleeper, or the risk of serious injury, they would not have purchased or used the product.  Defendants' false and misleading marketing of this dangerous product, and knowing failure to disclose the grave risks of its use as a sleeper, including for overnight or prolonged sleep, allowed Defendants to reap vast profits at the expense of consumers who erroneously believed they were giving their babies a safe place to sleep.

23.     In this egregious case of corporate greed run amok, Plaintiffs, on behalf of themselves and a class of owners of at least 4.7 million Rock 'n Play Sleepers, seek damages and all other relief available under law and equity from Fisher-Price and its corporate parent Mattel,

---

[17] *Id.*

[18] https://www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf?TPVAJZEQcz9x9sKeEGltm4LskkonxUWv , at 1 of PDF (last visited October 23, 2019).

including punitive damages for their appalling and unconscionable misconduct.  Plaintiffs also seek classwide injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

## PARTIES

### PLAINTIFFS

### New York

#### *Elizabeth Alfaro*

24.     Plaintiff Elizabeth Alfaro is a citizen of Suffolk County in the State of New York.  In or about September 2017, Ms. Alfaro purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Alfaro was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Alfaro would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Alfaro did not receive a Recall notice from Defendants.

#### *Samantha Jacoby*

25.     Plaintiff Samantha Jacoby is a citizen of Essex County in the State of New Jersey. In or about July 2017, while a resident of the State of New York, she was gifted a Rock 'n Play Sleeper through her baby registry to use as a sleeper for her baby and used the product. Ms. Jacoby was induced to choose and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Jacoby would not have chosen or used the Rock 'n Play Sleeper had

she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Jacoby did not receive a Recall notice from Defendants.

*Cassandra Mulvey*

26.     Plaintiff Cassandra Mulvey is a citizen of Nassau County in the State of New York.  In or about July 2016, Ms. Mulvey was gifted a Rock 'n Play Sleeper through her baby registry to use as a sleeper for her baby and used the product. Ms. Mulvey was induced to choose and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infant sleep, including for prolonged periods or overnight. Ms. Mulvey would not have chosen, owned, or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Mulvey did not receive a Recall notice from Defendants.

*Jesse Poppe*

27.     Plaintiff Jesse Poppe is a citizen of Rockland County in the State of New York. In or about November 2012, Ms. Poppe was gifted a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Poppe was induced to accept and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight.  Ms. Poppe would not have accepted or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Poppe did not receive a Recall notice from Defendants.

## Arizona

### *Emily Barton*

28.     Plaintiff Emily Barton is a citizen of Coconino County in the State of Arizona. On or about April 9, 2017, Ms. Barton purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Barton was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Barton would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Barton did not receive a Recall notice from Defendants.

## Arkansas

### *Melanie Nilius Nowlin*

29.     Plaintiff Melanie Nilius Nowlin is a citizen of Conway County in the State of Arkansas.  In or about the latter half of 2016, Ms. Nowlin purchased a Rock 'n Play Sleeper to use as a sleeper for her infant child and used the product. Ms. Nowlin was induced to purchase and use the Rock 'n Play Sleeper by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Nowlin would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her child to the risk of injury and even death. Ms. Nowlin did not receive a Recall notice from Defendants.

**California**

*Karen Flores*

30.     Plaintiff Karen Flores is a citizen of Orange County in the State of California.  On or about August 23, 2018, Ms. Flores purchased a Rock 'n Play Sleeper as a gift for her daughter-in-law to use for her infant grandchild, who used the product. Ms. Flores was induced to purchase the Rock 'n Play Sleeper by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Flores would not have purchased the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her grandchild to the risk of injury and even death. Ms. Flores did not receive a Recall notice from Defendants.

*Megan Kaden*

31.     Plaintiff Megan Kaden is a citizen of Marin County in the State of California.  In or about February 2017 and January 2018, she purchased two Rock 'n Play Sleepers to use as sleepers for her babies and used the product. Ms. Kaden was induced to purchase and use the Rock 'n Play Sleepers for her babies by Defendants' marketing that they were suitable environments for infants to sleep in, including for prolonged periods or overnight. Ms. Kaden would not have purchased or used the Rock 'n Play Sleepers had she known that the products were unsafe for their intended, marketed and/or reasonably expected purposes, dangerous, and exposed her babies to the risk of injury and even death. Ms. Kaden did not receive a Recall notice from Defendants.

**Colorado**

### Daniel Pasternacki

32.     Plaintiff Daniel Pasternacki is a citizen of Douglas County in the State of Colorado.  In or about June 2017, he purchased two Rock 'n Play Sleepers to use as sleepers for his babies and used the products. Mr. Pasternacki was induced to purchase and use the Rock 'n Play Sleepers for his babies by Defendants' marketing that they were suitable environments for infants to sleep in, including for prolonged periods or overnight. Mr. Pasternacki would not have purchased or used the Rock 'n Play Sleepers had he known that the products were unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed his babies to the risk of injury and even death. Mr. Pasternacki did not receive a Recall notice from Defendants.

### Renee Wray

33.     Plaintiff Renee Wray is a citizen of Arapahoe County in the State of Colorado.  In or about July 2016, Ms. Wray was gifted a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Wray was induced to accept and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Wray would not have accepted or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Wray did not receive a Recall notice from Defendants.

**Connecticut**

**Emily Simmonds**

34.     Plaintiff Emily Simmonds is a citizen of Fairfield County in the State of Connecticut.  In or about the Summer of 2016, she was gifted one Rock 'n Play Sleeper and purchased another to use as sleepers for her babies and used the product. Ms. Simmonds was induced to purchase and use the Rock 'n Play Sleepers for her babies by Defendants' marketing that they were suitable environments for infants to sleep in, including for prolonged periods or overnight. Ms. Simmonds would not have purchased or used the Rock 'n Play Sleepers had she known that the products were unsafe for their intended, marketed and/or reasonably expected purposes, dangerous, and exposed her babies to the risk of injury and even death. Ms. Simmonds did not receive a Recall notice from Defendants.

**Florida**

**Jena Huey**

35.     Plaintiff Jena Huey is a citizen of Seminole County in the State of Florida.  In or about February 2017, she received a Rock 'n Play Sleeper at her baby shower from her registry to use as a sleeper for her baby and used the product. In or about May 2017, Ms. Huey purchased a second Rock 'n Play Sleeper to use as a sleeper for her baby and used the product.  Ms. Huey was induced to choose and use the Rock 'n Play Sleepers for her baby by Defendants' marketing that the Rock 'n Play Sleeper was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Huey would not have chosen, owned or used the Rock 'n Play Sleepers had she known that the products were unsafe for their intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Huey did not receive a Recall notice from Defendants.

**Iowa**

*Nancy Hanson*

36.     Plaintiff Nancy Hanson is a citizen of Madison County in the State of Iowa.  In or about December 2012, she purchased two Rock 'n Play Sleepers to use sleepers for her infant grandchildren when they came to visit and used the product.  Ms. Hanson was induced to purchase and use the Rock 'n Play Sleepers by Defendants' marketing that they were suitable environments for infants to sleep in, including for prolonged periods or overnight. Ms. Hanson would not have purchased or used the Rock 'n Play Sleepers had she known that the products were unsafe for their intended, marketed and/or reasonably expected purposes, dangerous, and exposed her grandchildren to the risk of injury and even death. Ms. Hanson did not receive a Recall notice from Defendants.

**Maryland**

*Brianna Persons*

37.     Plaintiff Brianna Persons is a citizen of Allegany County in the State of Maryland. In or about December 2018, she was gifted a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product.  Ms. Persons was induced to accept and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight.  Ms. Persons would not have accepted or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death.  Ms. Persons did not receive a Recall notice from Defendants.

**Massachusetts**

   *Luke Cuddy*

   38.    Plaintiff Luke Cuddy is a citizen of Essex County in the Commonwealth of Massachusetts.  In or about August 2016, Mr. Cuddy was gifted a Rock 'n Play Sleeper to use as a sleeper for his baby and used the product. Mr. Cuddy was induced to accept and use the Rock 'n Play Sleeper for his baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Mr. Cuddy would not have accepted or used the Rock 'n Play Sleeper had he known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed his baby to the risk of injury and even death. Mr. Cuddy did not receive a Recall notice from Defendants.

**New Jersey**

   *Candace Kimmel*

   39.    Plaintiff Candace Kimmel is a citizen of Mercer County in the State of New Jersey.  On or about September 24, 2017, Ms. Kimmel purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Kimmel was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Kimmel would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Kimmel did not receive a Recall notice from Defendants.

   *Joshua Nadel*

   40.    Plaintiff Joshua Nadel is a citizen of Bergen County in the State of New Jersey. In or about August or September 2015 Mr. Nadel was gifted a Rock 'n Play Sleeper from a baby

registry and in or about August-September 2017, he purchased a second Rock 'n Play Sleeper, to use as sleepers for his babies and used the product. Mr. Nadel was induced to purchase and use the Rock 'n Play Sleepers for his babies by Defendants' marketing that they were suitable environments for infants to sleep in, including for prolonged periods or overnight. Mr. Nadel would not have purchased or used the Rock 'n Play Sleepers had he known that the products were unsafe for their intended, marketed and/or reasonably expected purposes, dangerous, and exposed his babies to the risk of injury and even death. Mr. Nadel did not receive a Recall notice from Defendants.

**Oklahoma**

*Megan Fieker*

41.     Plaintiff Megan Fieker is a citizen of Tulsa County in the State of Oklahoma.  In or about August  2014, she was gifted a Rock 'n Play Sleeper through her baby registry to use as a sleeper for her baby and used the product. Ms. Fieker was induced to choose and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Fieker would not have chosen or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Fieker did not receive a Recall notice from Defendants.

**Pennsylvania**

*Rebecca Drover*

42.     Plaintiff Rebecca Drover is a citizen of Fulton County in the State of Pennsylvania.  On or about November 18, 2015, she purchased a Rock 'n Play Sleeper from Amazon as a gift for her daughter and son-in-law to use for her infant grandchild, who used the

product. Ms. Drover was induced to purchase the Rock 'n Play Sleeper by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Drover would not have purchased the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her grandchild to the risk of injury and led to that grandchild's death. Ms. Drover did not receive a Recall notice from Defendants.

**Tennessee**

*Josie Willis*

43.     Plaintiff Josie Willis is a citizen of Rutherford County in the State of Tennessee. In or about March or April 2018, she purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Willis was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Willis would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Willis did not receive a Recall notice from Defendants.

**Texas**

*Linda Black*

44.     Plaintiff Linda Black is a citizen of Anderson County in the State of Texas.  In or about the winter of 2017, Ms. Black purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Black was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight. Ms. Black would not have purchased or used the

Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Black did not receive a Recall notice from Defendants.

**Virginia**

### Kerry Mandley

45.     Plaintiff Kerry Mandley is a citizen of Loudoun County in the Commonwealth of Virginia.  In or about July or August 2018, she was gifted a Rock 'n Play Sleeper through her baby registry to use as a sleeper for her baby and used the product.  Ms. Mandley was induced to choose and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including for prolonged periods or overnight.  Ms. Mandley would not have chosen, owned or used the Rock 'n Play Sleeper had she known that the product was unsafe for its intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Mandley did not receive a Recall notice from Defendants.

**Washington**

### Katharine Shaffer

46.     Plaintiff Katharine Shaffer is a citizen of Kitsap County in the State of Washington. On or about April 5, 2018, Ms. Shaffer purchased a Rock 'n Play Sleeper to use as a sleeper for her baby and used the product. Ms. Shaffer was induced to purchase and use the Rock 'n Play Sleeper for her baby by Defendants' marketing that it was a suitable environment for infants to sleep in, including  for prolonged periods or overnight. Ms. Shaffer would not have purchased or used the Rock 'n Play Sleeper had she known that the product was unsafe for its

intended, marketed and/or reasonably expected purposes, dangerous, and exposed her baby to the risk of injury and even death. Ms. Shaffer did not receive a Recall notice from Defendants.

**DEFENDANTS**

### Fisher-Price, Inc.

47.     Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business in East Aurora, Erie County, New York.   Fisher-Price designs, manufactures, distributes, markets, advertises, labels, and sells products for the care of infants and preschool children to consumers throughout the United States, including in New York, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Iowa, Maryland, Massachusetts, New Jersey, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia and Washington.

48.     Fisher-Price is a wholly-owned subsidiary of Mattel.   The website on which Defendants advertised their Rock 'n Play Sleepers includes Mattel's name:   https://fisher-price.mattel.com.

49.     Fisher-Prices' annual net sales were approximately $1.2 billion in 2018.[19]

### Mattel, Inc.

50.     Defendant Mattel, Inc. is a Delaware corporation with its principal place of business in El Segundo, California.   Mattel is the world's second largest toy maker and the corporate parent of Fisher-Price.   On its annual filings with the Securities Exchange Commission, Mattel references Fisher-Price as a "brand" in "Mattel's portfolio of global brands."[20]

---

[19] *See, e.g.,* Mattel, Inc., 2018 10-K, at 28 (February 22, 2019).

[20]*See, e.g.*, Mattel, Inc., 2018 10-K, at 4 (February 22, 2019); Mattel, Inc., 2017 10-K, at 3 (February 27, 2018).

51.     Mattel, until April 12, 2019, directly and/or through Fisher-Price, designed, manufactured, distributed, marketed, advertised, labeled, and sold Rock 'n Play Sleepers in all 50 states.

52.     Mattel shares overall responsibility for the safety of Fisher-Price products, including the Rock 'n Play Sleeper.  All recall and safety alerts for both Fisher-Price and Mattel products, as well as customer service for both Fisher-Price and Mattel products, are found on the Mattel website.[21] Mattel has at all times had significant involvement in and responsibility for the wrongful conduct alleged herein.  Indeed, Defendants have stated that the Rock 'n Play Sleeper was developed by "Mattel, through its Fisher-Price subsidiary."[22]

53.     Mattel fully owns Fisher-Price and includes its results on its filings with the SEC. For example, Mattel's 10-Q for the period ending July 30, 2019 contains a statement about litigation pending against Mattel and Fisher-Price concerning the Rock 'n Play Sleeper, including it among contingencies that could impact Mattel's financial results.[23]  On its financial filings, it describes Fisher-Price as a "brand," part of the "Infant, Toddler, and Preschool Segment" represented in Mattel's gross sales.[24]

54.     Mattel,  at all relevant times, had senior executives with control over, involvement in and oversight of Fisher-Price, with titles such as "Executive Vice President - Fisher-Price Global Brands," and "Executive Vice President - Fisher-Price Global Brand Marketing." For example, Bryan Brown, Mattel's Vice President of Quality, Design and North American

---

[21] https://service.mattel.com/us/recall.aspx (last visited April 15, 2019).

[22] Letter from Kitty Pilarz, Senior Director, Mattel Product Safety, Fisher Price, July 12, 2010. *See* https://www.regulations.gov/document?D=CPSC-2010-0028-0004 (last visited October 20, 2019).

[23] Mattel 10-Q, 2Q 2019 at 31, available at https://mattel.gcs-web.com/static-files/5c042098-86f0-44cb-8991-14cd799ed285  (last visited October 20, 2019).

[24] *Id.*

Manufacturing,  held a variety of positions in which he had oversight of and involvement in addressing issues concerning  Rock 'n Play Sleepers.

55.     Moreover, in 2013, Mattel moved 100 Fisher-Price employees from Fisher-Price's headquarters in East Aurora to Mattel's headquarters in El Segundo.[25]  Some Fisher-Price executives are located in and primarily work from California. As a former Fisher-Price executive stated in Buffalo Business First, "much of the leadership has been shifted to El Segundo, the Los Angeles suburb where Mattel is located."[26]

56.     Moreover, the instruction manuals for all of the Rock 'n Play Sleepers were posted on Mattel's website.[27]

57.     Mattel bears responsibility for failing to timely recall Rock 'n Play Sleepers. Mattel had direct involvement in all recalls of Fisher-Price products.

58.     Indeed, when an earlier recall of 800,000 Rock 'n Play Sleepers was instituted because of mold, the recall was announced on the Mattel website, https://service.mattel.com/us/recall/rock_sleepernew.asp.[28]

59.      Likewise, Mattel issued an earlier recall for a similar baby product -- the Fisher-Price Soothing Motions Seat -- because it caught fire.   Mattel's webpage concerning safety included this information:

---

[25] https://labusinessjournal.com/news/2013/may/27/toymaker-game-bring-staff-hq-el-segundo/ (last visited October 25, 2019).

[26] https://www.bizjournals.com/buffalo/news/2017/12/22/toy-story-fisher-price-faces-many-challenges.html (last visited October 25, 2019).

[27] *See*, *e.g.*, https://service.mattel.com/instruction_sheets/CHN29-SP.pdf (last visited February 14, 2019).

[28] *See* Newswire, "MATTEL REPORTS ACQUISITION BY EXECUTIVE VP GLOBAL BRANDS FISHER-PRICE WALKER," April 6, 2013.

**Passion for Product Safety**

**Product Recalls**

Safety comes first at Mattel. We listen to consumer feedback and quickly respond when appropriate. In 2017, Mattel voluntarily recalled the Fisher-Price Soothing Motions Seat when we received reports of the motor housing overheating, thereby causing a potential fire hazard. No injuries have been reported.

More information about Mattel's product recalls can be found **here**.

60.     And when the Recall of all 4.7 million Rock 'n Play Sleepers finally occurred, the announcement of the Recall on the CPSC's website stated the consumer contact for information about the Recall was, "Fisher-Price *online at www.service.mattel.com*...." (Emphasis added.) The terms of the Recall are set forth on Mattel's website.[29]

61.     Mattel cannot now try to distance itself from its oversight and direct role in the design, manufacture, distribution, marketing, advertising, labeling, sale, and delayed recall of its deadly Rock 'n Play Sleeper, which is part of Mattel's Fisher-Price brand.

62.     Mattel's annual net sales were approximately $4.5 billion in 2018. On information and belief, revenue from Fisher-Price flows upstream to Mattel.

**<u>JURISDICTION AND VENUE</u>**

63.     The Court has jurisdiction over Plaintiffs' claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because there are 100 or more class members, at least one class member is a citizen of a state that is diverse from each Defendant's citizenship, and the amount in controversy exceeds $5 million exclusive of interest and costs.

64.     Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Magnuson Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., arise under

---

[29] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited April 17, 2019).

federal law, and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

65.     The Court has personal jurisdiction over Fisher-Price because it purposefully availed itself of the privilege of conducting business in the State of New York, and because it has its headquarters in East Aurora, Erie County, New York.

66.     The Court has personal jurisdiction over Defendant Mattel because it has purposefully availed itself of the privilege of conducting business in the State of New York, including that it is the owner of Fisher-Price; because it transacts business, and supplies goods and services in the State of New York; because it committed tortious acts that caused injury to persons within the State of New York; and because there is a substantial relationship between Plaintiff's claims and New York transactions involving Mattel.

67.     Venue is proper in this District pursuant to the Transfer Order filed August 1, 2019 by the United States Judicial Panel on Multidistrict Litigation in this proceeding.

## FACTUAL ALLEGATIONS

**Overview**

68.     Inclined sleepers such as the Rock 'n Play Sleeper are sleeping products that are inclined upwards on one end to raise a baby's head and torso up to approximately 30 degrees. As initially reported in a November 26, 2018 Wall Street Journal article entitled *Infant Deaths Prompt Questions Over Safety of Inclined Sleepers*, dozens of deaths and hundreds of injuries associated with these inclined sleepers – including, predominantly, the Rock 'n Play Sleeper – have been reported to the CPSC since 2005.[30]  More than half of these reported deaths occurred

---

[30] Vogt, H. *Infant Deaths Prompt Questions Over Safety of Inclined Sleepers*, Wall Street Journal, Nov. 26, 2018, at A-3; *see also* Vogt, H., *Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency,* Wall Street Journal, Nov. 23, 2018, *available at*

since September 2016.[31]   As Defendants belatedly admitted in the April 12, 2019 Recall notice, they were aware as of that date that at least 32 infants died in the Rock 'n Play Sleeper since 2009.

69.   Defendants, who designed, manufactured, distributed, marketed, advertised, labeled, and sold the Rock 'n Play Sleeper, which was the most popular inclined sleeper in the United States, have known of the serious safety risks posed by the product throughout the time they designed, manufactured, distributed, marketed, advertised, labeled,  and sold it.   They, nonetheless, continued to market it for a decade as a safe environment for infant sleep, including prolonged or overnight sleep, placing at least 4.7 million infants at risk.

**Defendants' Introduction of the Rock 'n Play Sleeper to the Market**

70.   In 2008, Linda Chapman, a Fisher-Price product designer at the company's headquarters outside Buffalo, New York had the idea of an inclined, upright sleeper for babies with reflux and congestion.[32]   According to the Fisher-Price website, when Ms. Chapman "approached the Fisher-Price Safety Committee with this idea, they had . . . concerns." (ellipses in original).[33]   Nonetheless, and with no evidence that their "concerns" were addressed, Defendants introduced the Rock 'n Play Sleeper in the United States market in 2009 and have reaped hundreds of millions of dollars from its sale.

---

[31] https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited October 28, 2019).

[31] *Id.*

[32] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.b36c59623150 (last visited June 4, 2019) .

[33] https://www.fisher-price.com/en_US/ourstory/rock-n-play-sleeper/index.html (last visited February 6, 2019).

71.     A critical common design element of the Rock 'n Play Sleeper is a collapsible frame that supports a fabric hammock with tall sides (Figure 1), forcing the infant into a reclined position, with the head elevated at an approximately 30-degree angle from the lowest part of the baby's torso (Figure 2) and restraints (Figure 3) that, if used as Defendants recommended, limit the baby's motion.   There is a hard plastic shell inside the hammock that is covered with soft padded material (Figures 4 and 5), upon which the baby is placed.   Different views of the product are shown below:



Above: Figure 1



Above: Figure 2



Above: Figure 3



Above: Figure 4



Above: Figure 5

72.    Some "Premium" and "Deluxe" models, such as the deluxe model immediately above, have additional padding around the head.

73.    The Rock 'n Play Sleeper was extremely popular with parents and other caregivers.  The Rock 'n Play Sleeper was by far the best selling sleeper on Amazon.com.[34]

74.    Defendants made enormous profits from their decade-long sale of Rock 'n Play Sleepers and there were 4.7 million of them in homes with infants, as well as day care centers and elsewhere, across the country. Defendants knew of the AAP's pronouncement that for babies to sleep safely, they must be placed flat on their backs on a firm flat surface with no bedding or bumpers. Yet, the Rock 'n Play Sleeper has a 30-degree incline, a baby in it is not flat on his or her back, and there is soft padding around the baby.

75.    Despite knowing that the Rock 'n Play Sleeper is unsafe for infant sleep, including overnight or prolonged sleep, Defendants marketed and sold the product as a sleeper, leading parents to reasonably believe that the product is safe for its stated purpose.  The words "sleeper" and "sleep" appear no fewer than five times on the package, which depicts pictures of a mom blissfully sleeping or about to fall asleep with the baby asleep in the Rock 'n Play Sleeper.

**National Standards for Safe Infant Sleep**

76.    The National Institutes of Health ("NIH") of the United States Department of Health and Human Services and other federal and national organizations have worked with the AAP, a non-profit group with a membership of 66,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists, to develop safe sleep standards for babies.[35] Defendants, as manufacturers and marketers of widely sold infant sleepers, are well aware of NIH and AAP standards.

---

[34] https://www.amazon.com/Fisher-Price-Auto-Rock-Sleeper-Stone/dp/B00NEO5UTU?th=1 (last visited February 12, 2019).

[35] https://www.nih.gov/news-events/news-releases/federal-agencies-express-support-updated-safe-infant-sleep-recommendations (last visited April 15, 2019).

77.     In November 2005, the AAP issued a Policy Statement entitled – *The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider in Reducing Risk* – which contained detailed guidelines and recommendations on safe sleep for infants.[36]  These included:

- "Back to sleep: ***Infants should be placed for sleep in a supine position (wholly on the back) for every sleep***." (Emphasis added).

- "Use a firm sleep surface: ***Soft materials or objects . . . should not be placed under a sleeping infant***.  A firm crib mattress, covered by a sheet, is the recommended sleeping surface."

(Emphasis added).

78.     The AAP also recommended that, in order to avoid development of positional plagiocephaly (flat head), parents should, in relation the baby's sleep:

- Avoid having the infant spend excessive time in car-seat carriers and "bouncers," in which pressure is applied to the occiput.

and:

- Alter the supine head position during sleep.

79.     In January 2006, the NIH issued a news release adopting the AAP's guidelines.[37]  Among other things, the NIH stated:

The [AAP] recently issued updated recommendations for reducing the risk of SIDS:

- Always place your baby on his or her back to sleep, for naps and at night

- Place your baby on a firm sleep surface, such as on a safety-approved crib mattress, covered by a fitted sheet

and

---

[36] https://pediatrics.aappublications.org/content/116/5/1245 (last visited October 20, 2019).

[37] https://www.nichd.nih.gov/newsroom/releases/sids_winter (last visited April 15, 2019).

- Reduce the chance that flat spots will develop on your baby's head by . . . changing the direction that your baby lies in the crib[] and avoiding too much time in car seats, carriers, and bouncers[.]

80.    The Rock 'n Play Sleeper is not a crib mattress.  It features raised soft sides.  It is positioned at an angle similar to that of a car seat or carrier.  Simply put, it is unsafe under AAP and NIH guidelines.

81.    Nonetheless, Defendants introduced it to the market as a safe sleep product in 2009 and continued to market and sell it as such in the U.S. market for a decade, until they were forced to issue the Recall on April 12, 2019. Even then, they continued to insist their product was safe.

82.    In October 2011, the AAP issued an updated Policy Statement – *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment* – expanding the guidelines and recommendations on safe sleep for babies.[38]  The recommendations included:

- Infants should be placed "back to sleep for every sleep" in the "***supine position (wholly on the back).***"  The AAP noted that ***"[t]he supine sleep position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux*. . . .**"

- "***Elevating the head of the infant's crib while the infant is supine is not recommended***" because ***"it might result in the infant sliding to the foot of the crib into a position that might compromise respiration*.**"

- "Use a firm sleep surface – ***A firm crib mattress covered by a fitted sheet, is the recommended sleeping surface to reduce the risk of SIDS and suffocation*.**"

- ***"Soft materials . . . should not be placed under a sleeping infant.*"**

---

[38] https://pediatrics.aappublications.org/content/128/5/1030 (last visited April 10, 2019).

- **"*Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep . . . .*"**

- "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is safe and practical."

- "Avoid commercial devices" like "wedges, positioners, special mattresses and special sleep surfaces. There is no evidence . . . that they are safe."

(Emphasis added).

83.    On October 18, 2011, the NIH issued a news release supporting these updated AAP guidelines and stated that the United States Food and Drug Administration ("FDA") and other major entities also supported them.  The NIH's release provided a link to the full AAP guidelines and stated: "Support for the new recommendations was expressed by the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD) at the National Institutes of Health, the Maternal and Child Health Bureau (MCHB) of the Health Resources and Services Administration, the U.S. Centers for Disease Control and Prevention, and the U.S Food and Drug Administration."[39]

84.    On October 24, 2016, the AAP issued a further updated Policy Statement – *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment* – reaffirming and further developing the guidelines and recommendations on safe sleep for babies.[40]  The recommendations included:

---

[39] https://www.nichd.nih.gov/newsroom/releases/101811-infant-safe-sleep-recommendations (last visited April 15, 2019).

[40] https://pediatrics.aappublications.org/content/138/5/e20162938 (last visited October 28, 2019). Although issued on October 24, 2016, the recommendations are dated as of November 2016.

- "Recommendations for a safe sleep environment include ***supine positioning, the use of a firm sleep surface,  . . . and the avoidance of soft bedding . . . .***"

- "***[M]anufacturers should follow safe sleep guidelines in their messaging and advertising.***"

- "Avoid the use of commercial devices that are inconsistent with safe sleep recommendations."

- "***[I]nfants should be placed for sleep in a supine position (wholly on the back) for every sleep by every caregiver*** until the child reaches 1 year of age. . . . The supine sleep position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux . . . ."

- "Elevating the head of the infant's crib is ineffective in reducing gastroesophageal reflux and is not recommended; in addition, elevating the head of the crib may result in the infant sliding to the foot of the crib into a position that may compromise respiration."

- "[T]he best evidence suggests that infants should continue to be placed supine until 1 year of age. . . . Because rolling into soft bedding is an important risk factor for SUID [Sudden Unexpected Infant Death] after 3 months of age, parents and caregivers should continue to keep the infant's sleep environment clear of soft or loose bedding."

- "***Infants should be placed on a firm sleep surface (eg, mattress in a safety-approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS and suffocation***."

- "***Soft materials . . . should not be placed under a sleeping infant.***"

- "***Sitting devices, such as car seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep*** in the hospital or at home, particularly for young infants."

- "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is safe and practical."

- "***Media and manufacturers should follow safe sleep guidelines in their messaging and advertising. . . . Media and advertising***

> ***messages contrary to safe sleep recommendations may create misinformation about safe sleep practices.***"

(Emphasis added).

85.     The same day, the NIH issued a corresponding news release, stating "Federal agencies concerned with infant health and welfare today announced their support of the American Academy of Pediatrics (AAP) updated recommendations on safe infant sleep. The Eunice Kennedy Shriver National Institute of Child Health and Human Development, part of the National Institutes of Health, the Centers for Disease Control and Prevention, and the Maternal and Child Health Bureau of the Health Resources and Services Administration and the U.S. Food and Drug Administration urge everyone who cares for infants younger than 1 year of age — parents, grandparents, family members, child care providers, health care providers, and others — to learn about the updated recommendations for safe infant sleep."[41]

86.     Despite the expanded repeated warnings that the only safe sleep environment for babies is a firm flat surface with no soft materials, and that car seats, infant carriers, and similar devices should not be used for prolonged sleep, Defendants continued to market and sell their Rock 'n Play Sleeper, which positions infants for sleep at a significant incline (as in a car seat), in restraints, and on soft padded material, as suitable for safe infant sleep, including prolonged or overnight sleep by infants.

87.     Further, although Defendants knew of the AAP's exhortation that "manufacturers should follow safe sleep guidelines in their messaging and advertising" and "advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices," Defendants brazenly marketed and sold the unsafe Rock 'n Play Sleeper as a suitable

---

[41] https://www.nih.gov/news-events/news-releases/federal-agencies-express-support-updated-safe-infant-sleep-recommendations (last visited October 21, 2019).

sleeping environment, including for overnight and prolonged sleep for infants, including by using the word "sleeper" in the name of the product and on the box.

88.     However, as the AAP, NIH, the CSPC study pronounced, the Rock 'n Play Sleeper is not safe for infant sleep. Among other things:

      a.     the Rock 'n Play Sleeper holds the baby at an incline which allows the infant's head to roll downward and to the side which can close off the child's airway;

      b.     the Rock 'n Play Sleeper is not flat.  The infant sleeps in an "L" shape with the knees flexed up towards the belly;

      c.     the Rock 'n Play Sleeper is soft and plush, not firm, and the soft padding creates a suffocation risk for the infant if his or her head turns;

      d.     when used as directed, the baby sleeps in the Rock 'n Play Sleeper restrained and largely immobile, which is not the case in flat cribs recommended by sleep specialists; and

      e.     the Rock 'n Play Sleeper can cause babies to sleep too deeply.  There is evidence that deep sleep is linked to SIDS.

89.      As reported by the CPSC, these dangerous defects have resulted in dozens of reported infant deaths and hundreds of reported injuries in inclined sleepers, primarily the Rock 'n Play Sleeper. As discussed more fully below, a September 2019 study by the CPSC found 59 reported infant deaths tied to inclined sleepers, primarily the Rock 'n Play Sleeper.

**Defendants' Egregious Negligence in the Development of the Rock 'n Play Sleeper**

90.     As set forth above, despite Fisher-Price's account of the genesis of the Rock 'n Play Sleeper, including that the Fisher-Price Safety Committee had concerns about its safety, there is no indication that the "concerns" of the Fisher-Price Safety Committee in 2008 were ever

addressed nor is there any indication that the committee took into account the then existing best practices concerning infant sleep.

91.     A key person on the Rock 'n Play design team was Michael Steinwachs, who began working at Fisher-Price in 1973 and ultimately rose to become Senior Manager for Quality Engineering for Fisher-Price.  Mr. Steinwachs was the Engineer for Product Integrity on the Rock 'n Play Sleeper's development team where his primary role was to "be involved in the development of the new products and advise the development team on what types of standards and regulations would need to apply to the product."[42]

92.     When asked in a March 2018 deposition about the research he conducted into the safety of the 30-degree incline of the planned product, he testified that he looked to the infant car seat which cannot be angled at more than 45 degrees, "so we chose 30, which is well below 45 degrees… and so the product integrity team determined that a 30 degree angle was safe." Fisher-Price's Rock 'n Play Sleeper Product Integrity Team never determined what incline is safe for infant sleep – the team just chose a number arbitrarily.[43]

93.     Then when asked if there was any medical evidence to support the Rock 'n Play Sleeper's ability to address a baby's acid reflux and congestion, he testified "I don't believe we had medical evidence…."[44]

94.     As reported in The Washington Post on May 31, 2019, "[r]ather than seeking the advice of pediatricians, [Fisher-Price] consulted just a single doctor – [Dr. Gary Deegear,] a family physician from Texas whose expertise had already been doubted by judges and who

---

[42] *Goodrich, et al v. Fisher-Price, Inc.,* Case No. 16-cv-3316 (N.D. Ga.), Deposition Testimony of Michael Paul Steinwachs, March 22, 2018, at 11, 23.

[43] *Id.* at 41-42, 45-46.

[44] *Id.* at 150.

would eventually lose his medical license."[45]  Notably, Dr. Deegear was disqualified as an expert

witness twice for advancing theories unsupported by the scientific community.[46]

95. Kitty Pilarz, Director of Public Safety for Fisher-Price, testified in a deposition:

"I'm not sure that we did specific research at this time about incline angles other than talk to Dr.

Deegear."[47]

96. In a February 2009 email,[48] Ms. Pilarz justified this design decision as follows:

> Dr. Deegear stated pediatricians recommend babies with reflux sleep at 30
> degrees, this is just fine, or sleep in a car seat overnight for months or even
> a year. ***The Back to Sleep campaign places children on their backs, and
> elevated positions of the head is fine.***  He is not aware of research on this.
> He will do a quick search.  I explained that we are also researching this
> issue.  I also have a call in to a local group of pediatricians to see if they
> are willing to offer an opinion.

(Emphasis added).

97. Dr. Deegear did send Ms. Pilarz at least two pieces of research.  One of them was

"A Parent's Guide to Safe Sleep" issued by the AAP, which stated "Always place babies to sleep

on their backs during naps and at nighttime," and ***included an illustration of a baby sleeping flat

in a non-inclined crib.***[49]

---

[45] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.b36c59623150 (last visited June 4, 2019).  Moreover, after the license of that non-pediatrician, Dr. Gary Deegear, expired in 2015, the Texas Medical Board filed a cease and desist order against him in 2018 for allegedly practicing without a license and engaging in unsafe practices.

[46] *Id.*

[47] http://www.safetyresearch.net/blog/articles/who-does-cpsc-protect (last visited May 30, 2019) and Report    of William F. Kitzes, *J.D., Torres et al v. Imperial Manufactory Limited, et al*, No. 715CV00444, 2016 WL 10706198 (S.D. Tex. 2016).

[48] *Id.*

[49] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-

98.     Ms. Pilarz testified that she did not research how different inclines could impact an infant's respiration.  She testified that she is not aware that Fisher-Price did any specific research when developing the Rock 'n Play other than speaking to Dr. Deegear.  In June 2009, months before Fisher-Price introduced the Rock 'n Play Sleeper to the market, Dr. Deegear recommended Fisher-Price bring a prototype to a medical conference so that other doctors could see it, but Defendants did not do so.[50]

99.     Indeed, "the first time Fisher-Price hired a pediatrician to evaluate the Rock 'n Play was eight years later, as part of the company's defense in a product liability lawsuit, according to records."[51]  At a deposition she gave in *Goodrich v. Fisher Price*, Case No. 16-cv-3316 (N.D. Ga.), a personal injury case brought on behalf of an infant who was injured in a Rock 'n Play Sleeper, Ms. Pilarz testified that Fisher-Price did not have medical professionals on staff other than Dr. Deegear, the non-pediatrician consultant who subsequently lost his medical license.[52]

100.    Despite the lack evidence that the Rock 'n Play Sleeper was safe, Defendants pressed forward with the development and then introduced the Rock 'n Play Sleeper to the United States market in 2009 and kept it on the market for nearly a decade, while the relevant authorities issued standard after standard indicating that the Rock 'n Play Sleeper was an unsafe sleep environment for infants.

---

died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=. b36c59623150 (last visited June 4, 2019).   *See also* https://www.yumpu.com/en/ document/read/18802594/a-parents-guide-to-safe-sleep (last visited October 20, 2019).

[50] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html? utm_term=.b36c59623150 (last visited June 4, 2019).

[51] *Id.*

[52] *Goodrich, et al v. Fisher-Price, Inc.,* Case No. 16-cv-3316 (N.D. Ga.), Dkt. 106-35 at 97:5 – 7.

**Defendants Actively Manipulated Safety Standards for Inclined Sleepers In Order to Keep their Product on the Market**

101.    Not only did Defendants ignore the above-described warnings about the dangers posed by the Rock 'n Play Sleeper and guidelines for safe infant sleep, they also actively manipulated safety standards applicable to the Rock 'n Play Sleeper.

102.    The Consumer Product Safety Improvement Act of 2008, Public Law 110-314 ("CPSIA"), was enacted on August 14, 2008.  Section 104(b) of the CPSIA requires the CPSC to promulgate consumer product safety standards for durable infant or toddler products.

103.    When the Rock 'n Play Sleeper was designed in 2009, there was no applicable federal standard.[53]  However, in 2010, the CPSC became interested in regulating bassinets and cradles, and wanted to include a limitation on inclines.  In April 2010, under the leadership of then Chairwoman Inez Tenenbaum, the CPSC published a notice of proposed rules titled "Safety Standard for Bassinets and Cradles: Notice of Proposed Rulemaking"  (the "2010 NPR") with the intention of promulgating final regulations that were stricter than the voluntary standard developed by ASTM International ("ASTM")[54] if doing so would further reduce the risk of injury:

> •    These standards are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. In this document the Commission proposes a safety standard for bassinets and cradles.

---

[53] https://www.cpsc.gov/Regulations-Laws--Standards/Rulemaking/Final-and-Proposed-Rules

[54]  "ASTM International, formerly known as American Society for Testing and Materials, is an international standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems, and services." https://en.wikipedia.org/wiki/ASTM_ International (last visited October 20, 2019). *See* www.astm.org.

- The proposed standard is more stringent in some respects than the voluntary standard developed by ASTM International (formerly the American Society for Testing and Materials), ASTM F 2194-07a, ''Standard Consumer Safety Specification for Bassinets and Cradles.'' The proposed modifications, if finalized, will further reduce the risk of injury associated with bassinets and cradles.[55]

104. The CPSC was specifically concerned about infant hammocks and bassinets, some of which had been recalled due to suffocation hazards. It was also motivated by a 1995 Australian study that videotaped the behavior of healthy infants sleeping in a variety of commercial sleep products and concluded that, in order to be considered safe, cradles cannot tilt to greater than 5 degrees.[56]

105. The 2010 NPR would have prohibited any sleeper with a more than five-degree incline.[57] It would have also banned restraints because "[i]nfants lying on a flat surface do not need restraints and the use of restraints could contribute to a possible strangulation hazard."[58] The 2010 NPR would have also "clarif[ied] that bassinets should not include any restraining system that requires action on the part of the caregiver to secure the restraint."[59]

106. Dr. Judith S. Palfrey, the then President of the AAP, submitted comments to the CPSC in which she stated that the "Adoption of the proposed safety standards will further reduce the risk of injuries and fatalities associated with use of bassinets and cradles. We encourage CPSC to make the new mandatory safety standards effective as soon as feasible. … Positional asphyxiation and suffocation are the most common causes of fatalities in cradles and

---

[55] https://www.govinfo.gov/content/pkg/FR-2010-04-28/pdf/2010-7667.pdf (last visited June 10, 2019)

[56] https://www.federalregister.gov/documents/2010/04/28/2010-7667/safety-standard-for-bassinets-and-cradles-notice-of-proposed-rulemaking (last visited October 23, 2019).

[57] *Id.*

[58] *Id.*

[59] *Id.*

bassinets. Implementation of new mandatory safety standards is an opportunity to address a number of these potential hazards" while also adding some additional recommendations to reduce risks to infants.[60]  Had the CPSC's bassinet incline rule included "inclined sleepers," the Rock 'n Play Sleeper, which has a 30-degree incline, would have been banned.

107.    But, Defendants lobbied the CPSC to carve out inclined sleepers from the new rule.  In doing so, they misled the CPSC by providing it with out-of-date standards that had long since been repudiated by the bodies originally issuing them.[61]

108.    On July 12, 2010, Kitty Pilarz, Fisher-Price's Vice President for Product Safety and Regulatory Compliance, submitted an eight-page letter on Defendants' behalf in response to the CPSC's request for public comment on its proposed new bassinet standard.  In that letter, Ms. Pilarz relied on a newsletter that she quoted as suggesting, for infants who regurgitate, "elevating the head of the crib and diaper changing table to 30 degrees so they never lay flat."  However, that newsletter, which had been written by the North American Society for Pediatric Gastroenterology, Hepatology and Nutrition ("PDHN Society"), reflected the PDHN Society's treatment guidelines from 2001, which were withdrawn by the time Fisher-Price wrote its letter to the CPSC in 2010.  By 2010, the PDHN Society had changed its advice to warn that inclining babies for sleep was harmful.[62]  The reason for the change, according to Dr. Benjamin Gold, the

---

[60] Letter from AAP President Dr. Judith S. Palfrey to the Chair of the CPSC, July 7, 2010. https://www.regulations.gov/document?D=CPSC-2010-0028-0003. (last visited June 10, 2019).

[61] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.b36c59623150 (last visited June 4, 2019).

[62] *Id.*

society's then president-elect, was that there was new data, as a result of which inclined positioning "'was no longer recommended for infants.'"[63]

109.    Defendants' submission to the CPSC was completely inconsistent with the consensus of consumer and safety groups, including the AAP's.  Ms. Pilarz's letter[64] stated that:

- "Mattel, through its Fisher-Price subsidiary has developed….. [the] 'Newborn Rock 'n Play Sleeper,' which we market with our other bassinets. It is both *a 'nighttime sleeper'* and a 'playtime seat,' *and a key feature is its 'inclined seat, which makes sleeping more comfortable for babies who need their head elevated.'* The sleep surface…  includes a crotch-and-waist restraint system"

- *"The angle of the seat exceeds 5 degrees*, yet, as far as Mattel is aware, there has been no incident with this product indicating that it presents any of the risks of injuries the proposed rule aims to address. *There certainly have been no deaths or injuries."*

- *"Parents deprived of any appropriate product for calming their tired, colicky infants will look elsewhere – and substitute dangerous products for that purpose."*

- *"*The proposed rule would effectively ban most infant hammocks…. *Eleven of the thirteen firms supplying them would likely go out of business….* These restrictions would likely – and without a reasonable necessity – ban a category of products that uniquely serves an important segment of the market. *The restriction could even increase children's risk of injury, as parents reach for substitutes."*

(Emphasis added).

110.    The CPSC promulgated its final rule in October 2013 which granted Fisher-Price and Mattel the victory that they spent three years lobbying the CPSC for – a carve out for their immensely popular Rock 'n Play Sleeper.  The carve out they secured exempted inclined sleepers from the CPSC's Safety Standard for Bassinets and Cradles and deferred regulating

---

[63] *Id.*

[64] https://www.regulations.gov/document?D=CPSC-2010-0028-0004 (last visited October 20, 2019).

inclined sleepers with more than a 10-degree incline to ASTM's subcommittee on inclined sleepers, which by no coincidence was chaired by Mr. Steinwachs.

111.    The CPSC justified the carve out by stating that it would "complement" the inclined sleeper category being developed by ASTM – a private organization which develops voluntary standards, the membership of which includes executives from Mattel, Fisher-Price and other manufacturers.[65]

112.    As a product integrity engineer and one of the designers for the Rock 'n Play Sleeper and as Senior Quality Engineer for Fisher-Price, Mr. Steinwachs was by then in charge of developing the standards for inclined sleepers over 10 degrees.  Mr. Steinwachs, who spent his entire career at Fisher-Price, was joined on the subcommittee by Joel Taft, Senior Manager of Product Safety for Fisher-Price.[66]  Not surprisingly, the standards passed by the ASTM never addressed the concerns raised by the AAP and other consumer advocates relating to the dangers associated with infants sleeping at a 30-degree incline, among other things.

113.    It took the ASTM five years to issue voluntary standards for inclined sleepers, and those standards were issued despite objection from consumer advocates and the AAP as to their adequacy.[67]

114.    Having secured both a regulatory carveout from the CPSC and a special ASTM category for inclined sleepers, Defendants positioned themselves to make their own rules to

---

[65] https://www.federalregister.gov/documents/2012/10/18/2012-24896/safety-standard-for-bassinets-and-cradles (last visited October 22, 2019).

[66] https://www.linkedin.com/in/joel-taft-348b8a33 (last visited October 22, 2019).

[67] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.b36c59623150 (last visited June 4, 2019).

continue marketing and selling the Rock 'n Play Sleeper despite being fully aware of the unreasonably high risk that the Rock 'n Play would cause infant deaths and injuries.

115.    In May 2015, the ASTM issued standards related to inclined sleepers with more than a 10-degree incline that would "establish safety performance requirements, test methods and labeling requirements to minimize potential hazards to infants in inclined sleep products."[68] The standards permitted the continued marketing and sale of the Rock 'n Play Sleeper. The ASTM's press release announcing the standards' issuance stated "ASTM member Mike Steinwachs, senior manager, quality engineering, Fisher-Price, notes that use of infant inclined sleep products has become popular as parents sometimes feel that babies sleep better on an incline rather than flat surface."[69]

116.    To commend Mr. Steinwachs for his effort, the ASTM bestowed him with an award for his "leadership resulting in a new standard covering Inclined Sleep Products" noting that "[t]he ASTM Inclined Sleeper Subcommittee worked quickly to develop a new standard for these products and Mike's leadership was critical in keeping the group on track and moving forward. We're glad to recognize him for his outstanding efforts." [70]

---

[68] ASTM, New ASTM Standard Addressed Increased Use of Inclined Sleep Products, May 26, 2015, https://www.astm.org/cms/drupal-7.51/newsroom/new-astm-standard-addresses-increased-use-infant-inclined-sleep-products (last visited June 10, 2019)

[69] *Id.*

[70] ASTM Recognizes JPMA Member, April 26, 2016, https://www.jpma.org/news/286489/ASTM-Recognizes-JPMA-Member-.htm. (Last viewed June 10, 2019)

117. Ms. Tenenbaum, the former head of the CPSC, has returned to the private sector where she worked on behalf of Fisher-Price as an expert witness in at least one case brought against Fisher-Price for an infant's injuries related to the Rock 'n Play Sleeper.[71]

118. After the Rock 'n Play Sleeper was recalled in April 2019, Mr. Steinwachs immediately stepped down from his position at the ASTM.

119. Safety experts have criticized regulators for failing to address inclined sleepers.[72] It appears that this failure partially results from the close relationship between Defendants and these regulators.

**Responses to CPSC's Request for Comment on Inclined Sleepers**

120. In February 2017, the CPSC issued a Notice of Proposed Rulemaking for a Rule entitled *"Safety Standard for Infant Inclined Sleep Products"* and invited public comment.[73] The AAP and numerous widely respected consumer protection groups responded with public comments detailing the dangers of these products. Given the significant impact that a CPSC standard could have on a major product like the Rock 'n Play Sleeper, it is beyond question that Defendants were aware of the proposal and comments.

121. On July 5, 2017, the AAP submitted a comment letter stating that **"the AAP has concerns about all inclined sleep products and the hazards they may pose to infants."** (Emphasis added). The AAP drew an obvious analogy to "car safety seats, strollers, swings, infant carriers and infant slings, which are also not recommended for routine sleep," noting that

---

[71] https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.b36c59623150 (last visited June 4, 2019).

[72] *Id.*

[73] https://www.govinfo.gov/content/pkg/FR-2017-04-07/pdf/2017-06875.pdf (last visited April 18, 2019).

*"[i]nfants who are younger than four months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction.*"[74]   (Emphasis added).

122.     The AAP was not the only organization to respond to the CPSC about the dangers of inclined sleepers such as the Rock 'n Play Sleeper.   On June 21, 2017, the Consumer Federation of America, Kids in Danger, Consumers Union, and Public Citizen submitted a comment letter to the  CPSC,[75] stating:

> *[W]e have significant concerns with the hazards posed by the entire product class of infant inclined sleepers* . . . .  *Unlike bassinets, infant inclined sleep products do not place the baby in the recommended flat sleep position* . . . .  Some parents might believe their baby sleeps better at an incline, which may explain the rise in these types of products. However, there have been no studies that show this to be true, and *most safe sleep professionals support a flat sleep surface*.

(Emphasis added).

123.     This group's letter raised an additional significant point:

> [M]any of these products require a restraint for infant retention.  *There has been little, if any, academic study on the impact of continuous restraining on infants and development or the risks that restraints could pose in a sleep environment*.

(Emphasis added).

124.     The consumer groups also raised real world concerns about the context in which these products are used:

> Infant inclined sleep products are designed for infants who are not likely to distinguish between daytime and nighttime sleeping, but rather nap throughout the entire 24-hour period.  *The parents or primary caregivers*

---

[74] July 5, 2017 AAP Comment Letter on Proposed Safety Standard for Inclined Sleep Products. Docket No. CPSC-2017-0020.

[75] https://www.citizen.org/system/files/case_documents/consumer_group_comments_on_inclined _ infant_sleep_products_062117.pdf (last visited April 18, 2019).

*of these infants are likely to be operating on less sleep, and if the infant is a first child, be less familiar with baby gear and care*.  In addition, many other caregivers may use the product. Visitors, grandparents, helpers and others may be as likely to lay the baby down to sleep as the parent. *Since new parents often sleep or nap when their baby is sleeping or have other children or activities requiring their attention throughout the house, it should be expected that babies will sleep unattended in inclined sleep products, both at night and during the day*.  Therefore, it is *vital that these sleep environments offer infants the same measure of safety as a full-size crib*.

(Emphasis added).

125.    This letter also noted that there is a standard for bassinets that was revised with CPSC support to require a flat surface without restraints.  If it is dangerous for babies to be in bassinets that are not flat or that include restraints, the same is necessarily true of inclined sleepers like the Rock 'n Play Sleeper in which babies are also placed in to sleep.

126.    On June 13, 2018, these and still other consumer groups, joined by the AAP, wrote another public letter to the head of the CPSC detailing the dangers of inclined sleepers. The signers of this letter included the Director of Product Safety for Consumer Reports, the President of the American Academy of Pediatrics, the Legislative Director and General Counsel for the Consumer Federation of America, the Senior Policy Analyst of the Consumers Union, and the Executive Director of Kids in Danger.[76]  This letter was written in response to the CPSC's May 31, 2018 issuance of a reminder that caregivers should use restraints with inclined sleepers.

127.    The letter expresses concern about the "*inherently unsafe inclined sleep products,* the use of which does not align with American Academy of Pediatrics (AAP) safe sleep recommendations."  (Emphasis added).  It states, "We are concerned that one of the main

---

[76] https://advocacy.consumerreports.org/research/joint-letter-to-cpsc-chairman-on-infant-inclined-sleep-products/ (last visited April 15, 2019).

suggestions for consumers in this statement—to secure restraints while using the product—may

not prevent deaths linked to use of this type of product."

128.    The letter further states:

Parents and caregivers may seek out inclined sleep products out of concern about gastroesophageal reflux in their infants. However, the AAP's safe sleep experts have reviewed extensive research and *concluded that elevating the head of the infant's crib or using an inclined sleep product while the infant is supine (placed on his or her back), is not recommended*.  It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration.

…

Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are also not recommended for routine sleep in the hospital or at home.  Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create a risk of suffocation or airway obstruction.  If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practical.

For these reasons*, we are deeply concerned that the CPSC's May 31 announcement makes it seem, incorrectly, that inclined sleep products are safe if used with restraints*.  The CPSC fails to provide any data upon which it bases this implicit claim, and *we are concerned that this improper portrayal of infant inclined sleep products could result in additional infant deaths and injuries.*

. . . .  [A] bare crib is best, babies should be placed on their backs for every sleep time, and parents and caregivers should use a sleep product that meets current mandatory standards such as cribs, play yards, and bassinets for very young infants.  *Using restraints in a sleep product, allowing inclines in sleep products that might allow rolling into unsafe positions, and other hazards present in current inclined sleep products should not be promoted* by the CPSC.

(Emphasis added).

**Congresswoman Schakowsky's Letter to the Chairwoman of the CPSC**

129.    On July 30, 2018, Congresswoman Janice Schakowsky (D-Ill.), sent a letter to

Ann Marie Buerkle, the Chairwoman of the CPSC, expressing her concerns about the CPSC's

proposed rule and its May 2018 Consumer Alert.[77]  In her letter, the Congresswoman, citing the "repeated calls by many safety advocates that inclined sleepers are inherently unsafe," wrote that she is "concerned that [the CPSC] is not adequately protecting consumers from hazards posed by inclined sleep products," and "urge[d]" the agency "to more aggressively review whether those products are safe."

130.   Congresswoman Schakowsky also wrote:

> The Consumer Alert conveys the misleading impression that the *sole* causes of infant deaths are rolling over due to lack of restraints or because infant sleepers were used after an infant can roll over.  By doing so, it also implies that infants will not roll over as long as restraints are used and fails to consider that caregivers often do not know the exact moment an infant first rolls over.  Rollovers may occur while the infant and caregiver are both asleep.

131.   On August 21, 2018, Chairwoman Buerkle responded to the Congresswoman's letter stating, among other things, that the agency had "'learned of additional serious incidents in recent months'" and thus "'ratcheted up the resources and senior staff attention being devoted' to these products."[78]

132.   Despite all of the foregoing, Defendants continued to market and sell their dangerous inclined sleeper as safe for sleep, including overnight and prolonged sleep, thereby knowingly putting an untold number of babies at risk, until the Recall.

**Canadian and Australian Regulators Prohibit Selling the Rock 'n Play Sleeper as a "Sleeper"**

133.   In 2011, the governments of Canada and Australia expressly prohibited Defendants from selling the Rock 'n Play Sleeper as a "sleeper" in their countries.   That

---

[77] https://www.wsj.com/public/resources/documents/schakowsky-to-cpsc-07-30-2018.pdf?mod=article_inline (last visited April 15, 2019).

[78] Vogt, H., *Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency,* Wall Street Journal, Nov. 23, 2018; *see also* https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited October 28, 2019).

Defendants were forced to stop selling their product as a "sleeper" in those countries indisputably demonstrates that Defendants knew their product was considered to be dangerous by regulators and, thus, their marketing of the Rock 'n Play Sleeper as a safe sleep environment in the U.S. was false and misleading.

134.    In January 2011, the Queensland Government Office of Fair Trading wrote to Defendants' affiliate in Australia regarding its concerns about the Rock 'n Play Sleeper.  The Queensland Government Office of Fair Trading was concerned that Defendants' promotion of the Rock 'n Play Sleeper as an appropriate sleeping environment was at odds with widely accepted best practices (consistent with AAP guidelines) that this type of product should not be used as an infant bedding alternative, and refused to allow Defendants to sell the product in Australia unless all references to prolonged or all night sleeping were deleted.  The Queensland Government Office of Fair Trading was particularly concerned that a newborn could succumb to positional asphyxia through the use of the product.

135.    In March 2011, Defendants' affiliate in Australia provided new box graphics to the Queensland Fair Trading Office eliminating references to overnight sleeping and proposing to call the product a "Soother" instead of a "Sleeper."

136.    Ultimately, however, Defendants decided, rather than to change their marketing, to withdraw the product from sale in Australia.

137.    In February 2011, Health Canada, the federal department of the Canadian government responsible for national health, wrote to Defendants' affiliate in Canada regarding its concerns that the Rock 'n Play Sleeper failed to comply with recommendations by Health Canada, the Public Health Agency of Canada and the Canadian Pediatric Society that babies sleep on a firm and flat surface (consistent with AAP guidelines).

138.    In addition, in March 2011, the Mattel Product Integrity Quality and Safety Operating Procedure was revised to advise parents that the Rock 'n Play Sleeper was "not intended to replace a crib or bassinet for prolonged sleep."  Tellingly, this language was removed from the Mattel Product Integrity Quality and Safety Operating Procedure later in 2011.[79]

139.    The Rock 'n Play is available in Canada but is not called a "sleeper."  Defendants market and sell it in Canada as the "Rock 'n Play Soothing Seat."

140.    Fully aware of the AAP's guidelines and the objections of Australian and Canadian regulators, Defendants continued to market the product in the U.S. as an overnight sleeper even after 2011.  Defendants did not change the package, the user manual, or any of their marketing materials to disclose that the Rock 'n Play Sleeper should not be used for prolonged or overnight sleep and thereby knowingly exposed American babies to the grave risk of injury or death.

**Pediatricians' Warnings to Fisher-Price**

141.    In addition to all of the above entities, multiple individual pediatricians also warned Fisher-Price about the dangers of the Rock 'n Play Sleeper.  For example, pediatrician Dr. Natasha Burgert – who has since become the AAP's National Spokesperson – wrote an open letter to Fisher-Price in 2012,[80] stating:

> **As a pediatrician and parent consumer, I believe it irresponsible to promote the Rock n' Play™ Sleeper as an [sic] safe, overnight sleeping option for infants. By continuing to do so, you are putting babies at risk.**
>
> The Rock n' Play™ Sleeper should **not** be used for extended, unobserved infant sleep for the following reasons.  First, design features of this product are known to increase the risk of sudden infant death syndrome

---

[79] *See* Expert Report of William F. Kitzes, J.D., dated September 30, 2016, at 6, 7, submitted in *Torres et al. v. Imperial Manufactory Ltd., et al.*, Case No. 15-444 (S.D. Tex.).

[80] https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price (last visited April 10, 2019).

(SIDS). Second, I have personally seen infants with brachycephaly/plagiocephaly and torticollis as a direct result of using this product. Finally, infants are often left with poor sleep habits that continue long beyond the product's use.

**1. *The Rock n' Play™ Sleeper is not a safe place for overnight, unobserved infant sleep.***

The current American Academy of Pediatrics (AAP) guidelines for the prevention of SIDS includes placing baby on a firm sleep surface without extra padding, pillows, or loose items. The Rock and Play™ Sleeper does not adhere to these guidelines. Specifically, the bottom is not firm. And, some models include padded inserts that can move and shift during sleep.

In my opinion, **this product is a portable infant seat** with attached sides, and should be categorized and marketed as such. I am concerned that infants in the "sleeper" may be at risk of asphyxiation or suffocation if continued to be used as a place for overnight, unobserved infant sleep.

**2. *The Rock n' Play™ Sleeper puts infants at risk for deformities*.**

When an infant is placed in a sleep environment as suggested by the AAP, infants are allowed natural body movements during sleep. They are able to freely move their head from side to side, and move their arms and legs to achieve different comfort positions throughout the night.

As a consequence to babies being restricted to one sleep position for multiple hours per day, infants using the Rock n' Play™ Sleeper are developing plagiocephaly/brachycephaly ("flat head") and torticollis. These are significant diagnoses potentially requiring expensive head-molding helmets and physical therapy.

My observational experience is not unique. There are currently numerous complaints online that should not be ignored. For example, one mother writes:

*We were finally referred to a specialist because we kept voicing our concerns with our pediatrician and it turns out our son was diagnosed with severe brachycephaly and moderate plagiocephaly. We are now getting him fitted for a $3,800 helmet that he'll have to wear 23 hrs each day. He also has torticollis, which is the tightening of the neck muscles, caused by the way he favored one side in the sleeper. He has to do daily stretches which he hates, but hopefully he won't need physical therapy. I truly believe that this sleeper caused these problems and I would NOT recommend this product to anyone...it's just not worth the risk.*

*-From Product Review on Amazon.com*

Frequent tummy time during waking hours, and holding babies in upright positions during play time, are not enough to counter the negative effects in head and body positioning that 16 hours a day in this product will produce.

Lying on a flat, firm surface is a better option for healthy development of our infants; and should be preferred to the physically restrictive, overnight sleep in the Rock n' Play™ Sleeper.

**3. *The Rock n' Play™ Sleeper hinders the development of infant sleep habits.***

Learning good nighttime habits, including the ability to self-soothe, is a significant part of a child's growth and development. Patterns surrounding the sleep environment begin at very early ages. Specifically, foundational patterns of sleep-initiation, environmental experience, and nighttime expectations often begin to be established by 4 months of age.

In my experience, parents who have used the Rock n' Play™ Sleeper face unexpected challenges once their baby outgrows this space. Families are suffering from many sleepless nights while their older infant re-learns how to sleep, on their backs, in their long-term sleep environment.

(All emphasis in original).

142.   Dr. Burgert's letter also stated:

The Rock n' Play™ Sleeper does not allow body movement to occur during sleep. The soft-bottomed "sleeper" cradles the infant during sleep and secures this position with an included restrictive safety harness. These design elements confine an infant in only one position for the entire duration of sleep (up to 16 hours a day).

143.   In 2015, Rachel Coley, a pediatric occupational therapist, cited Dr. Burgert's letter on her website, Can Do Kiddo,[81] and addressed the issue from her professional perspective:

New parents LOVE the Rock 'n Play™. How do I know? Because it's included as an "essential," "must-have," "lifesaver" item among nearly all baby registry recommendations. I also know because so many of the parents I personally know (and love) use the Rock 'n Play as their babies' first sleeping spot - conveniently compact and within arm's reach of new mama. Unfortunately, I also know that new parents love the Rock 'n Play™ because I'm a pediatric Occupational Therapist. **A startling number of the babies referred for therapy services for head**

---

[81] http://www.candokiddo.com/news/rocknplay (last visited October 24, 2019).

**flattening, neck tightness and motor development issues have spent LOTS of their time sleeping and playing in this piece of baby gear.**

(Emphasis original).

144.    The FDA also voiced concerns about "sleep positioner" devices such as the Rock 'n Play Sleeper, which lock infants into a single position while sleeping.   In 2017, the FDA warned the public about such devices in an article titled, "Do Not Use Infant Sleep Positioners Due to the Risk of Suffocation."[82]   The article stated:

> The U.S. Food and Drug Administration is reminding parents and caregivers not to put babies in sleep positioners. These products—sometimes also called "nests" or "anti-roll" products—can cause suffocation (a struggle to breathe) that can lead to death….
>
> **Safety Advice for Putting Babies to Sleep**
>
> - **NEVER** use infant sleep positioners. Using this type of product to hold an infant on his or her side or back is dangerous.
>
> - **NEVER** put pillows, blankets, loose sheets, comforters, or quilts under a baby or in a crib. These products also can be dangerous. Babies don't need pillows and adequate clothing—instead of blankets—can keep them warm.
>
> - **ALWAYS** keep cribs and sleeping areas bare. That means you should also never put soft objects or toys in sleeping areas.
>
> - **ALWAYS** place a baby on his or her back at night and during nap time. An easy way to remember this is to follow the ABCs of safe sleep: "Alone on the Back in a bare Crib."

The Rock 'n Play Sleeper could hardly deviate further from the FDA's guidelines for infant sleeping conditions.

145.    Another pediatrician reported his communications with Fisher-Price about the product.  According to the blog of Dr. Roy Benaroch, in 2013, he exchanged emails with Fisher-Price about the Rock 'n Play Sleeper's failure to meet the AAP's standards for safe sleep in

---

[82] https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm227575.htm (last visited October 24, 2019).

2013.[83]  He wrote, for example, that "[t]he Newborn Rock 'n Play Sleeper does not keep a baby wholly on the back, but rather in an inclined position.  It is not a safe way for babies to sleep."  He also noted that the AAP guidelines provide that "[s]itting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home," and advised Fisher-Price that, "[t]hough this sentence doesn't specifically mention your product, the Newborn Rock 'n Play Sleeper is shaped like the devices in this category, and is therefore not recommended for sleep."

146.    Dr. Benaroch reported that Fisher-Price responded to this communication, confirming its receipt.  He said that a Fisher-Price representative responded, stating, "Thank you for your inquiry and comments.  We did receive your email on February 7, 2013.  We have provided these comments to the appropriate people within Fisher-Price.  The Rock 'n Play Sleeper complies with all applicable standards."

147.    Defendants have not, however, taken any steps to address the alarming concerns raised in the pediatricians' communications and continue to insist, to this day, that the product safe.

**Documented Instances of Infant Death or Injury from the Use of the Rock 'n Play Sleeper**

148.    As stated above, in November 2018, the Wall Street Journal reported that more than 30 deaths and 700 injuries have occurred as a result of the use of inclined sleepers like the Rock 'n Play Sleeper.  A follow-up article in the Washington Post reported that, as of October

---

[83] https://pediatricinsider.wordpress.com/2013/04/29/the-fisher-price-rock-n-play-sleeper-is-not-for-sleeping/ (last visited April 15, 2019).

2019, the reported death toll had risen to 59 babies.[84] The specific details of these stories are terrifying and are well-known to Defendants.

149.    In 2015, a mother filed a lawsuit in Texas against Defendants Fisher-Price and Mattel arising from the 2013 death of her baby daughter in a Rock 'n Play Sleeper (the *Torres* case).[85]  The complaint details the facts of this tragic event.

150.    Specifically, the complaint alleges that on or about October 29, 2013, the mother of an infant woke to find that her daughter, whom she had placed in a Rock 'n Play Sleeper, was not breathing.  The baby was restrained in accordance with Defendants' instructions.  The baby's head was turned to the side with her chin resting on her shoulder.  She had died of asphyxiation during the night.

151.    Plaintiff's expert in the *Torres* case referenced other alarming incidents in his expert report, including the following:

a.    In 2014, a grandmother in Georgia found her grandson in a Rock 'n Play Sleeper in a strange position, as though his head was stuck.  The baby was turning blue and would not wake up.  The grandmother was sure he had died, but at last he began to breathe. When the family took him to the hospital, the medical professionals advised them that the most likely cause was positional asphyxiation due to his head being down and cutting off his airway. After this, the family stopped using the Rock 'n Play Sleeper and put the child on an apnea monitor and found that he did not miss any more breaths while on the monitor.

b.    In 2012, the mother of a five-week old baby found her son unable to breathe in the Rock 'n Play Sleeper.  She took him to the hospital, where the doctor gave him a

---

[84] https://www.washingtonpost.com/business/2019/10/17/study-concludes-design-rock-n-play-other-infant-sleepers-led-deaths/ (last visited October 17, 2019).

[85] *Torres et al. v. Imperial Manufactory Ltd., et al.*, Case No. 15-cv-444 (S.D. Tex.).

sleep apnea monitor.  The monitor went off the next night while he was sleeping in the Rock 'n

Play Sleeper.  The mother found that his chin was down.  The mother put him in a bassinet and

he experienced no more episodes.

152.    On January 22, 2018, the parent of an infant who died in his Rock 'n Play Sleeper

on January 6, 2018 made this heartbreaking report to the CPSC:[86]

> My 6 month old son was put down for a nap in the Fisher Price Rock n
> Play.  During the time of his nap, he rolled over in the Rock N Play and
> silently died.  The Rock N Play is sold as a sleeper and is marketed for
> "great overnight sleep".  My son was 18 pounds well under the limit of 25
> pounds that the Rock N Play provides as a weight limit for use.  An
> average 9 month old boy is 25 pounds, average for a girl is 12 months old
> at 25 pounds.  Fisher Price has been notified of infant deaths due to their
> product and will still not recall it.  This product cannot be labeled as a
> sleeper or for "great overnight sleep".  ***My son was a beautiful, healthy
> baby and only died because of the Rock N Play and the false sense of
> security they provide with their false and UNSAFE claims of the Rock N
> Play being used for safe sleep.  The only place for safe sleep for an
> infant is a flat surface. This death trap needs to be recalled and labeled
> as a SUPERVISED PLAY PRODUCT so no other family has to lose
> their child like I have***.

(All *sic* except emphasis added.) This report was sent to the manufacturer on July 6, 2018.

153.    Another example of a documented instance of injury occurred in March 14, 2018,

where an aunt reported a "terrible scare" on a new mothers website: [87]

> I don't want to scare anyone but wanted to share a story as an FYI because
> i know so many people use rock and plays for sleep time. My brother and
> his wife used a rock and play with my niece and recently had a terrible
> scare. They fed the baby then put her back down the sleep with the rock
> and play on and ***she choked and stopped breathing - they had to do CPR
> to resuscitate***.
>
> This was just 2 months ago. Honestly I know everyone uses rock and
> plays and most babies are fine but they aren't sleep safe for the exact thing

---

[86] https://saferproducts.gov/ViewIncident/1728157?mod=article_inline (last visited April 10, 2019).

[87] https://community.whattoexpect.com/forums/february-2018-babies/topic/rock-and-play-warning-65446621.html (last visited April 15, 2019).

that happened to my niece. I talked to my pediatrician about using one because my son spits up a lot and he warned me not to use it for overnight sleep.

(All *sic* except emphasis added.)

154.　In addition to asphyxiation, parents continue to report their infants developing flat head (plagiocephaly/brachycephaly) and twisted neck (torticollis) syndromes.  For example, one consumer posted on Amazon.com on March 16, 2018:

> This product is know[n] to give babies flat heads!! Just got out of the Cranial Technology office with our 4 mo. old who needs to wear a helmet. **The Dr. said rock n plays keep them in business**.

(Emphasis added).

155.　It is beyond question that Defendants knew of such reviews.  ***Indeed, Fisher-Price responded*** to the immediately preceding review, writing:

> We recommend everyone to speak with their pediatrician before using one of our Rock 'n Play Sleepers, to see if your baby is a good fit for it. We're very concerned about the situation you've described.  One of our Consumer Services specialists would like to speak with you to get all the information we need to take action.  Please call us as soon as possible at 1-888-253-4303, between the hours of 9:00 a.m. and 6:00 p.m. EST, Monday – Friday.

156.　Despite the above response and admission, nothing on the product's packaging or in its advertising suggests that customers should speak to pediatricians before using the Rock 'n Play Sleeper.

157.　Many more complaints from customers reporting infant injury are readily available.  Below are some representative examples. (All *sic* except emphasis added).

　　　a.　On October 11, 2018, a mother posted on Amazon.com:[88]

---

[88] https://www.amazon.com/gp/customer-reviews/R3IUCH2LOOYK02/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B00NEO5UTU (last visited April 15, 2019).

Please do your research before choosing this as your baby's place to sleep It breaks my heart to have to give this once-beloved item one star but knowing what I know now I would have never purchased one . . . . By about 6 weeks I started noticing that my son's head was flattening at the back, widening at the sides and forming an upward slope toward the crown of his head. I didn't understand why his head wasn't rounding out, thinking maybe it just needed more time. By our 2 month pediatrician appointment, our doctor diagnosed our son with Brachycephaly (flat head). I was devastated. It quickly occurred to me that it was due to where he had been sleeping (in the rock n play). He didn't spend much time on the back of his head other than to sleep and after an exhaustive search online and in new parent forums, I soon learned I was not alone - he had gotten flat head from the rock n play. Many other parents had stated that their child too was experiencing "rock n play head". In fact, approximately 50% of 2 month olds experience flathead due to back sleeping, many of whom I would bet are using this best seller. *I later learned that by restricting movement during sleep (which of course is great for keeping babies sleeping), the soft insert is doubly dangerous since it REALLY keeps them positioned in one direction, looking forward applying pressure all night to the center of the back of baby's skull*. If your child favors one side they will be at risk for Plagiocephaly (flattening of one side of the head, which can cause facial asymmetry among other issues). We are now faced with having to helmet our child and are going for weekly physical therapy appointments to try to correct the damage from the rock n play. *Our physical therapist admitted that the rock n play is keeping her in business* . . . .This device is much better used in moderation during the day as a lounger than a place to sleep. I urge Fischer Price to change the marketing of this "essential" baby gear to a 'lounger' vs as 'sleeper' and to save others the heartache we are experiencing. Do your research. I wish I had known this beforehand as preventing flathead is infinitely easier than trying to correct it.

b.      Another, on April 10, 2018, wrote:[89]

Gave my newborn a flat head! This gave my son a flat head in the back. The area where the head rests is very hard, *my doctor said to stop using it immediately*. don't waste your money.

c.      Another, on July 24, 2016, wrote:

Flat head :( Our son loved this product from day 1, it was the only place he would sleep. *Now he is being treated for flat head and torticollis.*

---

[89] https://www.amazon.com/gp/customer-reviews/ R23N34CW3THONP/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B00NEO5UTU (last visited April 15, 2019).

***Babies can't move their heads properly during sleep in the rock n play****. (Emphasis added). I wish we had never bought this, and instead toughed out a few nights of no sleep to get him used to sleeping flat. It's not worth it!!!!

d.   Yet another example, posted on December 1, 2016:[90]

A magical device…that can also cause torticollis and plagiocephaly/ brachycephaly. My husband and I bought a RNP after we brought our son home from the hospital because he would not sleep in his crib or any completely flat surface, and we were desperate . . . . Great, right?! So, why only one star?

This device should NOT be used as a bed. Not only does it go against everything we are now taught about SIDS, but because it restricts head movement, it can also cause physical deformities, such as plagiocephaly/brachycephaly (flat head) and torticollis. My son is now 2 months old and just diagnosed with left side plagiocephaly and right torticollis. His head tilts to the right, but rotates to the left and the back, left-side of this head is flat. He favors looking to his left and has a bit of difficulty looking all the way to his right. We have to do stretches for his neck multiple times a day, hold him and feed him differently, and constantly encourage him to look to his right and keep him off the left side of his head as much as possible, in order to try to correct this problem before he requires a very expensive helmet. Not all babies with these conditions get it from a RNP, obviously, but do yourself a favor and google "rock n play torticollis," and you may want to find an alternate sleep solution.

**The Reaction to Defendants' Belated Admission of Known Infant Deaths and Their "Warnings" to Consumers**

158.    As set forth above, on April 5, 2019, Fisher-Price and the CPSC issued a joint press release disclosing to the public the dangers of the Rock 'n Play Sleeper and warned consumers "about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product."[91]

---

[90] https://www.amazon.com/gp/customer-reviews/R1XPNDFN88Q2VB/ ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B00NEO5UTU (last visited April 15, 2019).

[91] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited April 10, 2019).

159.    While the CPSC and Fisher-Price recommended that consumers stop using the Rock 'n Play when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities, as set forth above, the AAP recommended that inclined sleepers like the Rock 'n Play Sleeper should ***never*** be used for overnight or prolonged sleep for ***any*** infants, including newborns, whatever the age.  Thus, after the announcement by CPSC and Fisher-Price, the AAP stated: [92]

> We don't recommend that babies are placed to sleep with their heads elevated because that is a position that would be subject to accidental suffocation [and] strangulation in bed," said Feldman-Winter of the AAP. Instead, the AAP says that for prolonged or nighttime sleep, babies should be put on their backs, unrestrained, alone, on a flat, firm surface, such as a mattress covered by a fitted sheet in a bare crib, bassinet, or play yard.

160.    Further, while the CPSC and Fisher-Price suggested that parents using the restraints on their babies when in the Rock 'n Play Sleeper renders the product safer, the AAP's advice is the opposite: [93]

> [T]he American Academy of Pediatrics says it does not recommend products for routine sleep that require restraining a baby, especially if that product also rocks. "To [fasten] a baby down to a surface and then rock the baby is not consistent with our recommendations," said Lori Feldman-Winter, M.D., a member of the AAP task force on Sudden Infant Death Syndrome (SIDS) and a professor of pediatrics at Cooper Medical School of Rowan University in Camden, N.J.

**The Belated and Inadequate Recall**

161.    On February 21, 2019, Plaintiff Barton sent each Defendant a letter pursuant to California Civil Code § 1782(a), California Uniform Commercial Code § 2607(3)(A), 15 U.S.C. § 2310(e), and all other applicable statutes, and enclosing a draft of her complaint, informing

---

[92] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

[93] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited April 10, 2019).

each Defendant that it is in violation of the foregoing statutes, and demanding that Defendants take corrective action.  A copy of Barton's correspondence is attached as **Exhibit A** (enclosure omitted).

162.    As set forth above, on April 12, 2019, after admitting they knew that at least 32 infants died, hundreds more injured, and at least 4.7 million more exposed to risk of death, Defendants at last recalled the Rock 'n Play.  As noted above, in the Recall notice Defendants stated:[94]

> *Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances*.

(Emphasis original).  In the notice, Defendants advised, "**If you own a Rock 'n Play Sleeper, discontinue use of the item immediately.**" (Emphasis original).

163.    On April 24, 2019, following a mutually agreed extension, Defendants responded to Plaintiff Barton's letter and stated, in relevant part:

> As an initial matter, Fisher-Price and Mattel disagree with the allegations in your February 21 letter and the draft complaint relating to the alleged inherent danger of the Sleeper and inadequacy of the product warnings. ***Safety is of paramount importance to Fisher-Price and Mattel***. The Sleeper has met all applicable safety standards, including those of the international standards organization, known as ASTM International and was certified by the Juvenile Products Manufacturers Association ("JPMA").
>
> As you are likely aware, on April 12, 2019, after discussions and in conjunction with the [CPSC], Fisher-Price decided to voluntarily recall all of its Sleeper products, effective immediately, and to stop selling the product. Fisher-Price's decision to recall the Sleeper was not due to any alleged defect in the product. Rather, ***given the reported incidents in which the product was used contrary to safety warnings and instructions, Fisher-Price decided***, in partnership with the CPSC, ***that a voluntary recall was the best course of action***….

---

[94] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited April 14, 2019).

> Thus, the Sleeper recall…achieves the broadest injunctive relief [Plaintiff] Barton could have hoped to achieve through a lawsuit and provides an appropriate remedy to [Plaintiff] Barton and members of the putative class.

(Emphasis added). A copy of Defendants' correspondence is attached as **Exhibit B**.

164.    It is well known that product recalls generally have a low level of participation. This one is designed to be no different.   Defendants' Rock 'n Play Sleeper Recall is cumbersome, inconvenient, restrictive, and confusing to the general public.  Parents who own the product must take it apart and send in the hub assemblies that held parts of the product together. Parents who had the product for six months or less are eligible for a full refund, while parents who have owned it for longer than six months are only entitled to vouchers for a selection of Fisher-Price products determined by Fisher-Price on a sliding scale based on how long they have owned the Rock 'n Play.  The Recall is inadequate and unfair.

165.    Limiting full reimbursement to those who owned the product for six months or less is unfair because the product is not expressly sold for short term use and many parents obtained the product assuming they would be able to use it for a future child, or, when their baby outgrew it, to share it with a friend or relative with a younger baby.  Even for persons who owned the product for six months or less, only those who still have the original receipts are to be "reimbursed for the receipt amount including sales taxes."[95]

166.    Moreover, consumers who qualify cannot redeem their refund until they dismantle the Rock 'n Play Sleeper and ship parts of it back to Defendants. A picture[96] of the bulky hubs that Defendants require consumers to remove from their Rock 'n Play Sleepers,

---

[95] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited October 20, 2019).
[96] *Id.*

package in a box that they must obtain on their own time and at their own expense, and then arrange to drop off at the shipper, is below:

**Fisher-Price® Rock 'n Play Sleeper Recall**

The United States Consumer Product Safety Commission announced a voluntary recall of all Fisher-Price® Rock 'n Play Sleepers.

**Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.**

**If you own a Rock 'n Play Sleeper, discontinue use of the item immediately.**

We will be sending you a prepaid shipping label and detailed instructions on how to disassemble your Rock 'n Play Sleeper and return the two hubs. **Keep the remainder of your product, a copy of the receipt (if you have it), and the shipping receipt until you receive your recall resolution.**

The hubs you're returning should look like one of the following photos:



167.    That means that they must have not only take it apart, but package and bring bulky components to the post office.

168.    Furthermore, Defendants have placed an undue burden on those seeking the voucher. Consumers who purchased their product more than six months ago are more likely to have disposed of it, meaning they cannot even receive a voucher because they cannot mail back the hubs as required by Defendants to participate in the Recall.

169.    In addition, vouchers are not acceptable because they require consumers to purchase more goods from Defendants to be able to be "benefit" from the Recall, which is

caused by Defendants' indefensible misconduct. As stated by Nancy Cowles, executive director of Kids in Danger, vouchers based on a sliding scale "will discourage participation."[97]

170.    Moreover, under the Recall, parents will not be compensated for all costs they incurred in connection with the product, such as taxes (without a receipt), shipping, handling and other charges paid when the original purchase of the product was made; costs associated with participating in the Recall, such as buying a box or travelling to the post office; or costs associated with stopping use of the Rock 'n Play after the announcement of the Recall such as replacing it with a different product that is safe for infant sleep.  Parents who were using the product for their infants' overnight sleep up to the time of the Recall may have had to rush out and by a new place for their babies to sleep with no recompense.

171.    As further evidence that the Recall is inadequate, Rock 'n Play Sleepers continue to be used and sold, and thus continue to endanger infants' lives.  A recent study, reported in Consumer Reports on August 7, 2019, found that one in 10 daycare providers was still using Rock 'n Play Sleepers and other dangerous inclined sleepers after the Recall.[98]  Some daycare providers wrongly believe, based on Defendants' false statements, that if the product is used as directed, it is not dangerous.  Many do not know about the Recall at all.[99]  Compounding the problem, it is extremely likely that if daycare providers, who are required to keep informed about the safety of their facilities do not know of these dangers, then many parents do not either.

---

[97]https://www.washingtonpost.com/business/2019/04/12/after-reports-infant-deaths-nearly-million-fisher-price-rock-n-play-sleepers-recalled/?utm_term=.78925f7f3e37&wpisrc=nl_rainbow&wpmm=1 (last visited April 18, 2019).

[98] https://www.consumerreports.org/child-safety/dangerous-fisher-price-and-kids-ii-infant-sleepers-still-used-in-day-care-centers/ (last visited October 17, 2019).

[99] *Id.*

172.    Due to the inadequacy of the information in the Recall, even after the announcement of the Recall, Rock 'n Play Sleepers can still be found for sale online on sources such as Facebook Marketplace.[100]   This too demonstrates that parents remain ignorant of the dangers of these products.[101]

**Congress Introduces Legislation to Ban Infant Sleepers**

173.    On June 9, 2019 and June 10, 2019 bills were introduced in the United States House of Representatives and United States Senate, respectively, to ban the manufacture, distribution, import and sale of inclined sleepers.  The bills, introduced by Representative Tony Cárdenas (D-Calif.) and Sen. Richard Blumenthal (D-Conn.), would ban all infant sleeping devices with inclines of more than 10 degrees, which would put the United States in line with sleep standards in Canada.  Representative Cárdenas explained at a Congressional hearing on June 13, 2019 that he introduced the bill because "companies decided making money was more important than the lives of innocent babies" and "because the regulatory agency charged with protecting Americans decided to be puppets for industry and stood by as more precious lives were lost."[102]

---

[100] *See, e.g.*, https://www.facebook.com/marketplace/nyc/search/?query=rock%20n%20 play&vertical=C2C&sort=BEST_MATCH (last visited October 17, 2019).

[101] On June 27, 2019, Defendants issued a recall of its Ultra-Lite Day & Night Play Yard Inclined Sleeper Accessory.  This was an accessory at a similar incline to the Rock 'n Play Sleeper that was sold with Defendants' Play Yards.  Defendants stated that they were issuing this recall because infants had died in other inclined sleep products.  Approximately 71,000 units were recalled. *See* https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-inclined-sleeper-accessory-included-with-ultra-lite-day-night-play (last visited October 21, 2019).

[102] https://www.consumerreports.org/child-safety/inclined-sleeper-deaths-rise-to-50-as-industry-continues-to-sell-the-products/ (last visited October 22, 2019).

174.    Consumer Reports, the AAP and consumer advocates uniformly expressed relief about the introduction of these the bills.[103] A Washington Post article reporting on the legislation quoted Nancy Cowles, Kids in Danger executive director, "We think it's great…. We feel there is no way to make sleep safe in these devices."[104]

175.    In addition to the pending legislation discussed above, on August 13, 2019 the United States House of Representatives Committee on Oversight and Reform requested that the CPSC, Mattel, Fisher-Price, the ASTM and the Juvenile Products Manufacturers Association all produce documents and communications to the Committee by August 27, 2019 concerning the safety of inclined sleep products and other material concerning these products.

**The CPSC's Proposal of a More Stringent Rule and the Study Underlying that Proposal**

176.    On June 12, 2019, the CPSC's General Counsel called for termination of the CPSC's February 2017 inclined sleeper rulemaking proposal so that a more stringent rule could be proposed.[105]   The Draft Federal Register Notice accompanying the call for termination stated that based on information, "including the number of infant fatalities associated with inclined sleep products, the Commission's safety alerts based on some of these fatalities, and two recent recalls of inclined sleep products, the Commission concludes that [the 2017 proposal] … is unlikely to adequately address the risk of injury associated with inclined sleep products."[106]

---

[103] https://www.washingtonpost.com/business/economy/lawmakers-introduce-bills-to-ban-inclined-sleepers/2019/06/12/a3e14ee6-8d36-11e9-8f69-a2795fca3343_story.html (last visited October 9, 2019).

[104] *Id.*

[105] https://www.cpsc.gov/s3fs-public/Termination-of-Rulemaking-for-Infant-Inclined-Sleep-Products-June-12-2019.pdf?M1wyNKIZ4Zk1tjhKqlW4e6PW0slZBceF, at 1 of PDF, (last visited October 18, 2019).

[106] *Id.* at 5 of PDF.

177.   On October 16, 2019, the CPSC's General Counsel issued a Draft Supplemental Notice of Proposed Rulemaking ("2019 NPR") that it recommended should replace the 2017 proposed rule.[107]   The 2019 NPR "proposes to limit the seat back angle for sleep to 10 degrees or less, and to change the scope of the standard to cover products intended for infant sleep that are not already addressed by another standard."[108]

178.   The 2019 NPR states that the CPSC is aware of **451 incidents**, including **59 fatal incidents**, reported between October 1, 2016 and June 30, 2019; and that 43 percent of those incident reports were based solely on information from manufacturers and retailers.   Defendants previously reported incidents including infant deaths to the CPSC. This is further evidence that Defendants, who manufactured 4.7 million units, the greatest number of inclined sleepers in the world, were well aware of the dangers posed by their product.

179.   In developing the 2019 NPR, the staff commissioned a study of inclined sleep products lead by Dr. Erin Mannen, Ph.D., a mechanical engineer with a specialization in biomechanics, Assistant Professor of Orthopaedic Surgery, and Director of Translational Orthopaedic Research at the University of Arkansas for Medical Science. The Mannen study included a comparison of infants' muscle movement and oxygen saturation on flat and inclined surfaces and in selected inclined sleep products.[109] The team also reviewed 91 separate incident reports that had been reported to or investigated by the SPSC.[110]

---

[107] October16, 2019 Supplemental Notice of Proposed Rule Making, CPSC Docket No. 2017-0020, at 1 of PDF available at https://www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf?TP VAJZEQcz9x9sKeEGltm4LskkonxUWv (last visited October 18, 2019).

[108] *Id.* at 68 of PDF.

[109] *Id.* at 118 of PDF.

[110] *Id.* at 95 of PDF.

180.    Dr. Mannen's study concluded that "*no inclined sleep products that were examined as a part of this study are currently safe for infant sleep. The product category should be completely eliminated, or the ASTM standard significantly modified to ensure a safe environment and mitigate risk.*"[111] (Emphasis original).   The study further concluded that "an incline of 20-degrees or greater is <u>not</u> safe."  (Emphasis original).[112]   In other words, the CPSC study confirmed that the Rock 'n Play Sleeper, which is at an incline of 30 degrees, is not safe for infant sleep and is a product that "*should be completely eliminated*." (Emphasis original).[113]

181.    Photographs depicted in the study report clearly show that Rock 'n Play Sleepers were among the products studied:[114]



**Defendants' Deceptive Advertising and Marketing**

182.    Despite their indisputable knowledge of the AAP's guidelines; individual physicians' and consumer groups' recommendations that babies sleep supine flat on their backs, that their heads not be elevated, that they sleep on a firm surface without soft materials, and that sitting devices such as car seats, strollers, swings, infant carriers and infant slings are not recommended for routine sleep; the products being banned as "sleepers" in Australia and Canada; and the numerous reports of injuries and deaths, Defendants marketed and continued,

---

[111] *Id.* at 154 of PDF.

[112] *Id.* at 63 of the PDF.

[113] *Id.* at 154 of the PDF.

[114] *See id.* at 101-105 and 115 (photo) of PDF.

until April 12, 2019, to market the Rock 'n Play Sleeper in the U.S. as suitable for  safe infant sleep, including prolonged or overnight sleep.

183.    Defendants' deceptive advertising of the Rock 'n Play Sleeper as suitable for safe overnight sleep for babies takes three primary forms: on the box, online and in-store.  Online advertising appeared on the Fisher-Price website as well as other websites where the product was sold (such as Amazon.com).  In-store advertising appeared in the numerous stores where the Rock 'n Play Sleeper was sold.

184.    Defendants' deceptive advertising of the Rock 'n Play Sleeper starts with its very name: "***Sleeper***."   By naming the product a "Sleeper," Defendants misled consumers into believing that the product is a safe and suitable place for babies to sleep.  A reasonable consumer would assume the Rock 'n Play Sleeper's design is consistent with the applicable guidelines and recommendations about how babies should be safely placed to sleep. A reasonable consumer would also assume that Fisher-Price, a company that touts safety as a priority, would have designed the product with appropriate medical review and safety testing. As described above, the product actually is unfit for use as an infant sleeper and, in fact, exposes infants to the risk of injury and death.

**False and Misleading Representations on the Boxes**

185.    One of the principal means of advertising the Rock 'n Play Sleeper was the box in which the product is packaged.  The boxes prominently tout that the product is suitable for all-night sleep as illustrated by the figures below showing typical packaging:



Above: Figure 6



Above: Figure 7



Above: Figure 8

186.    The marketing statements on the packaging conflict with the AAP's guidelines and recommendations, and those of other infant sleep experts.

187.    For example, Defendants' statements that "Baby can sleep at a comfortable incline all night long!" (Figure 6), "Comfortable incline for babies that need it" (Figure 7), and "Incline or Recline – Choose the position that baby likes best" (Figure 8) are contrary to the AAP's guidelines and recommendations that babies sleep supine flat on their backs and that their heads not be elevated.[115]

188.    Defendants' statement that "Extra-plush fabrics for extra-comfy sleep" (Figure 6) is contrary to the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.

189.    Defendants' statements that the product is a "Nighttime sleeper and playtime seat!" (Figure 7) and an "Adjustable seat for all-night sleep!" (Figure 8) is contrary to the AAP's

---

[115]A baby may prefer to be inclined or reclined, but sleeping in an inclined or reclined position is inconsistent with AAP recommendations because it increases the risk of suffocation.

guideline and recommendation that sitting devices are not recommended for routine sleep. Similar statements appeared on all of Defendants' packaging for the Rock 'n Play Sleeper at all relevant times.

190.    Defendants' deceptive marketing of the product as a "Sleeper" that is safe for infant sleep, including overnight or prolonged sleep, is material to consumers' decision to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe.  Defendants should not have marketed the product as a "Sleeper" suitable for infant sleep, including prolonged or overnight sleep.  Alternatively, Defendants should have disclosed in their marketing statements that using the product for sleep, including prolonged or overnight sleep, is dangerous and contrary to medical guidelines and recommendations because this information would be material to a consumer's decision as to whether to purchase and/or own the product.

191.    Defendants' deceptive marketing of the Rock 'n Play Sleeper as a "Sleeper" when its use as such conflicts with the applicable medical guidelines and recommendations not only exposed Class members' infants to serious risk of injury and even death, but also induced consumers who would not have otherwise purchased the product to purchase it, own, and use it when they would not have otherwise owned and used it, and/or to pay a higher price than they would have otherwise paid for the product if it was not falsely and misleadingly advertised as a "Sleeper" suitable for sleep, including prolonged or overnight sleep.

**False and Misleading Representations on Product Webpages**

192.    Defendants' marketing on the www.fisher-price.mattel.com website touting the Rock 'n Play Sleeper as a "Nighttime sleeper and playtime seat in one!  This inclined sleeper rocks!  The supportive, angled seat back keeps baby elevated for playtime and inclined sleep (the

way some babies sleep best!), to help baby sleep allllll [sic] night long,"[116] also conflicted with the AAP's guidelines and recommendations.

193.    The product webpages for the Rock 'n Play Sleeper on Defendants' website, replicated in significant part on the websites of other distributers such as Amazon and Target, made similar misrepresentations to those on the box.  For example, on Amazon.com, the product was described as "an inclined baby seat that helps little ones sleep all naptime or nighttime long," touting that it is "a Sleeper & playtime seat in one," and saying that the parent and child "both could be sleeping in no time."[117]

194.    The webpages also stated:

 "The inclined seat helps baby sleep all night long;"[118]

and

"An extra-deep seat helps baby sleep all night long." [119]

and

"This sleeper helps give your little one the customized soothing motions he or she loves, so you both can get some much-needed shut-eye."[120]

---

[116] https://fisher-price.mattel.com/shop/en-us/fp/moonlight-meadow-deluxe-newborn-rock-n-play-sleeper-chx77 (last visited April 10, 2019).

[117] https://www.amazon.com/Fisher-Price-Deluxe-Sleeper-Snugapuppy-Dreams/dp/B01LTHZ5SO/ref=sr_1_5_s_it?s=baby-products&ie=UTF8&qid=1523996652&sr=1-5&keywords=rock+n+play+sleeper (last visited April 10, 2019).

[118] https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/newborn-rockn-play-sleeper-bct91 (last visited April 19, 2019); https://www.amazon.com/d/Infant-Bouncers/Fisher-Price-Rock-Sleeper-Rainforest-Friends/B00BUO4664?th=1 (last visited February 14, 2019).

[119] https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/auto-rock-n-play-sleeper-aqua-stone-fashion-chn28 (last visited April 15, 2019); https://www.amazon.com/dp/B00NEO5UTU?tag=price1139204-20&ascsubtag=wtbs_5c65fced35774a073762e94a&th=1 (last visited February 14, 2019).

[120] Wayback Machine Archive of Newborn Rock 'n Play Sleeper Fisher-Price page (Mar. 29, 2017),       https://web.archive.org/web/20170329030329/https:/fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/newborn-rockn-play-sleeper-bct91 (last visited Apr. 18, 2019).

195.    These webpages showed pictures of mothers lying down in bed with their babies in Rock 'n Play Sleepers next to them, assuring mothers they can sleep while their babies sleep peacefully in the product.  These statements and images are misleading for the same reasons the images on the boxes are misleading.

**False and Misleading Representations About Safety**

196.    Defendants misled consumers of Rock 'n Play Sleepers by having safety be a central component of their brand image.

197.    For example, Defendant Fisher-Price has a webpage dedicated to safety.[121]  This page, titled "A Safety Story," states:

> **It All Starts With Safety**
>
> Squeals of delight, sighs of contentment, giggles of joy . . . those are some of the reactions we hope for from families using our babygear and toys. There's a less visible one, too:  peace of mind.
>
> "Parents have trusted us for more than 80 years to provide safe products for their children, but we know we must still earn their trust every day," says Kitty Pilarz, Vice President of Product Safety & Regulatory Compliance at Fisher-Price.  "So, right from the start of a design concept, we work to make sure our products are as safe as they can be."
>
> **To standards and beyond**
>
> There's an entire team of quality engineers who work closely with design groups to make sure every product not only meets U.S. safety regulations and international standards, but lives up to the traditionally high Fisher-Price standards of quality, as well as consumer expectations.  A significant amount of testing is done all along the way.

198.    This is false, because, for all of the reasons set forth herein, the Rock 'n Play Sleepers are not "as safe as they can be," and instead are dangerous for all night sleep, the purpose for which they are advertised.

---

[121] https://www.fisher-price.com/en_US/ourstory/safety/index.html (last visited April 15, 2019).

199.    The "Safety Story" continues:[122]

**Listening to consumers**

"We welcome feedback from consumers—it's critical to helping us make better products," says Gary Cocchiarella, Director of Consumer Services. "Families don't hesitate to share their opinions, so we collect, analyze and share their comments with our teams.  That way, we can detect and solve problems quickly, as well as improve our design and manufacturing processes."

200.    This too is false.  Defendants did not modify the Rock 'n Play Sleeper for a decade despite complaints from parents about the safety of the product, documented reports of infant death and injury from its use, and warnings from pediatricians and consumer protection advocates that inclined sleepers such as the Rock 'n Play Sleeper are unsafe.

201.    The overarching message on Defendants' website is also safety.  Among other things, the website states that the most important part of creating its products is to make sure they are safe and that its internal product safety procedures are designed to meet or exceed applicable regulations and laws.[123]

202.    Parents' trust is essential for Defendants' success, and Defendants advertise their commitment to safety including assurances that their products comply with all safety standards.

203.    According to Chuck Scothon, General Manager of Fisher-Price: "Fisher-Price has a long, proud tradition of prioritizing safety is a cornerstone of our mission."[124]

---

[122] *Id.*

[123] http://citizenship.mattel.com/inspired-design/ (last visited February 14, 2019).

[124]  https://news.mattel.com/news/media-statement-on-the-u-s-consumer-product-safety-commission-fisher-priceR-joint-security-alert-released-on-april-5-2019 (last visited October 15, 2019).

204.    Defendants' marketing led parents and other consumers of Rock 'n Play Sleepers to reasonably believe that the products have been tested, comply with all applicable regulations and laws, and are fit for their intended use.

205.    This false and misleading messaging is also reflected in Defendants' direct interactions with consumers.  As recently as ***February 1, 2019***, just a little over two months before the April 12 Recall, in response to a consumer's request for a refund after she learned of the many infants who died while using the Rock 'n Play Sleeper, Mattel Consumer Services representative Stefanie W. responded with the following form letter sent from the FisherPriceBabyGearConsumerRelations@mattel.com corporate e-mail address:

> ***We can assure you that the Rock 'n Play Sleeper is safe for inclined sleep, including overnight sleep, when used according to the instructions.*** And we understand it can be confusing to hear an American Academy of Pediatrics recommendation that may seem to conflict with a product designed for inclined sleep. But maybe this will help clarify: what the AAP states is that sitting devices - car seats, strollers, swings, infant carriers and infant slings - are not recommended for routine sleep in the hospital or at home.
>
> The Rock 'n Play Sleeper is not a sitting device - it is a product specifically designed for inclined sleep. As such, it meets all applicable industry safety standards, including those of the international standards organization known as the ASTM.
>
> We hope that clears up any confusion you may have had….

(Emphasis added).

**Defendants' In-Box Disclosures Are Materially Misleading**

206.    Defendants' limited disclosures inside the Rock 'n Play Sleeper box do not disclose the inherent danger of the product and are worded in such a way that they are intentionally misleading.  These in-box disclosures also make recommendations that parents cannot possibly follow.  There are no disclosures or warnings on the box itself.

207.    There is a warning label attached to the soft padded material inside the Rock 'n

Play Sleeper that cannot be read – if an exhausted parent notices or reads it at all – until the

product is removed from the box.  The "warning" states:



208.    Because a parent cannot see the label until after opening the box, these statements

on the padding label, even if they were adequate warnings (which they are not), cannot inform a

consumer's decision about whether to purchase or obtain the product.  Even if the disclosures

were on the box, they would be insufficient and useless due to numerous dangerous omissions

that render them materially misleading.

209.    First, Defendants stated that infants have suffocated "on **added** pillows, blankets

and extra padding" (emphasis added), leading parents to reasonably believe that the padding that

comes with the Rock 'n Play Sleeper *is* safe and cannot cause suffocation.  Indeed, the statement

that follows instructs:  "Use ONLY the pad provided by Fisher-Price.  NEVER place extra padding or beside an infant."  As Defendants are well aware, the AAP guidelines state ***any*** soft material under a baby can cause suffocation.  As described above, numerous instances of babies suffocating because of the padding that comes with inclined sleepers have been reported.

210.    Further, Defendants omitted the critical material fact that babies can also die due to positional asphyxiation.  Positional asphyxiation can occur when a baby tips to one side and because of an inclined back position, is unable to pull herself out of that position, and her face either presses into the soft fabric of the sides, or her neck is bent at such an angle that oxygen cannot get through.  Defendants also omitted the fact that, explained in an April 15, 2019 article in The New Yorker, sleep aids like the Rock 'n Play are dangerous because they attempt to solve a problem that should not be solved – getting an infant to sleep all night.[125]  As explained by Rachel Moon, the chair of the AAP Task Force on SIDS, "Babies are not supposed to sleep through the night," and products that are supposed to "make babies 'sleep better,' quote-unquote, are dangerous because they make babies sleep more deeply, and, with SIDS, when they sleep more deeply, they can't wake up." [126]

211.    In a so-called warning that is obviously designed to mislead parents while skirting the AAP's guidelines, Defendants stated, "ALWAYS place child on back to sleep."  But Defendants omitted the crucial fact that parents should always place infants supine – ***flat on their backs*** – for sleep, including overnight or prolonged sleep, and that allowing babies to sleep on an incline is dangerous.  They disregard the language in the AAPs guidelines stating, "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib

---

[125] https://www.newyorker.com/culture/culture-desk/the-life-and-death-of-a-wildly-popular-baby-sleeper (last visited October 19, 2019).

[126] *Id.*

or other appropriate flat surface as soon as is practical.*"* Given its marketing as an overnight sleeper, reasonable parents cannot be expected to conclude that the warning means anything other than placing the infant on its back *in the sleeper*.

212.    Significantly, this supposed warning is not listed under the "suffocation hazard," which only mentions using an additional layer of padding, but is listed separately.  Thus, even with the misleading so-called "warning," Defendants omitted the asphyxiation hazard that the AAP guidelines are designed to prevent.

213.    In addition, Defendants state that parents should "always use the restraint system," but fail to disclose that the use of restraints on babies in the Rock 'n Play does not render the Rock 'n Play safe and, indeed, is in itself dangerous.  Defendants omit the material fact that deaths and injuries have occurred when using restraints on a baby in the Rock 'n Play Sleeper.  Nor do they disclose that strapping a baby for up to 16 hours at a time in a sleeper can result in physical deformities in the baby's head and neck.

214.    Defendants further state that parents should "always provide the supervision necessary for the continued safety of your child," while promoting the Rock 'n Play Sleeper as an all-night sleeper.  This instruction is impossible to comply with because a sleeping parent is in no position to supervise her child.  Indeed, some of Defendants' public statements actually market the Rock 'n Play Sleeper as *suitable for unattended sleep*, as in this still for a marketing video for the product:



215.    Finally, Defendants advise parents that "[w]hen used for playing, never leave a child unattended," which suggests that a parent could safely leave the child unattended when the sleeper was not being used for play — such as when the infant is ***sleeping***.

**Defendants' Disclosures in the User Manual Are Materially Misleading**

216.    The user manuals for Rock 'n Play Sleepers, which are substantially similar in all material respects, also contain misrepresentations, misleading statements, and omissions.  These manuals are inside the boxes in which the products were sold.  This means that the manual cannot be read until the product is removed from the box.

217.    The manuals contain warnings substantially similar to the one below:

⚠ **WARNING**

**Failure to follow these warnings and the instructions could result in serious injury or death.**
- ALWAYS use the restraint system.
- ALWAYS use the pad provided, which includes the restraint. NEVER add a mattress, pillow, comforter, or padding.
- **SUFFOCATION HAZARD** – Infants can suffocate:
  - in gaps between an extra pad and the side of the product.
  - on soft bedding.
- **FALL HAZARD** – To prevent falls, DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs (11 kg), whichever comes first.
- Strings can cause strangulation! NEVER place items with a string around a child's neck such as hood strings or pacifier cords. NEVER suspend strings over product or attach strings to toys.
- NEVER place product near a window where cords from blinds or drapes can strangle a child.
- To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians recommend healthy infants be placed on their backs to sleep, unless otherwise advised by your physician.
- Always provide the supervision necessary for the continued safety of your child.
- When used for playing, never leave child unattended.

218.     Like the warning label on the padding, this warning omits the material risk that use of the Rock 'n Play Sleeper can result in positional asphyxiation.  Also like the warning label on the padding, this user manual warning instructs consumers to always use the restraint, but it does not disclose that keeping a baby restrained for extended periods of time can result in deformations to the head or neck.  And, again, like the warning label on the padding, this warning instructs users to "always provide the supervision necessary for the continued safety of your child," but it ignores the fact that this is not possible when the baby is in the Rock 'n Play Sleeper for sleep or the caregiver is asleep when the baby is in the product.

219.     The warning section in the manual also includes slight variations on the language in the label on the padding, but the overall impact is no less misleading.  For example, the warning section in the manual uses the acronym "SIDS" and states that, "[t]o reduce the risk of [SIDS], pediatricians recommend healthy infants be placed on their backs to sleep," but it does not say that the recommendation is actually that babies should be flat on their backs and not on an incline.

220.   In addition, the warning section in the manual states:

ALWAYS use the pad provided, which includes the restraint.   NEVER add a mattress, pillow, comforter, or padding.

SUFFOCATION HAZARD: – Infants can suffocate:

- in gaps between an extra pad and the side of the product.

- on soft bedding.

This warning is misleading because it does not disclose that the pad that comes with the product and the soft fabric walls that are a part of the product themselves pose a risk of suffocation.

221.   The manuals are also misleading in ways beyond the inadequate and misleading warning section.   For example, the manuals show images of mothers lying down in bed, covered with blankets, which indicates either that they are ready for sleep or awakening from sleep. Below is an example:[127]



222.   This image is misleading because it implies that mothers can sleep when their babies are in the sleepers, while, at the same time, Defendants warn that babies should be

---

[127] https://service.mattel.com//instruction_sheets/BCG43-2L.pdf (last visited February 14, 2019).

supervised when in a Rock 'n Play Sleeper.  Mothers cannot supervise their children when they are themselves sleeping.

223.    The manuals also contain a section titled, "Preventing Baby's Head from Flattening."   This Section contains numerous statements that are misleading due to misrepresentations or omissions, including:

> Pediatricians and child health organizations agree that healthy babies should be placed on their backs to sleep for naps and at nighttime, to reduce the risk of Sudden Infant Death Syndrome (SIDS).  But babies who are always on their backs can sometimes develop flat spots on their head (plagiocephaly) . . . .

This statement is misleading because it does not say that pediatricians recommend they be *flat* on their back, thereby implying that sleeping on the back at an incline is consistent with medical recommendations.

224.    The manual also instructs users:

> Change the location of your baby's sleeper or crib in the room, so she has to look in different directions . . . .

This is also misleading because it implies that sleepers and cribs are equally safe.  It does not acknowledge the additional risks that are presented by the baby being strapped in and on an incline in a Rock 'n Play Sleeper.

225.    The manual also recommends:

> Help your baby avoid resting his head in the same position all the time by frequently changing the direction he lies in the crib.  For example, have your baby's feet point toward one end of the crib for a few days, and then change the position so his feet point toward the other end of the crib.  This will encourage your baby to turn and look in different directions.

This, of course, is impossible in a Rock 'n Play Sleeper.  A baby is not supposed to be in a sleeper with its feet in the elevated end and its head dangling below.  Again, Defendants do not

acknowledge that a Rock 'n Play Sleeper is not a crib, is less safe than a crib, and that a crib allows for the baby to sleep supine and horizontal, while the Rock 'n Play Sleeper does not.

226.   The manual further recommends:

> Try to minimize the amount of time your baby spends in car seats, carriers and bouncy seats while awake.

This statement is materially misleading because it omits "sleepers" from this list, although inclined sleepers pose the same risks as the devices on the list.   In a further attempt to differentiate the Rock 'n Play Sleeper from this group of products, Defendants suggest parents minimize the amount their babies spend in these products *while awake*.

227.   In short, Defendants knew, at all relevant times, of the grave risks that their Rock 'n Play Sleeper posed to babies, and that the product was unfit for its intended use for infant sleep, including overnight or prolonged use.   Nonetheless, they introduced it to the U.S. market as an infant sleeper – but were prevented from doing so in Canada and Australia – using the material misrepresentations and omissions detailed above.   As a result, Plaintiffs and other members of the proposed classes were damaged and are entitled to all monetary and equitable relief provided by law.

## TOLLING OF THE STATUTE OF LIMITATIONS

**Continuing Act Tolling**

228.   Beginning in 2009, Defendants continuously marketed and sold the dangerous Rock 'n Play Sleeper to unsuspecting parents and caregivers of infants.   They continuously represented these inclined sleepers as safe environments for infant sleep, including prolonged or overnight sleep.   By continuously repeating these false representations, and failing to disclose that the Rock 'n Play Sleeper was defectively designed and exposed infants to great risk of injury

and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

229.    Defendants' knowledge of the defects is evidenced by, among other things: numerous complaints by consumers of injury and death (to some of which they responded); warnings from the AAP and major consumer groups; by lawsuits against them for an infant's death and another's injuries; their lobbying and capture of rulemaking bodies to carve out the Rock 'n Play Sleeper from regulations which would have resulted in the product being banned; and by Canada's and Australia's refusal to allow them to sell the device as a "sleeper."

230.    Thus, at all relevant times, Defendants indisputably possessed continuous knowledge of the material dangers posed by the Rock 'n Play Sleeper, and, yet, they knowingly continued to aggressively market  and sell the product as safe for infant sleep, including overnight or prolonged sleep.  Plaintiffs' and other Class members' claims are not time barred.

**Fraudulent Concealment Tolling**

231.    Defendants had a duty to disclose to Plaintiffs and the Class members the true quality and nature of the Rock 'n Play Sleeper, that the Rock 'n Play Sleeper has a uniform dangerous defect, and that the Rock 'n Play Sleeper poses safety concerns and is in fact dangerous.

232.    This duty arose, among other things, due to Defendants' overt representations that the Rock 'n Play Sleeper was safe for overnight use.

233.    Defendants have known at all relevant times of the risks that the Rock 'n Play Sleeper poses to infants.   Prior to selling it, Defendants knew about the AAP's 2005 recommendations concerning safe sleep, which state that babies should sleep flat on their backs in an empty bassinet or crib.  As of 2011, Defendants knew that the AAP expanded on those

warnings and when Canada and Australia prohibited them from selling the Rock 'n Play Sleeper as a "sleeper."  In the following years, Defendants knew as pediatricians wrote to them and they were sued due to an infant's death.  And, finally, in 2016, Defendants knew that the AAP further expanded on its recommendations.  These facts cannot have been unknown to Defendants in the absence of extreme recklessness. Indeed, their actual knowledge is evidenced by, among other things, Defendants' extensive lobbying activities intended to exclude the Rock 'n Play Sleeper from regulations which would have resulted in the product being banned.

234.    Despite their knowledge of the defective design and danger of the product when used as intended, Defendants failed to disclose and concealed this material information from Plaintiffs and other Class members, and instead they continued to market the Rock 'n Play Sleeper as safe for infant sleep, including overnight or prolonged.

235.    The purpose of Defendants' concealment of the dangers was to continue to profit from the sale of their wildly popular Rock 'n Play Sleeper and to prevent Plaintiffs and other Class members from seeking redress.

236.    Plaintiffs and the other Class members justifiably relied on Defendants to disclose the true nature of the products they purchased and/or owned because that defect was not discoverable by Plaintiffs and the other Class members through reasonable efforts.

237.    Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing. To this day, Defendants continue to insist the Rock 'n Play Sleeper was and is safe.

**Discovery Rule Tolling**

238.    Plaintiffs and other Class members, through the exercise of reasonable diligence, could not have discovered Defendants' wrongdoing.  Even after the April 12, 2019 Recall, there

is no evidence that news of the Recall reached all owners of the Rock 'n Play Sleeper. Defendants were concealing and misrepresenting dangerous defects in the Rock 'n Play Sleeper and the risks that were posed by those defects by every means possible, including lobbying the CPSC to refrain from regulating their unsafe inclined sleepers.

239.    Plaintiffs and other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Defendants knowingly failed to disclose material information within their knowledge about a dangerous defect to consumers in the U.S. and elsewhere.

240.    As such, no potentially relevant statute of limitations should be applied.

**Estoppel**

241.    Defendants were under a continuous duty to disclose to Plaintiffs and other Class members the fact they knew about the dangerously defective design of the Rock 'n Play Sleeper.

242.    Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Rock 'n Play Sleeper from Plaintiffs and other members of the Class.

243.    Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

244.    Plaintiffs bring this class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3)  of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of a nationwide class (the "Nationwide Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper from 2009 to the present.**

245.    Additionally or alternatively, Plaintiffs Alfaro, Jacoby, Mulvey and Poppe seek certification of a Class of New York purchasers and/or owners (the "New York Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in New York from 2009 to the present.**

246.    Additionally or alternatively, Plaintiff Barton seeks certification of a Class of Arizona purchasers and/or owners (the "Arizona Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Arizona from 2009 to the present.**

247.    Additionally or alternatively, Plaintiff Melanie Nilius Nowlin seeks certification of a Class of Arkansas purchasers and/or owners (the "Arkansas Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Arkansas from 2009 to the present.**

248.    Additionally or alternatively, Plaintiffs Flores and Kaden seek certification of a Class of California purchasers and/or owners (the "California Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in California from 2009 to the present.**

249.    Additionally or alternatively, Plaintiffs Pasternacki and Wray seek certification of a Class of Colorado purchasers and/or owners (the "Colorado Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Colorado from 2009 to the present.**

250.    Additionally or alternatively, Plaintiff Simmonds seeks certification of a Class of Connecticut purchasers and/or owners (the "Connecticut Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Connecticut from 2009 to the present.**

251.     Additionally or alternatively, Plaintiff Huey seeks certification of a Class of Florida purchasers and/or owners (the "Florida Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Florida from 2009 to the present.**

252.     Additionally or alternatively, Plaintiff Hanson seeks certification of a Class of Iowa purchasers and/or owners (the "Iowa Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Iowa from 2009 to the present.**

253.     Additionally or alternatively, Plaintiff Persons seeks certification of a Class of Maryland purchasers and/or owners (the "Maryland Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Maryland from 2009 to the present.**

254.     Additionally or alternatively, Plaintiff Cuddy seeks certification of a Class of Massachusetts purchasers and/or owners (the "Massachusetts Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Massachusetts from 2009 to the present.**

255.     Additionally or alternatively, Plaintiffs Kimmel and Nadel seek certification of a Class of New Jersey purchasers and/or owners (the "New Jersey Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in New Jersey from 2009 to the present.**

256.     Additionally or alternatively, Plaintiff Fieker seeks certification of a Class of Oklahoma purchasers and/or owners (the "Oklahoma Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Oklahoma from 2009 to the present.**

257.    Additionally or alternatively, Plaintiff Drover seeks certification of a Class of Pennsylvania purchasers and/or owners (the "Pennsylvania Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Pennsylvania from 2009 to the present.**

258.    Additionally or alternatively, Plaintiff Willis seeks certification of a Class of Tennessee purchasers and/or owners (the "Tennessee Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Tennessee from 2009 to the present.**

259.    Additionally or alternatively, Plaintiff Black seeks certification of a Class of Texas purchasers and/or owners (the "Texas Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Texas from 2009 to the present.**

260.    Additionally or alternatively, Plaintiff Mandley seeks certification of a Class of Virginia purchasers and/or owners (the "Virginia Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Virginia from 2009 to the present.**

261.    Additionally or alternatively, Plaintiff Shaffer seeks certification of a Class of Washington purchasers and/or owners (the "Washington Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Washington from 2009 to the present.**

262.    The New York, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Iowa, Maryland, Massachusetts, New Jersey, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia and Washington Classes are collectively the "State Classes."

263.    Excluded from the Nationwide Class and the State Classes (collectively, unless otherwise indicated, the "Class" herein) are Defendants and their affiliates, parents, subsidiaries,

employees, officers, agents, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

264.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

265.    ***Numerosity—Federal Rule of Civil Procedure 23(a)(1).*** The members of the Class are so numerous that joinder of all Class members is impracticable.  Defendants admit that 4.7 million units of the Rock 'n Play Sleeper were sold in the U.S. Numerosity is established.

266.    ***Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Such common questions of law or fact include, among other things:

a.    Whether Defendants' claims about the Rock 'n Play Sleeper being suitable for any type of sleep, including prolonged or overnight sleep, are true.

b.    Whether Defendants' claims about the Rock 'n Play Sleeper being suitable for any type of sleep, including prolonged or overnight sleep, are reasonably likely to deceive.

c.    Whether Defendants' claims about the Rock 'n Play Sleeper being suitable for any type of sleep, including prolonged or overnight sleep, are material to reasonable consumers.

d.    Whether Defendants engaged in unfair and/or deceptive advertising in marketing the product as a "Sleeper" that was suitable for any type of sleep, including prolonged or overnight sleep.

e.      Whether Defendants' misconduct violates the consumer protection statutes of any of the states on behalf of whom state class claims are brought.

f.      Whether Defendants' misconduct constitutes a breach of the implied warranty of merchantability.

g.      Whether Defendants have been unjustly enriched.

h.      Whether Plaintiffs and the members of the Class have been harmed by Defendants' misconduct.

i.      Whether Plaintiffs and the members of the Class are entitled to damages, and the amount and nature of such damages.

j.      Whether Plaintiffs and the members of the Class are entitled to injunctive relief, including implementing a corrective advertising campaign to alert caregivers to the dangers of inclined sleepers, including the Rock 'n Play Sleeper, and educating them about the standards for safe infant sleep.

267.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other Class members.  Similar or identical statutory violations, common law wrongs, business practices, and injuries are involved. Individual questions, if there are any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

268.    ***Typicality—Federal Rule of Civil Procedure 23(a)(3).***  Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were injured through the uniform misconduct described above, and all Class members were subject to Defendants' deceptive and misleading statements and omissions, including deceptive claims that accompanied each and every Rock 'n Play Sleeper that was sold

concerning its suitability for safe infant sleep, including prolonged or overnight sleep.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Classes they seek to represent.

269.    ***Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).*** Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel experienced in complex class action litigation, including consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of other members of the Class.

270.    ***Insufficiency of Separate Actions—Federal Rule of Civil Procedure 23(b)(2).*** Defendants have acted in a manner that applies uniformly to the Class such that relief is appropriate respecting the Class as a whole.  The Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(2).

271.    ***Superiority—Federal Rule of Civil Procedure 23(b)(3).***   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system should not have to bear such a cost. Individualized litigation creates a potential for inconsistent or contradictory rulings, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication.  Economies of scale

and comprehensive supervision by a single court strongly weigh in favor of resolution on a class basis.

272.    Plaintiffs do not seek damages for any personal injury or wrongful death claims.

## CLAIMS FOR RELIEF

**Claims on Behalf of the Nationwide Class:**

### COUNT 1

**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2301, *et seq*.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

273.    All Plaintiffs repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

274.    The sale of the Rock 'n Play Sleepers was subject to the provisions and regulations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

275.    The Rock 'n Play Sleepers are "consumer products" as defined in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

276.    Plaintiffs and the other Nationwide Class members are "consumers" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

277.    Defendants are "suppliers" and "warrantors" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

278.    The Rock 'n Play Sleepers' implied warranties are covered by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

279.    Defendants breached these warranties, as further described above, by selling the Rock 'n Play Sleepers as "sleepers," and not disclosing their defective condition, and by providing Rock 'n Play Sleepers not in merchantable condition and not fit for the ordinary

purpose for which baby sleepers are used.  They are also not fit for the specific purposes for which Defendants sold them and for which Class members purchased and/or owned them.

280.    Privity is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Defendants and those who sell their products; specifically, they are the intended beneficiaries of Defendants' express and implied warranties.  The vendors were not intended to be the ultimate consumers of the Rock 'n Play Sleepers and have no rights under the warranty agreements provided with the Rock 'n Play Sleepers; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because the Rock 'n Play Sleepers are dangerous instrumentalities due to the aforementioned defects and nonconformities.

281.    Requiring an informal dispute settlement procedure, or affording Defendants a reasonable opportunity to cure their breach of written warranties, is unnecessary and futile. Defendants knew, should have known, or were reckless in not knowing, of their misrepresentations concerning the Rock 'n Play Sleepers' inability to provide a safe sleeping environment, but nonetheless failed to rectify the situation and/or disclose the truth.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

282.    Plaintiffs and the other Class members have been damaged as a result of the wrongful conduct complained of herein.  Said conduct continues and the harm or risk of harm is ongoing.

283.    The amount in controversy exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3).   Each Class member's individual claim is equal to or larger than $25 and the cumulative amount in controversy (excluding interest and costs) exceeds $50,000.

284.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act and warranties with consumers, Plaintiffs and the other members of the Class have been damaged in an amount to be determined at trial.

**Claims Brought on Behalf of the New York Class:**

**COUNT 2**

**Violation of New York General Business Law,
N.Y. Gen. Bus. Law § 349
(On Behalf of Plaintiffs Alfaro, Jacoby, Mulvey, Poppe and the New York Class)**

285.    Plaintiffs Alfaro, Jacoby, Mulvey, and Poppe ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

286.    This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for the purposes of this Count) for violation of New York General Business Law § 349 ("GBL § 349"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce in New York State.

287.    GBL § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater."

288.    GBL § 349(h) further provides that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand

dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."

289.    Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "business, trade or commerce" under GBL § 349(a).

290.    Defendants' conduct violates GBL § 349 because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiffs and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the  false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

291.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

292.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

293.    Defendants' actions impact the public interest because Plaintiffs and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

294.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class.

295.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiffs and members of the Class.

296.    Defendants' violation of GBL §349 was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

297.    Had Plaintiffs and the members of the Class known of Defendants' deceptive acts and practices including their misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

298.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

299.    As a direct and proximate result of Defendants' conduct in violation of GBL §
349, Plaintiffs and the members of the Class have been injured in an amount to be proven at trial,
with a statutory minimum of fifty dollars per Class member. Because Defendants' violation was
knowing and willful, Plaintiffs are entitled to treble damages under GBL § 349(h).

300.    Plaintiffs also seek injunctive relief, including a state of the art notice program for
the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the
implementation of a corrective advertising campaign by Defendants.

301.    Additionally, pursuant to GBL § 349, Plaintiffs and the Class seek attorneys' fees
and costs.

## COUNT 3

### Breach of Implied Warranty
### (On Behalf of Plaintiffs Alfaro, Jacoby, Mulvey, and Poppe and the New York Class)

302.    Plaintiffs Alfaro, Jacoby, Mulvey, and Poppe ("Plaintiffs" for the purposes of this
Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set
forth herein.

303.    This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for
the purposes of this Count).

304.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined
in N.Y. U.C.C. §§ 2-104 and 2-105 governing the implied warranty of merchantability.

305.    Pursuant to N.Y. U.C.C. § 2-314, a warranty that the Rock 'n Play Sleeper was in
merchantable condition was implied by law in the sale of the product.  Defendants impliedly
warranted that the Rock 'n Play Sleepers were of a merchantable quality.

306.    Pursuant to N.Y. U.C.C. § 2-315, a warranty that the Rock 'n Play Sleeper was
appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

307.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

308.    As merchants, Defendants knew that consumers, including Plaintiffs and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiffs and the New York Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

309.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

310.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

311.    Plaintiffs and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

312.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection

and warranty claims under California law.  *See* Ex. A.  On April 24, 2019 Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

313.   The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiffs and the Class.

314.   Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiffs' and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

315.   Plaintiffs' and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party

beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

316.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 4

### Negligence
### (On Behalf of Plaintiffs Alfaro, Jacoby, Mulvey, and Poppe and the New York Class)

317.    Plaintiffs Alfaro, Jacoby, Mulvey and Poppe ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

318.    This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for the purposes of this Count).

319.    Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

320.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

321.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

322.    Had Plaintiffs and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

323.     Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

324.     Plaintiffs and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiffs and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

325.     Therefore, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 5

### Unjust Enrichment
### (On Behalf of Plaintiffs Alfaro, Jacoby, Mulvey and Poppe and the New York Class)

326.     Plaintiffs Alfaro, Jacoby, Mulvey, and Poppe ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

327.     This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for the purposes of this Count).

328.     As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiffs and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

329.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiffs and the Class as

the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class.

**Claims Brought on Behalf of the Arizona Class:**

### COUNT 6

**Violation of Arizona Consumer Fraud Act,**
**A.R.S. § 44-1521,** *et seq.*
**(On Behalf of Plaintiff Barton and the Arizona Class)**

330.    Plaintiff Barton ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

331.    This Count is brought on behalf of Plaintiff and the Arizona Class ("Class" for the purposes of this Count), for violation of the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.* (the "ACFA").

332.    The ACFA makes unlawful the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby[.]" A.R.S., § 44-1522(A).

333.    Mattel and Fisher-Price are each a "person" within the meaning of the ACFA. A.R.S. § 44-1521(6).

334.    Within the meaning of the ACFA, "[t]he term 'deceptive' has been interpreted to include representations that have a tendency and capacity to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is

said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found." *Madsen v. W. Am. Mtge. Co.*, 694 P.2d. 1228, 1232, 143 Ariz. 614, 618 (Ct. App. 1985) (internal quotations and citations omitted).

335.   Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "sale or advertisement" under the ACFA. A.R.S. §§ 44-1521(1), (7).

336.   The Rock 'n Play Sleeper is "merchandise" within the meaning of the ACFA. A.R.S. § 44-1521(5).

337.   Defendants' conduct violates the ACFA because Defendants engaged in the deceptive and unfair acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

338.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

339.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

340.   Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

341.   Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

342.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

343.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

344.   Defendants' violation of the ACFA was wanton, reckless or recklessly indifferent to the interests of consumers and their infant children.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from being sold as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

345.    Had Plaintiff and the members of the Class known of Defendants' deceptive and unfair acts and practices, including misrepresentations, misleading statements, and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

346.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

347.    As a direct and proximate result of Defendants' conduct in violation of ACFA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial.

348.    Plaintiff further demands punitive damages on her own behalf and on behalf of the Class.

## COUNT 7

### Breach of Implied Warranty
### (On Behalf of Plaintiff Barton and the Arizona Class)

349.    Plaintiff Barton ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

350.    This Count is brought on behalf of Plaintiff and the Arizona Class ("Class" for the purposes of this Count).

351.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Uniform Commercial Code.

352.    Pursuant to Arizona Revised Statute § 47-2314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

353.   Pursuant to Arizona Revised Statute § 47-2315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

354.   By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

355.   As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

356.   Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

357.   The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

358.   Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

359.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  See Ex. A.  On April 24, 2019 Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  See Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

360.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

361.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

362.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

363.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 8

### Negligence
### (On Behalf of Plaintiff Barton and the Arizona Class)

364.    Plaintiff Barton ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

365.    This Count is brought on behalf of Plaintiff and the Arizona Class ("Class" for the purposes of this Count).

366.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

367.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

368.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

369.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

370.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

371.    Plaintiff and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members. The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

372.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 9

### Unjust Enrichment
### (On Behalf of Plaintiff Barton and the Arizona Class)

373.    Plaintiff Barton ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

374.    This Count is brought on behalf of Plaintiff and the Arizona Class ("Class" for the purposes of this Count).

375.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it does not provide the benefits as represented and exposes their child(ren) to greater and more serious risks than represented.

376.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Arkansas Class:**

### COUNT 10

**Violation of Arkansas Deceptive Trade Practices Act,
Ark. Code Ann. § 4-88-101, *et seq.*
(On Behalf of Plaintiff Nowlin and the Arkansas Class)**

377.    Plaintiff Nowlin ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

378.    This Count is brought on behalf of Plaintiff and the Arkansas Class ("Class" for the purposes of this Count), for violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq. ("ADTPA"), which prohibits deceptive acts or practices in the conduct of any business in Arkansas.

379.    The ADTPA prohibits "[k]nowingly making a false representation as to the characteristics, [] uses, benefits, [] or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model." Ark. Code Ann. § 4-88-107(a)(1). The ADTPA also prohibits "[e]ngaging in any ... unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10).

380.    Defendants engaged in business, commerce or trade within the meaning of the ADTPA.  Ark. Code Ann. § 4-88-107(a)(10).

381.    The Rock 'n Play Sleeper is a "good" within the meaning of the ADTPA.  Ark. Code Ann. § 4-88-102(4).

382.    Defendants' conduct violates the ADTPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

383.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

384.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

385.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

386.    Plaintiff and the members of the Class relied on Defendants' misrepresentations, misleading statements, and omissions about the Rock 'n Play Sleeper, when they purchased and/or owned the product.

387.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

388.    Defendants' violation of the ADTPA was unconscionable and recklessly indifferent to the interests of consumers and their infant children.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

389.    Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, misleading statements, and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

390.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

391.    As a direct and proximate result of Defendants' conduct in violation of ADTPA, Plaintiffs and the members of the Class have been injured in an amount to be determined at trial. Because Defendants engaged in unconscionable, false and deceptive practices in trade or commerce, Plaintiffs seek punitive damages as allowed by law.

392. Plaintiff and the Class also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

393. Plaintiff and the Class also seek an award of their attorneys' fees and costs. .

### COUNT 11

**Breach of Implied Warranty**
**(On Behalf of Plaintiff Nowlin and the Arkansas Class)**

394. Plaintiff Nowlin ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

395. This Count is brought on behalf of Plaintiff and the Arkansas Class ("Class" for the purposes of this Count).

396. Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Uniform Commercial Code. Ark. Code Ann. § 4-2-105.

397. Pursuant to Ark. Code Ann. § 4-2-314, an implied warranty that goods are merchantable is implied in every contract for a sale of goods. Defendants impliedly warranted that the Rock 'n Play Sleepers were merchantable.

398. Pursuant to Ark. Code Ann. § 4-2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

399. By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

400.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

401.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

402.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

403.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

404.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the

product." *See* Ex. B. It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach. Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

405. The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

406. Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

407. Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

408. As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 12

### Negligence
### (On Behalf of Plaintiff Nowlin and the Arkansas Class)

409.    Plaintiff Nowlin ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

410.    This Count is brought on behalf of Plaintiff and the Arkansas Class ("Class" for the purposes of this Count).

411.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

412.    Defendants also owed a duty to Plaintiff and Class members to detect and address major defects in a timely manner.

413.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

414.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

415.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth

416.    Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.   Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.   The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

417.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 13

**Unjust Enrichment**
**(On Behalf of Plaintiff Nowlin and the Arkansas Class)**

418.    Plaintiff Nowlin ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

419.    This Count is brought on behalf of Plaintiff and the Arkansas Class ("Class" for the purposes of this Count).

420.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it does not provide the benefits as represented and exposes their child(ren) to greater and more serious risks than represented.

421.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the California Class:**

## COUNT 14

**Violations of the California Consumers Legal Remedies Act,**
**Cal. Civil Code § 1750, *et seq*.**
**(On Behalf of Plaintiffs Flores and Kaden and the California Class)**

422.    Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

423.    This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count) for violation of the Consumer Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA"), which provides that enumerated "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful." CLRA § 1770(a).

424.    The CLRA provides that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain" various forms of relief, including injunction, damages, and attorneys' fees.  CLRA § 1780(a).

425.    On May 31, 2019, prior to the filing of this Complaint, Plaintiff Flores's counsel sent Fisher-Price a CLRA notice letter, which complies in all respects with California Civil Code §1782(a).  The letter was sent via certified mail, return receipt requested, advising Fisher-Price that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff Flores and all other similarly situated purchasers.

426.    Defendants' sales of the Rock 'n Play Sleepers were "sales of … good[s]" within the meaning of Cal. Civ. Code §§ 1761(a) and 1770.

427.    Defendants' conduct violates the CLRA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiffs and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

428.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

429.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

430.    Defendants' actions impact the public interest because Plaintiffs and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

431.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class.

432.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiffs and members of the Class.

433.    Defendants' violation of the CLRA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which

necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

434.   Had Plaintiffs and the members of the Class known of Defendants' misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

435.   Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

436.   As a direct and proximate result of Defendants' conduct in violation of the CLRA, Plaintiffs and the members of the Class have been injured in an amount to be proven at trial.

437.   Plaintiffs also seek injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

438.   Additionally, pursuant to section 1780(a)(2) of the CLRA, Plaintiffs and the Class seek attorneys' fees and costs.

439.   Plaintiffs further demand punitive damages on their own behalf and on behalf of the Class as allowed by law.

440.   Pursuant to section 1780(d) of the CLRA, annexed to this pleading is a declaration showing that this action has been commenced in the proper forum.

**COUNT 15**

**Violations of the California Unfair Competition Law,**
**Cal. Business & Professions Code § 17200,** *et seq.*
**(On Behalf of Plaintiffs Flores and Kaden and the California Class)**

441.    Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

442.    This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count).

443.    The Unfair Competition Law, Cal. Business & Professions Code § 17200, *et seq.* ("UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice and any false or misleading advertising.

444.    In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, making the representations  and omissions of material facts, as set forth more fully herein, and violating Cal. Civil Code § 1750, *et seq.*, and the common law.

445.    Plaintiffs, individually and on behalf of the other members of Class, reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

446.    Defendants' actions constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendants engaged in deceptive and false advertising, and misrepresented and omitted material facts regarding their Rock 'n Play Sleepers, and thereby offend an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities substantially injurious to consumers.  This conduct constitutes violations of the unfair prong of the UCL.

447.    The UCL also prohibits any "fraudulent business act or practice."  Defendants' actions, claims, nondisclosures, and misleading statements, as alleged herein, also constitute

"fraudulent" business practices in violation of the UCL because, among other things, they are false, misleading, and/or likely to deceive reasonable consumers within the meaning of the UCL.

448.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

449.   Defendants' conduct violates the UCL because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiffs and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

450.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

451.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

452.   Defendants' actions impact the public interest because Plaintiffs and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

453.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class.

454.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiffs and members of the Class.

455.    As a result of their deception, Defendants have been able to reap unjust revenue and profit in violation of the UCL.

456.    Had Plaintiffs and the members of the Class known of Defendants' misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

457.    Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

458.    As a direct and proximate result of Defendants' conduct in violation of the UCL, Plaintiffs and the members of the Class have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member.  In addition, Plaintiffs, individually, and on behalf of the Class, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the Class collected by Defendants as a result of unlawful, unfair, and/or fraudulent conduct, and seeks attorneys' fees and costs and all other relief this Court deems appropriate, consistent with California Business & Professions Code, § 17203.

**COUNT 16**

**Breach of Implied Warranty**
**(On Behalf of Plaintiffs Flores and Kaden and the California Class)**

459.    Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

460.    This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count).

461.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined in California's Uniform Commercial Code governing the implied warranty of merchantability. Cal. U. Com. Code §§ 2104, 2105.

462.    Pursuant to Cal. U. Com. Code. § 2314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product.  Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

463.    Pursuant to Cal. U. Com. Code § 2314, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

464.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for its customary and intended use, infant sleep, including prolonged or overnight sleep.

465.    As merchants, Defendants knew that consumers, including Plaintiffs and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiffs and the Class, reasonably relied upon the skill and judgment of Defendants,

and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

466.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

467.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

468.    Plaintiffs and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

469.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards and "given the reported incidents in which the product was used contrary to safety warnings and instructions," Defendants were instituting the Recall and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the

numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

470.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiffs and the Class.

471.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiffs' and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

472.    Plaintiffs' and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

473.    As a direct and proximate result of Defendants' breach warranties, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 17

**Breach of Implied Warranty Pursuant to Song-Belly Consumer Warranty Act,**
**California Civil Code §§ 1792 and 1791.1, *et seq.***
**(On Behalf of Plaintiffs Flores and Kaden and the California Class)**

474.    Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

475.    This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count).

476.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class.

477.    Plaintiffs' Rock 'n Play Sleepers are "consumer goods" within the meaning of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1795.1.

478.    Defendants were at all relevant times the manufacturers, distributors, warrantors, and/or sellers of the Rock 'n Play Sleeper. Defendants knew or had reason to know of the specific use for which Rock 'n Play Sleepers were purchased.

479.    Defendants provided Plaintiffs and the Class members with an implied warranty that Rock 'n Play Sleepers were merchantable and fit for the ordinary purposes for which they were sold. Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous.

480.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

481.    Plaintiffs and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

482.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards,  that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  See Ex. B. It is not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

483.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiffs and the Class.  The defect is inherent and was present in each Rock 'n Play Sleeper at the time of sale.

484.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against

Defendants with respect to Plaintiffs' and all other Class members' acquisition of Rock 'n Play Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

485. Plaintiffs' and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

486. As a result of Defendants' breach of the applicable implied warranties, purchasers of Rock 'n Play Sleepers suffered an ascertainable loss of money, property, and/or value of their Rock 'n Play Sleepers.

487. As a direct and proximate result of Defendants' breach of implied warranty of merchantability, Plaintiffs and the California Class are entitled to damages in an amount to be determined at trial.

488. Plaintiffs also seek injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

489. Additionally, Plaintiffs and the Class seek attorneys' fees and costs pursuant to Cal. Civ. Code § 1794.

## COUNT 18

### Negligence
### (On Behalf of the Plaintiffs Flores and Kaden and the California Class)

490.   Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

491.   This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count).

492.   Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

493.   Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

494.   Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

495.   Had Plaintiffs and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

496.   Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

497.   Plaintiffs and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members. The damages to Plaintiffs and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

498.     Therefore, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 19

### Unjust Enrichment
### (On Behalf of Plaintiffs Flores and Kaden and the California Class)

499.     Plaintiffs Flores and Kaden ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

500.     This Count is brought on behalf of Plaintiffs and the California Class ("Class" for the purposes of this Count).

501.     As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiffs and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

502.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiffs and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class.

**Claims Brought on Behalf of the Colorado Class:**

## COUNT 20

### Violation of Colorado Consumer Protection Act,
### C.R.S.A. § 6-1-101 *et al*.
### (On Behalf of Plaintiffs Pasternacki and Wray and the Colorado Class)

503.     Plaintiffs Pasternacki and Wray ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

504.     This Count is brought on behalf of Plaintiffs and the Colorado Class ("Class" for the purposes of this Count) for violation of the Colorado Consumer Protection Act, C.R.S.A. § 6-1-101 *et. al.* ("CCPA"), which prohibits deceptive acts or practices in the conduct of any business in Colorado.

505.     C.R.S.A. § 6-1-113 provides a right to bring a civil action to any consumer of the Defendants' goods, or successor in interest.  In federal court, such action may be brought as a class action.  *See*, *e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (holding that class action could proceed in federal court despite state rule's class action bar); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, Civil Action No. 16-2765 (JLL), 2017 U.S. Dist. LEXIS 70299, at *74 (D.N.J. May 8, 2017) (denying motion to dismiss class CCPA claim, and holding that in *Shady Grove*, "the Supreme Court has addressed this issue and has held that matters may proceed as putative class actions, regardless of whether state statutes prohibit such claims, so long as the application of Fed. R. Civ. P. 23 does not 'abridge, enlarge or modify any substantive right.'").

506.     Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "business" under C.R.S.A. § 6-1-105.

507.     Defendants' conduct violates C.R.S.A. § 6-1-105 because Defendants engaged in the deceptive acts and practices described above, which included issuing marketing messages directed at Plaintiffs and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

508.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

509.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

510.    Defendants' actions impact the public interest because Plaintiffs and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

511.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances including Plaintiffs and members of the Class.

512.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiffs and members of the Class.

513.    Defendants' violation of the CCPA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which

necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

514.    Had Plaintiffs and the members of the Class known of Defendants' misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

515.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

516.    As a direct and proximate result of Defendants' conduct in violation of the CCPA, Plaintiffs and the members of the Class have sustained damages in amounts to be proven at trial.

517.    As a result, pursuant to the CCPA, Plaintiffs and the Class are entitled to make claims against Defendant for damages to be determined at trial, but not less than actual damages or $500 dollars per Class member.

518.    Plaintiffs also seek injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

## COUNT 21

### Breach of Implied Warranty
### (On Behalf of Plaintiffs Pasternacki and Wray and the Colorado Class)

519.    Plaintiffs Pasternacki and Wray ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

520.    Pursuant to C.R.S.A. § 4-2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product.  Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

521.    Pursuant to C.R.S.A. § 4-2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

522.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

523.    As merchants, Defendants knew that consumers, including Plaintiffs and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiffs and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing the Rock 'n Play Sleeper.

524.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and the Rock 'n Play Sleepers do not.

525.    The Rock 'n Play Sleeper is dangerous in that it is of such a character that when used in its expected manner it is likely to be a source of potential death and injury to babies.

526.    Plaintiffs and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

527.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

528.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiffs and the Class.

529.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and

are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiffs' and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

530.    Plaintiffs' and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

531.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 22

### Negligence
### (On Behalf of Plaintiffs Pasternacki and Wray and the Colorado Class)

532.    Plaintiffs Wray and Pasternacki ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 as if fully set forth herein.

533.    This Count is brought on behalf of Plaintiffs and the Colorado Class ("Class" for the purposes of this Count).

534.    Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

535.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

536.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

537.    Had Plaintiffs and the members of the Class known of Defendants' breaches of their duties they would not have purchased and/or owned Rock 'n Play Sleepers.

538.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

539.    Plaintiffs and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members. The damages to Plaintiffs and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

540.    Therefore, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 23

### Unjust Enrichment
### (On Behalf of Plaintiffs Pasternacki and Wray and the Colorado Class)

541.    Plaintiffs Pasternacki and Wray ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

542.    This Count is brought on behalf of Plaintiffs and the Colorado Class ("Class" for the purposes of this Count).

543.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly

enriched at the expense of Plaintiffs and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

544.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiffs and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class.

**Claims Brought on Behalf of the Connecticut Class**:

**COUNT 24**

**Violations of the Connecticut Unfair Trade Practices Act ("CUTPA")**
**Connecticut General Statutes § 42-110a, *et seq*.,**
**(On Behalf of Plaintiff Simmonds and the Connecticut Class)**

545.    Plaintiff Simmonds ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

546.    This Count is brought on behalf of Plaintiff and the Connecticut Class ("Class" for the purposes of this Count) for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), which provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

547.    CUTPA provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice [statutorily] prohibited . . . may bring an action . . . to recover actual damages" and that "[t]he court may, in its discretion, award punitive damages and may provide such equitable relief as it

deems necessary or proper" and "costs and reasonable attorneys' fees." Conn. Gen. Stat. § 42-110g(a), 110g(d).

548.    Each Defendant is a "person" within the meaning of CUTPA, Conn. Gen. Stat. § 42-110a(3). At all relevant times, Defendants were acting in the conduct of trade or commerce as they advertised, distributed, marketed and sold Rock 'n Play Sleepers to consumers in Connecticut and the rest of the United States.

549.    Defendants' conduct violates CUTPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

550.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

551.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

552.    Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

553.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

554.    Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

555.    Defendants' acts and practices caused substantial injury to Plaintiff and Class members because consumers have overpaid for the Rock 'n Play Sleepers, could not have reasonably avoided such injury and such injury is not outweighed by any countervailing benefits to consumers or competition.

556.    Had Plaintiff and the members of the Class known of Defendants' misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

557.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleepers than what the product is worth.

558.    As a direct and proximate result of Defendants' conduct in violation of CUTPA, Plaintiff and the other Class members should be awarded damages, including punitive damages as allowed by law, in an amount to be determined at trial.

559.     Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

560.     Additionally, pursuant to Conn. Gen. Stat. § 42-110g(d), Plaintiff and the Class seek attorneys' fees and costs.

561.     Plaintiffs further demand punitive damages on their own behalves and behalf of the Class as allowed by law.

**COUNT 25**

**Breach of Implied Warranty**
**(On Behalf of Plaintiff Simmonds and the Connecticut Class)**

562.     Plaintiff Simmonds ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

563.     This Count is brought on behalf of Plaintiff and the Connecticut Class ("Class" for the purposes of this Count).

564.     Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Connecticut Uniform Commercial Code – Sales governing the implied warranty of merchantability.

565.     Pursuant to Conn. Code § 42a-2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

566.     Pursuant to Conn. Code § 42a-2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

567.     By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising

and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

568.   As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

569.   Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

570.   The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

571.   Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

572.   At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were

instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product." *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

573.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

574.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

575.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

576.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

### COUNT 26

### Negligence
### (On Behalf of Plaintiff Simmonds and the Connecticut Class)

577.    Plaintiff Simmonds ("Plaintiff" for the purpose of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

578.    This Count is brought on behalf of Plaintiff and the Connecticut Class ("Class" for the purposes of this Count).

579.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

580.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

581.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

582.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

583.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

584.    Plaintiff and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages

to Class members. The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

585.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 27

## Unjust Enrichment
### (On Behalf of Plaintiff Simmonds and the Connecticut Class)

586.    Plaintiff Simmonds ("Plaintiff" for the purposes of this Count) repeats and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

587.    This Count is brought on behalf of Plaintiff and the Connecticut Class ("Class" for the purposes of this Count).

588.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

589.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Florida Class**:

**COUNT 28**

**Violation of Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. §§ 501.201-213
(On Behalf of Plaintiff Huey and the Florida Class)**

590.     Plaintiff Huey ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

591.     This Count is brought on behalf of Plaintiff and the Florida Class ("Class" for purposes of this Count) for violation of the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201-213 ("FDUTPA"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce in the State of Florida.

592.     The FDUTPA, Fla. Stat. § 501.202(2), is intended to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

593.     The FDUTPA, Fla. Stat. § 501.211(2), provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs…."

594.     Plaintiff and the Florida Class are "consumers" within the meaning of Fla. Stat. § 501.203(7).

595.     Each Defendant is a "person" or "entity" as used in the FDUPTA.

596.     Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

597.    FDUTPA, Fla. Stat. 501.204(1), declares "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful.

598.    Defendants have engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" as set forth in, and in violation of, Fla. Stat. § 501.204(1) because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, the message that the Rock 'n Play Sleeper is appropriate for safe infant sleep, including overnight and prolonged sleep.

599.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

600.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

601.    Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices described herein.

602.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

603.    Defendants' misrepresentations, misleading statements and omissions were materially misleading to Plaintiff and members of the Class.

604.    Defendants' violation of the FDUTPA was knowing and intentional.    As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements and omissions as detailed above, continued to sell the products in the United States for overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

605.    Had Plaintiff and the members of the Class known of Defendants' misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

606.    As a result of their deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

607.    As a direct and proximate result of Defendants' conduct in violation of the FDUTPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial.

608.    Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

609.    Additionally, pursuant to the FDUTPA, Plaintiff and the Class seek attorneys' fees and costs.

610.    Plaintiff further demands punitive damages on her own behalf and behalf of the Class.

## COUNT 29

### Breach of Implied Warranty of Merchantability and Fitness
### (On Behalf of Plaintiff Huey and the Florida Class)

611.    Plaintiff Huey ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

612.    This Count is brought on behalf of Plaintiff and the Florida Class ("Class" for the purposes of this Count).

613.    The Rock 'n Play Sleeper is a "good" and Defendants are "merchants" as defined in Florida's codification of the Uniform Commercial Code.   Fla. Stat. Ann. §§ 672.104(1); 672.105(1).

614.    Pursuant to Fla. Stat. Ann. § 672.314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

615.    Pursuant to Fla. Stat. Ann. § 672.315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

616.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

617.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

618.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous.

619.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

620.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

621.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff

Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

622.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

623.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

624.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of

contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

625.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 30

### Negligence
### (On Behalf of Plaintiff Huey and the Florida Class)

626.   Plaintiff Huey ("Plaintiff" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

627.   This Count is brought on behalf of Plaintiff and the Florida Class ("Class" for the purposes of this Count).

628.   Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

629.   Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

630.   Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

631.   Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

632.   Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth

633.   Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.   Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.   The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

634.   Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 31

### Unjust Enrichment
### (On Behalf of Plaintiff Huey and the Florida Class)

635.    Plaintiff Huey ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

636.    This Count is brought on behalf of Plaintiff and the Florida Class ("Class" for the purposes of this Count).

637.   As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through their purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

638.   Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.   Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

639.     Plaintiff and the Class are entitled to seek and do seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

**Claims Brought on Behalf of the Iowa Class:**

**COUNT 32**

**Violation of the Consumer Frauds Act,
Iowa Code Chapter 714H
(On Behalf of Plaintiff Hanson and the Iowa Class)**

640.     Plaintiff Hanson ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

641.     This Count is brought on behalf of Plaintiff and the Iowa Class ("Class" for the purposes of this Count) for violation of the Iowa Consumer Fraud Act,  which prohibits representations and omissions of material facts that are made "with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

642.     Iowa Code § 714H.5 provides that a "consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages."

643.     Iowa Code § 714H.5 further provides that "the court shall award to the consumer the costs of the action and to the consumer's attorney reasonable fees" and may award "statutory damages up to three times the amount of actual damages."

644.     Defendants' conduct violates Iowa law because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at

Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

645.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

646.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

647.   Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

648.   Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

649.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

650.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

651.    Defendants' violation of Iowa law was willful and wanton. As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

652.    Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

653.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

654.    As a direct and proximate result of Defendants' conduct in violation of Iowa law, Plaintiff and the members of the Class have been injured and are entitled to make claims against Defendant for ascertainable damages in an amount to be proven at trial. Because Defendants' violation was willful and wanton, Plaintiff and the Class are entitled to treble damages under Iowa Code § 714H.5(4).

655.    Additionally, pursuant to Iowa Code § 714H.5(2), Plaintiff and the Class seek attorneys' fees and costs.

656.    Plaintiff obtained the attorney general's approval prior to filing this action pursuant to Iowa Code § 714H.7.

## COUNT 33

### Breach of Implied Warranty
### (On Behalf of Plaintiff Hanson and the Iowa Class)

657.    Plaintiff Hanson ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

658.    This Count is brought on behalf of Plaintiff and the Iowa Class ("Class" for the purposes of this Count).

659.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Iowa Commercial Code governing the implied warranty of merchantability

660.    Pursuant to Iowa Code § 544.2314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

661.    Pursuant to Iowa Code § 544.2315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

662.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

663.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell

products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

664.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

665.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

666.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

667.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their

breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

668.   The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

669.   Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

670.   Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

671.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 34

### Negligence
### (On Behalf of Plaintiff Hanson and the Iowa Class)

672.    Plaintiff Hanson ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

673.    This Count is brought on behalf of Plaintiff Hanson and the Iowa Class ("Class" for the purposes of this Count).

674.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

675.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

676.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

677.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

678.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

679.    Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

680.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 35

### Unjust Enrichment
### (On Behalf of Plaintiff Hanson and the Iowa Class)

681.    Plaintiff Hanson ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

682.    This Count is brought on behalf of Plaintiff and the Iowa Class ("Class" for the purposes of this Count).

683.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it does not provide the benefits as represented and exposes their child(ren) to greater and more serious risks than represented.

684.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Maryland Class:**

## COUNT 36

### Maryland Consumer Protection Act,
### Md. Code Ann., Com. Law §§ 13-101, *et seq.*
### (On Behalf of Plaintiff Persons and the Maryland Class)

685.    Plaintiff Persons ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

686.     This Count is brought on behalf of Plaintiff and the Maryland Class ("Class" for the purposes of this Count) for violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq*. ("Maryland CPA"), which prohibits any person from engaging in "any unfair, abusive, or deceptive trade practice" in connection with the "sale, lease, rental, loan, or bailment of consumer goods" or the "offer for sale, lease, rental, loan, or bailment of consumer goods" in the State of Maryland.  Md. Code Ann., Com. Law § 13-303.

687.     The Maryland CPA prohibits "any [f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers."  Md. Code Ann., Com. Law § 13-301(1).  The Maryland CPA also prohibits any "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods."  Md. Code Ann., Com. Law § 13-301(9) – 13-301(9)(i).

688.     The Maryland CPA, Md. Code Ann., Com. Law § 13-408(a), provides that "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title."

689.     The Maryland CPA, Md. Code Ann., Com. Law § 13-408(b), further provides that "[a]ny person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."

690.     Plaintiff and the Maryland Class are "consumers" within the meaning of the Maryland CPA. Md. Code Ann., Com. Law § 13-101(c).

691.     Each Defendant is a "person" as used in the Maryland CPA.  Md. Code Ann., Com. Law § 13-101(h).

692.     The Rock 'n Play Sleeper is a "consumer good" within the meaning of the Maryland CPA.  Md. Code Ann., Com. Law § 13-101(d).

693.     Defendants' design, manufacture, distribution, marketing, adverting, labeling, and sale of the Rock 'n Play Sleeper constitutes a "sale" or "offer for sale" under the Maryland CPA.

694.     Defendants' conduct violates the Maryland CPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, and the message that the Rock 'n Play Sleeper is appropriate for safe infant sleep, including overnight and prolonged sleep.

695.     Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

696.     Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

697.     Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

698.     Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

699.     Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

700.     Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

701.     Defendants' misrepresentations, misleading statements and omissions were material to Plaintiff and members of the Class.

702.     Defendants' violation of the Maryland CPA was knowing and intentional.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

703.     Had Plaintiff and the members of the Class known of Defendants'
misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they
would not have purchased and/or owned the product.

704.     As a result of their deceptive acts and practices, Defendants were able to
charge more for the Rock 'n Play Sleeper than what the product is worth.

705.     As a direct and proximate result of Defendants' conduct in violation of the
Maryland CPA, Plaintiff and the members of the Class have been injured in an amount to be
proven at trial.

706.     Plaintiff also seeks injunctive relief, including a state of the art notice program
for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and
the implementation of a corrective advertising campaign by Defendants.

707.     Additionally, pursuant to Md. Code Ann., Com. Law § 13-408(b), Plaintiff and
the Class seek attorneys' fees and costs.

## COUNT 37

### Breach of Implied Warranty
### (On Behalf of Plaintiff Persons and the Maryland Class)

708.     Plaintiff Persons ("Plaintiff" for the purposes of this Count) repeats and
realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

709.     This Count is brought on behalf of Plaintiff and the Maryland Class ("Class"
for the purposes of this Count).

710.     Defendants are "merchants" and the Rock 'n Play is a "good" as defined in
Maryland's Commercial Law governing the implied warranty of merchantability.  Md. Code
Ann., Com. Law §§ 2-104(1), 2-105(1)

711.     Pursuant to Maryland Code § 2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product.  Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

712.     Pursuant to Maryland Code § 2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

713.     By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is reasonably safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

714.     As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, market, label, and sell products that were reasonably safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

715.     Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe infant sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

716.     The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

717.     Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

718.     At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

719.     The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

720.     Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play

Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

721.     Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

722.     As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Maryland Class are entitled to damages in an amount to be determined at trial.

## COUNT 38

### Negligence
### (On Behalf of Plaintiff Persons and the Maryland Class)

723.     Plaintiff Persons ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

724.     This Count is brought on behalf of Plaintiff and the Maryland Class ("Class" for the purposes of this Count).

725.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

726.     Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

727.     Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

728.     Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned the defective Rock 'n Play Sleepers.

729.     Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

730.     Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

731.     Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 39

### Unjust Enrichment
### (On Behalf of Plaintiff Persons and the Maryland Class)

732.     Plaintiff Persons ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

733.     This Count is brought on behalf of Plaintiff and the Maryland Class ("Class" for the purposes of this Count).

734.     As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through their

purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including overnight and prolonged sleep.

735.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Massachusetts Class**:

**COUNT 40**

**Violation of the Massachusetts Consumer Protection Act,**
**Mass. Gen. Laws ch. 93A § 1,** *et seq.*
**(On Behalf of Plaintiff Cuddy and the Massachusetts Class)**

736.    Plaintiff Cuddy ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

737.    This Count is brought on behalf of Plaintiff and the Massachusetts Class ("Class" for the purposes of this Count) for violation of Mass. Gen. Laws ch. 93A § 2 (the "MCPA"), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

738.    The MCPA provides that "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful [under the MCPA] . . . may bring an action . . . for damages and [] equitable relief." Mass. Gen. Laws ch. 93A § 9(1).

739.    The MCPA further provides that "damages may include double or treble damages, attorneys' fees and costs." Mass. Gen. Laws ch. 93A § 9(3A).

740. Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "trade or commerce." Mass. Gen. Laws ch. 93A § 2.

741. Defendants' conduct violates the MCPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is appropriate for safe infant sleep, including overnight and prolonged sleep.

742. Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

743. Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

744. Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

745. Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

746. Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

747. Defendants' violation of the MCPA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

748. Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

749. Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

750.    As a direct and proximate result of Defendants' conduct in violation of the MCPA, Plaintiff and the members of the Class have been injured  and a threatened with further injury in an amount to be proven at trial, Because Defendants' violation was willful and knowing, Plaintiff is entitled to treble damages under Mass. Gen. Laws ch. 93A, § 9(3A).

751.    Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

752.    Additionally, pursuant to Mass. Gen. Laws ch. 93A, § 9(3A)(4), Plaintiff and the Class seek attorneys' fees and costs.

## COUNT 41

### Breach of Implied Warranty
### (On Behalf of Plaintiff Cuddy and the Massachusetts Class)

753.    Plaintiff Cuddy ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

754.    This Count is brought on behalf of Plaintiff and the Massachusetts Class ("Class" for the purposes of this Count).

755.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined in Massachusetts's Uniform Commercial Code governing the implied warranty of merchantability. Mass. Gen. Laws ch. 106  §§ 2-104, 2-105.

756.    Pursuant to Mass. Gen. Laws ch. 106 § 2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the parties' transactions. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

757.    Pursuant to Mass. Gen. Laws ch. § 106 2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

758.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

759.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

760.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

761.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

762.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

763.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the

truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe. On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law. *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product." See Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

764.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleeper, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

765.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

766.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the

one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.  Moreover, Plaintiff and the members of the Class are persons whom the Defendants knew might reasonably have expected to use, consume or be affected by the goods, and as such, under Mass. Gen. Laws ch. 106 § 2-318, lack of privity shall be no defense to any claim for breach of express or implied warranty brought against Defendants.

767.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 42

### Negligence
### (On Behalf of Plaintiff Cuddy and the Massachusetts Class)

768.    Plaintiff Cuddy ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

769.    This Count is brought on behalf of Plaintiff and the Massachusetts Class ("Class" for the purposes of this Count).

770.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

771.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

772.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

773.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

774.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

775.    Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

776.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 43

### Unjust Enrichment
### (On Behalf of Plaintiff Cuddy and the Massachusetts Class)

777.    Plaintiff Cuddy ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

778.    This Count is brought on behalf of Plaintiff and the Massachusetts Class ("Class" for the purposes of this Count).

779.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the

Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

780.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the New Jersey Class**:

**COUNT 44**

**Breach of the New Jersey Consumer Fraud Act**
**N.J.S.A. 56:8-1,** *et seq*.
**(On Behalf of Plaintiffs Kimmel and Nadel and the New Jersey Class)**

781.    Plaintiffs Kimmel and Nadel ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

782.    This Count is brought on behalf of Plaintiffs and the New Jersey Class ("Class" for the purposes of this Count) for violation of the New Jersey Consumer Fraud Act ("NJCFA"), which was enacted to protect consumers against sharp and unconscionable commercial practices by persons engaged in the sale of merchandise, including goods or services.

783.    The NJCFA provides that "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action."  N.J. Stat. Ann. § 56:8-19.

784.    The NJCFA further provides that "the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. Ann. § 56:8-19.

785.    Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "merchandise" under the NJCFA.

786.    Defendants' conduct violates the NJCFA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiffs and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

787.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

788.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

789.    Defendants' actions impact the public interest because Plaintiffs and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

790.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class.

791.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiffs and members of the Class.

792.   Defendants' violation of NJCFA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

793.   Had Plaintiffs and the members of the Class known of Defendants' misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

794.   Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

795.   As a direct and proximate result of Defendants' conduct in violation of the NJCFA, Plaintiffs and the members of the Class have been injured and are entitled to make claims against Defendant for ascertainable damages in an amount to be proven at trial. Plaintiffs and the Class are entitled to treble damages under N.J. Stat. Ann. § 56:8-19.

796.     Plaintiffs also seek injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

797.     Additionally, pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the Class seek attorneys' fees and costs.

**COUNT 45**

**Breach of Implied Warranty**
**(On Behalf of Plaintiffs Kimmel and Nadel and the New Jersey Class)**

798.     Plaintiffs Kimmel and Nadel ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

799.     This Count is brought on behalf of Plaintiffs and the New Jersey Class ("Class" for the purposes of this Count).

800.     Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined in New Jersey's Commercial Code governing the implied warranty of merchantability.  N.J. Rev. Stat. §§ 12A:2-104, 12A:2-105 (2013),

801.     Pursuant to New Jersey's Commercial Code §2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

802.     Pursuant to New Jersey's Commercial Code §2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

803.     By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising

and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

804.    As merchants, Defendants knew that consumers, including Plaintiffs and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiffs and the New Jersey Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

805.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

806.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

807.    Plaintiffs and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

808.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards and  "given the

reported incidents in which the product was used contrary to safety warnings and instructions," Defendants were instituting the Recall and that the Recall "was not due to any alleged defect in the product." *See* Ex. B.  It is not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

809.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiffs and the Class.

810.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiffs' and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

811.    Plaintiffs' and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

812.    As a direct and proximate result of the Defendants' breach of implied warranties, Plaintiffs and the other Class members are entitled to damages available under applicable law, including, but not limited to, the purchase price of the Rock 'n Play Sleepers.

**COUNT 46**

**Negligence**
**(On Behalf of Plaintiffs Kimmel and Nadel and the New Jersey Class)**

813.    Plaintiffs Kimmel and Nadel ("Plaintiffs" for the purposes of this count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

814.    This Count is brought on behalf of Plaintiffs and the New Jersey Class ("Class" for the purposes of this Count).

815.    Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

816.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

817.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

818.    Had Plaintiffs and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

819.    Plaintiffs and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members. The damages to Plaintiffs and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

820.    Therefore, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

### COUNT 47

### Unjust Enrichment
**(On Behalf of Plaintiffs Kimmel and Nadel and the New Jersey Class)**

821.    Plaintiffs Kimmel and Nadel ("Plaintiffs" for the purposes of this Count) repeat and reallege the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

822.    This Count is brought on behalf of Plaintiffs and the New Jersey Class ("Class" for the purposes of this Count).

823.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiffs and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

824.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiffs and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class.

**Claims Brought on Behalf of the Oklahoma Class:**

### COUNT 48

### Violation of Oklahoma Consumer Protection Act,
### 15 O.S. §§ 751 *et al.*
**(On Behalf of Plaintiff Fieker and the Oklahoma Class)**

825.    Plaintiff Fieker ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

826.   This Count is brought on behalf of Plaintiff and the Oklahoma Class ("Class" for the purposes of this Count) for violation of the Oklahoma Consumer Protection Act, 15 O.S. §§ 751, et al. ("OCPA"), which prohibits deceptive acts or practices in the conduct of any business in Oklahoma.

827.   OCPA § 761.1(A) provides that "… the aggrieved consumer shall have a private right of action for damages, including but not limited to, costs and attorney's fees."

828.   Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes Defendants' "course of business."

829.   Defendants' conduct alleged herein violates the OCPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

830.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

831.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

832.   Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

833.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

834.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

835.   Defendants' violation of the OCPA was unconscionable and knowing.  As described above, at all relevant times, Defendants, among other things, knew that their Rock 'n Play Sleepers had caused many infant deaths and injuries, and that the AAP, as well multiple other pediatric professionals and consumer groups, recommended they not be used as sleepers, and that certain other countries had prohibited them from being sold as sleepers. Nonetheless, Defendants continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits.

836.   Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

837.   Defendants were also able to charge more than what the Rock 'n Play Sleeper would have been worth had they disclosed the truth about it.

838.   As a direct and proximate result of Defendants' conduct in violation of the OCPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial.

839.    Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

840.    Additionally, pursuant to the OCPA, Plaintiff and the Class seek attorneys' fees and costs.

**COUNT 49**

**Breach of Implied Warranty**
**(On Behalf of Plaintiff Fieker and the Oklahoma Class)**

841.    Plaintiff Fieker ("Plaintiff" for the purposes of this Count) incorporates by reference and re-alleges herein ¶¶ 1 through 272 above.

842.    This Count is brought on behalf of Plaintiff and the Oklahoma Class ("Class" for the purposes of this Count).

843.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Oklahoma Commercial Code.  12A O.S. §§ 2-104, 2-105.

844.    Pursuant to 12A O.S. § 2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product.  Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

845.    Pursuant to 12A O.S. § 2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

846.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

847.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said express and implied warranties in purchasing the Rock 'n Play Sleeper.

848.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

849.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

850.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

851.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards and  "given the reported incidents in which the product was used contrary to safety warnings and instructions," Defendants were instituting the Recall and that the Recall "was not due to any alleged defect in

the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

852.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

853.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

854.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

855.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 50

### Negligence
### (On Behalf of Plaintiff Fieker and the Oklahoma Class)

856.     Plaintiff Fieker ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

857.     This Count is brought on behalf of Plaintiff and the Oklahoma Class ("Class" for the purposes of this Count).

858.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

859.     Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

860.     Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

861.     Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

862.     Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

863.     Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

864.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 51

### Unjust Enrichment
### (On Behalf of Plaintiff Fieker and the Oklahoma Class)

865.    Plaintiff Fieker ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

866.    This Count is brought on behalf of Plaintiff and the Oklahoma Class ("Class" for the purposes of this Count).

867.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

868.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Pennsylvania Class:**

## COUNT 52

### Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,
### 73 Pa. Cons. Stat. §§ 201-1, *et seq.*
### (On Behalf of Plaintiff Drover and the Pennsylvania Class)

869.    Plaintiff Drover ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

870.   This Count is brought on behalf of Plaintiff and the Pennsylvania Class ("Class" for the purposes of this Count) for violation of the Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA"), which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce ...." 73 Pa. Cons. Stat. § 201-3.

871.   The Pennsylvania UTPA provides that "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by . . . this act, may bring a private action to recover actual damages or one hundred dollars ($ 100), whichever is greater." 73 Pa. Cons. Stat. § 201-9.2(a).

872.   The Pennsylvania UTPA further provides that "[t]he court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($ 100), and may provide such additional relief as it deems necessary or proper., and that "[t]he court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." 73 Pa. Cons. Stat. § 201-9.2(a).

873.   Defendants' conduct violates the Pennsylvania UTPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

874.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also

misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

875.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

876.   Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

877.   Plaintiff and the Class justifiably relied upon Defendants' deceptive acts and practices, including their misrepresentations, misleading statements, and omissions.

878.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

879.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

880.   Defendants' violation of the Pennsylvania UTPA was willful and knowing. As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without

bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30- incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

881.   Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, misleading statements, and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

882.   As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

883.   As a direct and proximate result of Defendants' conduct in violation of the Pennsylvania UTPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial, with a statutory minimum of one hundred dollars per Class member. Plaintiff and the Class are also entitled to treble damages under 73 Pa. Cons. Stat. § 201-9.2(a).

884.   Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

885.   Additionally, pursuant to 73 Pa. Cons. Stat. § 201-9.2(a), Plaintiff and the Class seek attorneys' fees and costs.

## COUNT 53

**Breach of Implied Warranty**
**(On Behalf of Plaintiff Drover and the Pennsylvania Class)**

886.    Plaintiff Drover ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

887.    This Count is brought on behalf of Plaintiff and the Pennsylvania Class ("Class" for the purposes of this Count).

888.    Defendants are and were at all relevant times "merchants" and "sellers" of products under 13 Pa. Cons. Stat. §§ 2104 and 2103(a).

889.    Pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212, a warranty that the Rock 'n Play Sleepers were in merchantable condition was implied by law.

890.    Pursuant to 13 Pa. Cons. Stat. §§ 2315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law

891.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

892.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

893.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

894.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

895.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

896.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.   On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.   *See* Ex. A.   On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."   *See* Ex. B.   It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.   Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

897.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

898.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

899.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

900.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 54

### Negligence
### (On Behalf of Plaintiff Drover and the Pennsylvania Class)

901.    Plaintiff Drover ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

902.    This Count is brought on behalf of Plaintiff and the Pennsylvania Class ("Class" for the purposes of this Count).

903.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

904.     Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

905.     Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

906.     Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

907.     Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

908.     Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

909.     Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 55

### Unjust Enrichment
### (On Behalf of Plaintiff Drover and the Pennsylvania Class)

910.     Plaintiff Drover ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

911.    This Count is brought on behalf of Plaintiff and the Pennsylvania Class ("Class" for the purposes of this Count).

912.    As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

913.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Tennessee Class:**

## COUNT 56

**Violation of the Tennessee Consumer Protection Act,**
**Tenn. Code Ann. § 47-18-101, *et seq.***
**(On Behalf of Plaintiff Willis and the Tennessee Class)**

914.    Plaintiff Willis ("Plaintiff" for the purpose of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

915.    This Count is brought on behalf of Plaintiff and the Tennessee Class ("Class" for the purposes of this Count) for violation of Tenn. Code Ann. § 47-18-101, *et seq.* (the "TCPA"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in Tennessee.

916.    Tenn. Code Ann. § 47-18-109(a)(1) provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article,

commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damage."

917.   In federal court, an action under the TCPA may be brought on behalf of a class. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (holding that class action could proceed in federal court despite state rule's class action bar); *In re Zetia (Ezetimibe) Antitrust Litig.,* No. 2:18md2836, 2019 U.S. Dist. LEXIS 134791, at *58 (E.D. Va. Aug. 9, 2019) ("the court agrees with the Magistrate Judge's conclusion that *Shady Grove* governs class actions in federal court and permits the EPPs' suit under the Tennessee statute.").

918.   Tenn. Code Ann. § 47-18-109(a)(3) further provides that "[i]f the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper…."

919.   Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "trade or commerce."

920.   Defendants' conduct violates the TCPA because Defendants engaged in unfair or deceptive acts and practices described above, which included issuing marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is appropriate for safe infant sleep, including overnight and prolonged sleep.

921.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also

misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

922.    The materially misleading statements and deceptive acts and practices of Defendants alleged herein were directed at the public at large, including Plaintiff and the Class.

923.    Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

924.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances.

925.    Defendants' misrepresentations, misleading statements, and omissions were materially misleading to Plaintiff and members of the Class.

926.    Defendants' violation of Tenn. Code Ann. § 47-18-104 was willful and knowing. As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree  incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations,

misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

927.    Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, deceptive acts and practices including their misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

928.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

929.    As a direct and proximate result of Defendants' conduct in violation of Tenn. Code Ann. § 47-18-104, Plaintiff and the members of the Class have been injured in an amount to be determined at trial, Because Defendants' violation was willful and knowing, Plaintiff is entitled to treble damages under Tenn. Code Ann. § 47-18-109.

930.    Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

931.    Additionally, pursuant to Tenn. Code Ann. § 47-18-109, Plaintiff and the Class seek attorneys' fees and costs.

## COUNT 57

### Breach of Implied Warranty
### (On Behalf of Plaintiff Willis and the Tennessee Class)

932.    Plaintiff Willis ("Plaintiff" for the purpose of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

933.    This Count is brought on behalf of Plaintiff and the Tennessee Class ("Class" for the purposes of this Count).

934.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under Tenn. Code Ann. §§ 47-2-104 and 47-2-105.

935.    Pursuant to Tenn. Code Ann. § 47-2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the transactions relevant thereto. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

936.    Pursuant to Tenn. Code Ann. § 47-2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

937.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

938.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

939.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for

prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

940.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

941.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

942.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.   On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

943.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

944.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

945.    Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

946.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 58

### Negligence
### (On Behalf of Plaintiff Willis and the Tennessee Class)

947.    Plaintiff Willis ("Plaintiff" for the purpose of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

948.    This Count is brought on behalf of Plaintiff and the Tennessee Class ("Class" for the purposes of this Count).

949.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

950.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

951.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

952.    Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

953.    Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

954.    Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.   Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.   The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

955.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

**COUNT 59**

**Unjust Enrichment**
**(On Behalf of Plaintiff Willis and the Tennessee Class)**

956.    Plaintiff Willis ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

957.    This Count is brought on behalf of Plaintiff and the Tennessee Class ("Class" for the purposes of this Count).

958.     As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

959.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Texas Class:**

**COUNT 60**

**Texas Deceptive Trade Practices and Consumer Protection Act,**
**Tex. Bus. & Com. Code § 17.41, *et seq.***
**(On Behalf of Plaintiff Black and the Texas Class)**

960.     Plaintiff Black ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

961.     This Count is brought on behalf of Plaintiff and the Texas Class ("Class" for the purposes of this Count) for violation of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.* ("TDTPA"), which prohibits unfair, unconscionable, and deceptive methods, acts, and practices in the State of Texas.

962.     The TDTPA, Tex. Bus. & Com. Code § 17.50, provides that a "consumer may maintain an action where [there is a statutorily prescribed] cause of economic damages or damages for mental anguish."

963.    The TDTPA, Tex. Bus. & Com. Code § 17.50, further provides that "the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages" and that "[e]ach consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees."

964.    Plaintiff and the Class are "consumers" within the meaning of the TDTPA.

965.    Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "trade" and "commerce" within the meaning of the TDTPA.

966.    Defendants' conduct violates the TDTPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

967.    Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

968.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

969.     Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

970.     Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

971.     Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

972.     Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

973.     Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

974.     Defendants' violation of the TDTPA was knowing and/or intentional. As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for

infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

975.    Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

976.    As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

977.    As a direct and proximate result of Defendants' conduct in violation of the TDTPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial. Because Defendants' violation was knowing and/or intentional, Plaintiff and the Class are entitled to treble damages under Tex. Bus. & Com. Code § 17.50(b)(1).

978.    Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

979.    Additionally, pursuant to Tex. Bus. & Com. Code § 17.50(d), Plaintiff and the Class seek attorneys' fees and costs.

980.    Plaintiff further demands punitive damages on her own behalf and on behalf of the Class.

## COUNT 61

### Breach of Implied Warranty
### (On Behalf of Plaintiff Black and the Texas Class)

981.    Plaintiff Black ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

982.    This Count is brought on behalf of Plaintiff and the Texas Class ("Class" for the purposes of this Count).

983.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Texas Business and Commercial Code governing the implied warranty of merchantability.

984.    Pursuant to Texas Bus. & Com. Code § 2.314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

985.    Pursuant to Texas Bus. & Com. Code § 2.315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

986.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

987.    As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children,  and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

988.    Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for

prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

989.    The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

990.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

991.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

992.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

993.   Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

994.   Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

995.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 62

### Negligence
### (On Behalf of Plaintiff Black and the Texas Class)

996.   Plaintiff Black ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

997.   This Count is brought on behalf of Plaintiff and the Texas Class ("Class" for the purposes of this Count).

998.   Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

999.   Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

1000.   Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

1001.   Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

1002.   Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

1003.   Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.   Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.   The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

1004.   Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

**COUNT 63**

**Unjust Enrichment**
**(On Behalf of Plaintiff Black and the Texas Class)**

1005.   Plaintiff Black ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1006.   This Count is brought on behalf of Plaintiff and the Texas Class ("Class" for the purposes of this Count).

1007.   As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

1008.   Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.   Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Virginia Class:**

**COUNT 64**

**Virginia Consumer Protection Act,**
**Va. Code §§ 59.1-196,** *et seq.*
**(On Behalf of Plaintiff Mandley and the Virginia Class)**

1009.   Plaintiff Mandley ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1010.   This Count is brought on behalf of Plaintiff and the Virginia Class ("Class" for the purposes of this Count) for violation of the Virginia Consumer Protection Act, Va. Code § 59.1-196, *et seq.* ("VCPA"), which provides that enumerated "fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful." Va. Code § 59.1-200.

1011. The VCPA, Va. Code § 59.1-200(A)(5), prohibits suppliers from "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits."

1012.   The VCPA, Va. Code § 59.1-200(A)(14), further prohibits suppliers from engaging in any "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

1013.   The VCPA, Va. Code § 59.1-204(A)-(B), provides that "[a]ny person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater" and that "such person also may be awarded reasonable attorneys' fees and court costs."

1014.   The VCPA, Va. Code § 59.1-204(A), further provides that "[i]f the trier of fact finds that violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater."

1015.   Each Defendant is a "supplier" and the Rock 'n Play Sleeper is a "good" as defined under Va. Code § 59.1-198.

1016.   Defendants' design, manufacture, distribution, marketing, adverting, labeling, and sale of the Rock 'n Play Sleeper constitutes a "consumer transaction" within the meaning of the VCPA.

1017.   Defendants' conduct violates the VCPA because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and Defendants' "brand" of utmost safety in products for children, and the message that the Rock 'n Play Sleeper is appropriate for safe infant sleep, including overnight and prolonged sleep.

1018.   Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the

product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

1019.   Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

1020.   Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

1021.   Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

1022.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

1023.   Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices described herein.

1024.   Defendants' misrepresentations, misleading statements and omissions were material to Plaintiff and members of the Class.

1025.   Defendants' violation of the VCPA was knowing, intentional, and willful.   As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other

pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock 'n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock 'n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements and omissions as detailed above, continued to sell the products in the United States for overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

1026.   Had Plaintiff and the members of the Class known of Defendants' misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

1027.   As a result of their deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

1028.   As a direct and proximate result of Defendants' conduct in violation of the VCPA, Plaintiff and the members of the Class have been injured in an amount to be proven at trial.

1029.   Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

1030.   Additionally, pursuant to Va. Code § 59.1-204(B), Plaintiff and the Class seek attorneys' fees and costs.

**COUNT 65**

**Breach of Implied Warranty**
**(On Behalf of Plaintiff Mandley and the Virginia Class)**

1031.   Plaintiff Mandley ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1032.   This Count is brought on behalf of Plaintiff and the Virginia Class ("Class" for the purposes of this Count).

1033.   Defendants are "merchants" and the Rock 'n Play is a "good" as defined in Virginia's Commercial Code governing the implied warranty of merchantability.  Va. Code §§ 8.2-104(1), 105(1).

1034.   Pursuant to Va. Code § 8.2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in sale of the product.  Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

1035.   Pursuant to Va. Code § 8.2-315, a warranty that the Rock 'n Play Sleeper was appropriate for safe sleep, including prolonged or overnight sleep, was implied by law.

1036.   By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is reasonably safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

1037.   As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, market, label, and sell products that were reasonably safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

1038.  Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

1039.  The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

1040.  Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

1041.  At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that its warranties were false, and yet they did not disclose the truth in a timely manner, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continue to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

1042.   The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when it reached Plaintiff and the Class.

1043.   Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

1044.   Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

1045.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Virginia Class are entitled to damages in an amount to be determined at trial.

### COUNT 66

### Negligence
**(On Behalf of Plaintiff Mandley and the Virginia Class)**

1046.   Plaintiff Mandley ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1047.   This Count is brought on behalf of Plaintiff and the Virginia Class ("Class" for the purposes of this Count).

1048.   Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

1049.   Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

1050.   Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

1051.   Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned the defective Rock 'n Play Sleepers.

1052.   Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

1053.   Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.   Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.   The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

1054.   Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 67

### Unjust Enrichment
### (On Behalf of Plaintiff Mandley and the Virginia Class)

1055.   Plaintiff Mandley ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1056.  This Count is brought on behalf of Plaintiff and the Virginia Class ("Class" for the purposes of this Count).

1057.  As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through their purchase of the Rock 'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including overnight and prolonged sleep.

1058.  Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

**Claims Brought on Behalf of the Washington Class:**

**COUNT 68**

**Violations of the Washington Unfair Business Practices – Consumer Protection Act,
Revised Code of Washington § 19.86.010, *et seq.*
(On Behalf of Plaintiff Shaffer and the Washington Class)**

1059.  Plaintiff Shaffer ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1060.  This Count is brought on behalf of Plaintiff and the Washington Class ("Class" for the purposes of this Count) for violation of the Washington Unfair Business Practices – Consumer Protection Act, Revised Code of Washington § 19.86.010, *et seq.*, which prohibits unfair or deceptive acts and practices in the State of Washington.

1061.  Wash. Rev. Code § 19.86.020 prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce" in the State of Washington.

1062.  Wash. Rev. Code § 19.86.090 further provides that "the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained . . . [up to] twenty-five thousand dollars" and that the court may award "reasonable attorney's fees."

1063.  Plaintiff and the Class  are "persons" within the meaning of Wash. Rev. Code § 19.86.010.

1064.  Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper constitutes "trade" and "commerce" within the meaning of Wash. Rev. Code § 19.86.010.

1065.  Defendants' conduct violates Washington law because Defendants engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, and through Defendants' "brand" of utmost safety in products for children, the false message that the Rock 'n Play Sleeper is suitable for safe infant sleep, including overnight and prolonged sleep.

1066.  Defendants' marketing and sale of the product omitted material facts concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers. Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep, which were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Defendants' conduct is inherently deceptive and materially misleading, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

1067.  Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

1068.   Defendants intended for others to rely upon their marketing of the Rock 'n Play Sleeper as suitable for safe infant sleep, including prolonged or overnight sleep, in deciding whether to purchase or own the product for that purpose.

1069.   Plaintiff and the Class justifiably relied upon Defendants' misleading statements and deceptive acts and practices.

1070.   Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

1071.   Defendants' actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

1072.   Defendants' misrepresentations, misleading statements, and omissions were material to Plaintiff and members of the Class.

1073.   As described above, at all relevant times, Defendants, among other things, knew their Rock 'n Play Sleepers had caused many infant deaths and injuries; knew the AAP, as well multiple other pediatric professionals and consumer groups, pronounced that safe infant sleep, including prolonged or overnight sleep, requires infants to be placed supine on a flat surface without bedding, which necessarily means that Rock `n Play Sleepers, which are at a 30-degree incline, are unsafe; and knew certain other countries prohibited them from marketing and selling their Rock `n Play Sleepers as sleepers. Nonetheless, Defendants, through their misrepresentations, misleading statements, and omissions as detailed above, continued to sell the products in the United States for infant sleep, including overnight and prolonged sleep, in order to increase their own profits, all the while putting the lives of nearly 5 million infants at risk.

1074.   Had Plaintiff and the members of the Class known of Defendants' deceptive acts and practices, including their misrepresentations, misleading statements and omissions about the Rock 'n Play Sleeper, they would not have purchased and/or owned the product.

1075.   As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

1076.   As a direct and proximate result of Defendants' conduct in violation of the Wash. Rev. Code § 19.86.020, Plaintiff and the members of the Class have been injured in an amount to be proven at trial. Plaintiff and the Class are entitled to treble damages under Wash. Rev. Code § 19.86.090.

1077.   Plaintiff also seeks injunctive relief, including a state of the art notice program for the wide dissemination of a factually accurate recall notice for the Rock 'n Play Sleeper and the implementation of a corrective advertising campaign by Defendants.

1078.   Additionally, pursuant to Wash. Rev. Code § 19.86.090, Plaintiff and the Class seek attorneys' fees and costs.

### COUNT 69

### Breach of Implied Warranty
### (On Behalf of Plaintiff Shaffer and the Washington Class)

1079.   Plaintiff Shaffer ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1080.   This Count is brought on behalf of Plaintiff and the Washington Class ("Class" for the purposes of this Count).

1081.   Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Uniform Commercial Code – Sales.

1082.   Pursuant to Revised Code of Washington § 62A.2-314, a warranty that the Rock 'n Play Sleeper was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock 'n Play Sleepers were of a merchantable quality.

1083.   Pursuant to Wash. Rev. Code § 62A.2.315, a warranty that the Rock 'n Play Sleeper was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

1084.   By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe for infant sleep, including prolonged or overnight sleep.

1085.   As merchants, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants, and Defendants' "brand" of utmost safety in products for children, and upon said implied warranties in purchasing and/or owning the Rock 'n Play Sleeper.

1086.   Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock 'n Play Sleepers are not safe and, in fact, are dangerous for infants.

1087.   The Rock 'n Play Sleeper is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of potential death and injury to babies.

1088.  Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

1089.  At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties, and continued to insist the product is safe.  On February 21, 2019, Plaintiff Barton sent each of the Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.  *See* Ex. A.  On April 24, 2019, Defendants responded and asserted that the Rock 'n Play Sleeper met all applicable safety standards, that they were instituting the Recall due to "the reported incidents in which the product was used contrary to safety warnings and instructions," and that the Recall "was not due to any alleged defect in the product."  *See* Ex. B.  It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.  Defendants have also been provided notice of their breaches of warranty through numerous complaints filed against them, including the numerous complaints filed against them in this Court and other courts that were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

1090.  The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleepers, and the Rock 'n Play Sleepers were therefore still defective when they reached Plaintiff and the Class.

1091.  Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' acquisition of Rock 'n Play

Sleepers. Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

1092.  Plaintiff's and each Class member's acquisition of the Rock 'n Play Sleepers suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

1093.  As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT 70

### Negligence
### (On Behalf of Plaintiff Shaffer and the Washington Class)

1094.  Plaintiff Shaffer ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1095.  This Count is brought on behalf of Plaintiff and the Washington Class ("Class" for the purposes of this Count).

1096.  Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, distributing, marketing, advertising, labeling and selling products for infant use.

1097.  Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

1098.  Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for infant sleep, including prolonged or overnight sleep.

1099.  Had Plaintiff and the members of the Class known of Defendants' breaches of their duties, they would not have purchased and/or owned Rock 'n Play Sleepers.

1100.  Defendants benefitted from their breaches of their duties because they were able to sell millions of their Rock 'n Play Sleepers, and were able to charge more for the products than they are worth.

1101.  Plaintiff and Class members were reasonably foreseeable victims of Defendants' wrongdoing.  Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 71

### Unjust Enrichment
### (On Behalf of Plaintiff Shaffer and the Washington Class)

1102.  Plaintiff Shaffer ("Plaintiff" for the purposes of this Count) repeats and realleges the allegations contained in ¶¶ 1 through 272 above, as if fully set forth herein.

1103.  This Count is brought on behalf of Plaintiff and the Washington Class ("Class" for the purposes of this Count).

1104.  As a result of Defendants' material, deceptive design, manufacture, distribution, marketing, advertising, labeling, and sale of the Rock 'n Play Sleeper, Defendants were unjustly enriched at the expense of Plaintiff and all other Class members through the purchase of the Rock

'n Play Sleeper, because it is unsafe and dangerous and unfit for its stated purpose of safe infant sleep, including for overnight and prolonged sleep.

1105.   Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class as the result of their deceptive marketing and advertising practices.   Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

1.      Certifying the proposed Nationwide Class and State Classes;

2.      Appointing Plaintiffs as Class representatives and their undersigned counsel as Class counsel;

3.      Awarding Plaintiffs and the proposed Class members damages;

4.      Awarding punitive damages to the extent permitted under applicable law;

5.      Awarding restitution and disgorgement of Defendants' revenues to Plaintiffs and the proposed Class members;

6.      Awarding declaratory relief as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of their misconduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful;

7.      Ordering Defendants to modify the Recall of all Rock 'n Play Sleepers sold in the United States to provide full recompense to all Class members;

8.      Ordering Defendants to modify the Recall so that owners of all Rock 'n Play Sleepers sold in the United States can participate in the Recall without burdensome requirements;

9.      Ordering Defendants to engage in a corrective advertising campaign;

10.     Awarding attorneys' fees and costs; and

11.     Granting such additional relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated:      Buffalo, New York
            October 28, 2019

**CONNORS LLP**

/s/ Terrence M. Connors
Terrence M. Connors
Katherine G. Howard
1000 Liberty Building
Buffalo, NY 14202
(716) 852-5533
tmc@connorsllp.com
kgh@connorsllp.com

*Plaintiffs' Liaison Counsel*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Demet Basar
Daniel Tepper
Kate McGuire
270 Madison Ave.
New York, New York 10016
(212) 545-4600
basar@whafh.com
tepper@whafh.com
mcguire@whafh.com

*Plaintiffs' Lead Counsel*

**PIERCE BAINBRIDGE BECK PRICE
& HECHT LLP**
Andrew J. Lorin
Jonathan A. Sorkowitz
Kristin Darr
Melody McGowin
277 Park Avenue, 45th Floor
New York, New York 10172
(212) 484-9866
alorin@piercebainbridge.com
jsorkowitz@piercebainbridge.com
kdarr@piercebainbridge.com
mmcgowin@piercebainbridge.com

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis (*admitted pro hac vice*)
5 Greentree Centre
525 Route 73 North, Suite 410
Marlton, NJ 08053
(856) 797-9951
sdenittis@denittislaw.com

**SMOLEN & ROYTMAN**
Daniel Smolen
701 S. Cincinnati Avenue
Tulsa, OK 74119
(918) 585-2667
danielsmolen@ssrok.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher
Blair Reed
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
(925) 300-4455
ltfisher@bursor.com
breed@bursor.com

*Plaintiffs' Executive Committee*

*Additional Counsel to Plaintiffs:*

**CARUSO LAW FIRM, P.C.**
Mark A. Smith
The Colonial Building
1325 East 15th Street, Suite 201
Tulsa, OK 74120
(918) 583-5900
msmith@carusolawfirm.com

**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
Gary S. Graifman
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570
ggraifman@kgglaw.com

**STULL, STULL & BRODY**
Melissa R. Emert
Howard T. Longman
6 East 45th Street-5th  floor
New York, NY 10017
(212) 687-7230
memert@ssbny.com
hlongman@ssbny.com

**REICH RADCLIFFE & HOOVER LLP**
Mark G. Reich
Adam T. Hoover
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
(949) 975-0512
mgr@reichradcliffe.com
adhoover@reichradcliffe.com

**FORCHELLI DEEGAN TERRANA LLP**
Elbert F. Nasis
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
(516) 248-1700
enasis@forchellilaw.com

**BRANSTETTER, STRANCH & JENNINGS, PLLC**
J. Gerard Stranch, IV
Benjamin A. Gastel
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

**CORY WATSON P.C**.
F. Jerome Tapley
Douglas A. Dellaccio, Jr.
Hirlye R. "Ryan" Lutz, III
Adam W. Pittman
Lauren S. Miller
2131 Magnolia Ave. S.
Birmingham, AL 35205
(205) 328-2200
jtapley@corywatson.com
ddellaccio@corywatson.com
rlutz@corywatson.com
apittman@corywatson.com
lmiller@corywatson.com

**PITTMAN, DUTTON & HELLUMS, P.C.**
Chris T. Hellums
Jonathan S. Mann
2001 Park Place North, Suite 1100
Birmingham, AL 35203
(205) 322-8880
chrish@pittmandutton.com
jonm@pittmandutton.com

**SHINDLER ANDERSON GOPLERUD & WEESE PC**
J. Barton Goplerud
Brian O. Marty
5015 Grand Ridge Dr.
West Des Moines, IA 50265
(515) 223-4567
goplerud@sagwlaw.com
marty@sagwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert K. Shelquist
100 South Washington Ave., Suite 2200
Minneapolis, MN 55401
(612) 339-6900
rkshelquist@locklaw.com

**CUNEO GILBERT & LADUCA, LLP**
Charles J. LaDuca
4725 Wisconsin Ave, NW
Washington, DC 20016
 (202) 789-3960
CharlesL@cuneolaw.com

806644

**CLRA VENUE DECLARATION**

**PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(D)**

I, Terrence M. Connors, declare as follows:

1.      I am an attorney licensed to practice in the State of New York and a member of the Bar of this Court. I am the principal of Connors LLP, Plaintiffs' Liaison Counsel in this matter.  I have personal knowledge of the facts in this Declaration based upon the records maintained by my law firm, and if called as a witness, I could and would competently testify thereto under oath.

2.      I am informed that Plaintiff Karen Flores resides in Orange County, California, and that Plaintiff Megan Kaden resides in Marin County, California.

3.      The Consolidated Amended Complaint filed in this action is filed in a proper place for trial under California Civil Code Section 1780(d) because the Judicial Panel on Multidistrict Litigation coordinated the proceedings in the Western District of New York, Defendant Fisher-Price has its principal place of business in this District, and a substantial portion of the events alleged in the Consolidated Amended Complaint occurred in this District.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Buffalo, New York on October 28, 2019.

/s/ Terrence M .Connors
Terrence M. Connors