### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 1:19-md-2903<br><br>This Document Relates to: ALL CASES<br><br>Hon. Geoffrey W. Crawford |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND OPINIONS OF MR. COLIN B. WEIR

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ....................................................................... 1

II.  BACKGROUND ............................................................................................. 3

III. LEGAL STANDARDS ..................................................................................... 4

   A.   Rule 702 of the Federal Rules of Evidence and *Daubert* ...................................... 4

   B.   *Daubert* at the Class Certification Stage ................................................................ 5

IV.  MR. WEIR'S THREE SENTENCE "OPINION" ON FULL REFUND DAMAGES IS INADEQUATE, UNRELIABLE, AND INADMISSIBLE. .................. 6

V.   MR. WEIR'S CONCLUSIONS ON DIMINUTION OF VALUE DAMAGES ARE PURE *IPSE DIXIT* AND SHOULD BE EXCLUDED. .......................... 7

VI.  MR. WEIR'S DIMINUTION IN VALUE METHODOLOGY IS INACCURATE AND UNRELIABLE BECAUSE IT FAILS TO INCORPORATE SUPPLY-SIDE CONSIDERATIONS. ........................................................................... 13

VII. MR. WEIR'S PROPOSED METHODOLOGY IS INADMISSIBLE BECAUSE IT IS INCONSISTENT WITH PLAINTIFFS' THEORY OF LIABILITY. .................. 17

VIII. MR. WEIR'S TESTIMONY IS UNRELIABLE AND NOT HELPFUL TO THE COURT BECAUSE HE HAS DEFERRED TO THE COURT FOR DIRECTION ON HIS PURPORTED SURVEY METHODOLOGY. .................................... 20

IX.  BOTH OF MR. WEIR'S PROPOSED METHODOLOGIES ARE UNRELIABLE BECAUSE THEY DO NOT INCORPORATE NECESSARY INDIVIDUALIZED ANALYSIS. ...................................................................... 21

X.   CONCLUSION ............................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ................................................................6

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................5, 8, 12

*Barban v. Rheem Textile Sys.*,
  01-CV-8475 (ILG), 2005 U.S. Dist. LEXIS 5996 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147
  Fed. App'x 222 (2d Cir. 2005)...................................................8

*Chart v. Town of Parma*,
  No. 10-CV-6179P, 2014 WL 4923166 (W.D.N.Y. Sept. 30, 2014).........................4

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................2, 17, 20

*Dashnaw v. New Balance Athletics*,
  No. 3:17-cv-00159-L-JLB (S.D. Cal.) ................................................2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)........................................................... passim

*Edwards v. Walmart Inc.*,
  No. 2:18-cv-9655 (C.D. Cal.) ................................................2

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).............................................................8

*Gillespie v. United States*,
  23 F.3d 36 (2d Cir. 1994)........................................................14

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999).......................................................8

*Hughes v. The Ester C Company*,
  317 F.R.D. 333 (E.D.N.Y. 2016) ..............................................20

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015).......................................................6

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) ............................................12

*In re General Motors LLC Ignition Switch Litigation*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019).........................................15, 16

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  No. 115CV6549 (CMR) (WL), 2021 WL 100489 (S.D.N.Y. Jan. 12, 2021)......................5, 6

# TABLE OF AUTHORITIES

(continued)

**Page**

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
No. 18-MD-2819 (NG) (LB), 2020 WL 2280144 (E.D.N.Y. May 5, 2020) ...........................5

*In re Teva Sec. Litig.*,
No. 3:17-CV-558 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021).....................................6

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
500 F. Supp. 3d 940 (N.D. Cal. 2020) ..............................................................................12, 15

*Jensen v. Cablevision Sys. Corp.*,
372 F. Supp. 3d 95 (E.D.N.Y. 2019), *appeal dismissed, leave to appeal denied*, No.
19-628, 2019 WL 4296129 (2d Cir. Aug. 28, 2019) ...........................................................5, 8

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).................................................................................................................4

*Montgomery v. Stanley Black & Decker, Inc., d/b/a Craftsman*,
No. 3:19-cv-01182-AVC (D. Conn.) .......................................................................................2

*Opperman v. Kong Technologies, Inc.*,
No. 13-cv-00453-JST, 2017 WL 3149295 (N.D. Cal. July 25, 2017)....................................10

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
No. 02 Civ. 8046(WHP), 2003 WL 21242769 (S.D.N.Y. May 28, 2003) ...............................4

*Prantil v. Arkema Inc.*,
986 F.3d 570 (5th Cir. 2021) ...................................................................................................6

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................................8

*Saavedra v. Eli Lilly & Co.*,
No. 2:12-CV-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)..............................10

*Schechner v. Whirlpool Corp.*,
No. 2:16-cv-12409, 2019 WL 4891192 (E.D. Mich. Aug. 13, 2019)................................2, 16

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ...............................................................................................5

*Sher v. Raytheon Co.*,
419 F. App'x 887 (11th Cir. 2011) ...........................................................................................6

*United States v. Cartwright*,
411 U.S. 546 (1973)...............................................................................................................14

*Weaver v. Champion Petfoods USA Inc.*,
No. 18-CV-1996-JPS-JPS, 2019 WL 7370374 (E.D. Wis. Dec. 31, 2019)............................12

*Weiner v. Snapple Beverage Corp.*,
07 Civ. 8742(DLC), 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ........................9, 10, 11, 12

**TABLE OF AUTHORITIES**

(continued)

**Page**

**RULES**

Federal Rule of Evidence 702..................................................................................... passim

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"), Defendants Fisher-Price, Inc. and Mattel, Inc. (collectively, "Defendants") move to exclude from evidence the Declaration of Mr. Colin B. Weir (Dkt. No. 125-2) ("Weir Declaration" or "Declaration"), which has been submitted by Plaintiffs in connection with their Motion for Class Certification.

## I.    PRELIMINARY STATEMENT

In support of their Motion for Class Certification, Plaintiffs have offered the Weir Declaration to purportedly demonstrate that damages for their purchases of the Rock 'n Play Sleeper ("RNPS") can be measured on a class-wide basis.  Mr. Weir is a favorite of both the class-action plaintiffs' bar broadly and Plaintiffs' attorneys specifically.  In every relevant case for which he has been hired, Mr. Weir has offered the same opinion—that damages can be determined on a class-wide basis.  Courts' acceptance of his opinions has been mixed.

Predictably, Mr. Weir also opines in *this* case that it is possible to determine damages on a class-wide basis.  Indeed, Mr. Weir arrived at that conclusion about twenty minutes into his first introduction to the case, without even reviewing any documents other than possibly the Consolidated Amended Complaint ("CAC").  *See* Weir Decl., Ex. 6; Ex. A to Marshack Decl. [Weir Depo.] at 130:20–131:07; 137:15–19.  Given the significant damages complexities in this case, Mr. Weir's opinions are transparently result-oriented.  His skeletal Declaration, which is based on assumption and speculation, does not reliably support the opinions he has reached.

In fact, the inadequacies and inaccuracies of Mr. Weir's Declaration are not surprising given that, over the last four years, he has only designed four conjoint surveys on his own (without the assistance of an expert more experienced in conjoint survey design), none of which has been accepted by a court and one of which was harshly criticized, resulted in the Court's finding that Plaintiffs failed to offer a proper damages calculation, and contributed to a denial of

1

Plaintiffs' motion for class certification.[1]

Mr. Weir has failed to meet the *Daubert* threshold requirements that are predicates to presenting expert opinion, and his purported testimony must therefore be excluded, for several reasons.

First, Mr. Weir's "opinion" on full-refund damages is so inadequate and generic that it would be disingenuous to call it an expert opinion; it is merely a mathematical formula that comprises a few lines in his Declaration and contains no analysis tied to the facts of this case, and cannot assist the trier of fact, as *Daubert* requires.

Second, Mr. Weir has failed to design a conjoint survey based on accepted scientific principles in support of a diminution of value damages calculation. His Declaration sets forth only what work he *might* do in the future to try to prove damages can be reliably calculated on a class-wide basis. Because Mr. Weir's analysis is all hypothetical, his Declaration cannot inform the Court whether his proposed methodologies are sound and consistent with the facts of this case.

Third, although it is widely accepted that any accurate assessment of diminution of value

---

[1] The cases in which Mr. Weir alone designed a conjoint survey, as described by Mr. Weir, are *Edwards v. Walmart Inc.*, No. 2:18-cv-9655 (C.D. Cal.); *Montgomery v. Stanley Black & Decker, Inc.*, *d/b/a Craftsman*, No. 3:19-cv-01182-AVC (D. Conn.); *Dashnaw v. New Balance Athletics*, No. 3:17-cv-00159-L-JLB (S.D. Cal.); and *Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409-SJM (E.D. Mich.). *See* Ex. A to Marshack Decl. [Weir Depo.] at 89:7–91:2. Mr. Weir's damages analysis was presented to the Court only in *Schechner*, where, after initially allowing Mr. Weir's analysis into evidence, the Court harshly criticized his survey in its order on class certification. *See* Ex. A to Marshack Decl. [Weir Depo.] at 91:3–92:6; *see also Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409, 2019 WL 4891192, at *7–8 (E.D. Mich. Aug. 13, 2019) (finding that "Weir's choice sets were unrealistic and did not represent realistic product choices available on the market[,]" "Weir failed to incorporate supply-side considerations into his calculated price" given that "[p]rices are set by supply and demand" and "[b]ecause Weir failed to account sufficiently for the market conditions . . . his conjoint analysis also fails the requirements of *Comcast*.").

2

damages must include an assessment of both willingness to pay *and* a willingness to sell, Mr. Weir's proposed conjoint survey does not consider the necessary supply-side factors (or other market factors) that would allow him to set forth an accurate model.

Fourth, Mr. Weir fundamentally misunderstands Plaintiffs' theory of liability, and does not present damages methodologies that can calculate the damages stemming from any alleged misrepresentations/omissions regarding the suitability of the RNPS for sleep.

Fifth, Mr. Weir's admission that he will look to the Court for guidance on how to revise his proposed conjoint survey demonstrates that he is not fulfilling his purported role as an expert in this action, which is to assist the Court in determining facts at issue (and not the other way around), and undermines the opinions that he has offered.

Last, Mr. Weir does not even attempt to consider the numerous and substantial individual damages inquiries in this case, rendering his methodologies inaccurate and unreliable.

At bottom, *Daubert*, even at the class certification stage, requires more than Mr. Weir has provided. For these reasons, the Weir Declaration should be excluded from evidence.

## II.    **BACKGROUND**

Plaintiffs seek to certify several classes of people who purchased or used the RNPS.[2] Plaintiffs used the RNPS for multiple purposes, most on a daily basis and in some instances with multiple children, without incident or injury, for the useful life of the product, and testified that it

---

[2] Plaintiffs seek damages for 12 proposed statewide classes, which consist of purchasers of the products in 12 different states. *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, p. 19. Plaintiffs also seek injunctive relief for the putative "Nationwide Class," which they define as "[a]ll persons, other than Mattel, Inc. and Fisher-Price, Inc., and their employees, who purchased or owned any model of Fisher Price Rock 'n Play Sleeper in the United States from October 1, 2009 until the date of notice," and seek to certify a nationwide class that includes only purchasers, which they call the "Nationwide Purchaser Class." *Id.* Defendants incorporate relevant facts from the concurrently-filed Opposition to Plaintiffs' Motion for Class Certification.

performed precisely as advertised and as they expected.  Nevertheless, Plaintiffs now claim that they suffered economic injury due to their purchase of the RNPS, arguing that it was improperly marketed as being safe for infant sleep, and alleging that they are entitled to their money back. Alternatively, and only "if the Court determines that the product has some value," Plaintiffs claim that Defendants charged (and consumers paid) more for the RNPS than the product was worth (*i.e.* a "price premium").

Mr. Weir proffers two purported economic damages methodologies: (1) full refund damages; and (2) diminution in value of the product, for which he has proposed, but not designed, a conjoint survey.  *See* Weir Decl., at ¶¶ 14–17; 25–29; Ex. 3.

## III.    LEGAL STANDARDS

### A.    Rule 702 of the Federal Rules of Evidence and *Daubert*

Under Rule 702 of the Federal Rules of Evidence and *Daubert*, trial courts play a critical "gatekeeping role" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589.  This is true at any stage of the case.  *Daubert*'s requirements apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).  Expert economic analysis qualifies as "technical" or "specialized" knowledge for the purposes of *Daubert*.  *See Playtex Prods., Inc. v. Procter & Gamble Co*., No. 02 Civ. 8046(WHP), 2003 WL 21242769, at *4 (S.D.N.Y. May 28, 2003).

To be relevant, the expert's testimony must assist "the trier of fact to understand the evidence or to determine a fact in issue," and be grounded in the facts of the case.  *See* Fed. R. Evid. 702; *Chart v. Town of Parma*, No. 10-CV-6179P, 2014 WL 4923166, at *13 (W.D.N.Y. Sept. 30, 2014) ("[I]f an expert opinion is based upon assumptions that are not present in the case, the opinion cannot be said to assist the trier of fact as Rule 702 requires.") (internal

4

citations omitted).

To be reliable, expert opinions must be "derived by the scientific method," "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal citations omitted). "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266 (internal citations omitted); *see also Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 112 (E.D.N.Y. 2019), *appeal dismissed, leave to appeal denied*, No. 19-628, 2019 WL 4296129 (2d Cir. Aug. 28, 2019) ("The requirement of 'reliability' is extremely important and requires a clear analytical connection between the expert's methodology and his conclusions.") (internal citations omitted).

**B.** *Daubert* **at the Class Certification Stage**

"[T]he heavy weight of authority militat[es] towards a *Daubert* inquiry at class certification." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 115CV6549 (CMR) (WL), 2021 WL 100489, at *8 (S.D.N.Y. Jan. 12, 2021). "Courts in this Circuit regularly subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis." *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-MD-2819 (NG) (LB), 2020 WL 2280144, at *2 (E.D.N.Y. May 5, 2020); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016) ("Trial courts in this circuit often subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.").

Some courts in the Second Circuit have applied an even more rigorous *Daubert* standard at the class certification stage, suggesting a full *Daubert* analysis is a proper exercise of the court's gatekeeping function. *See In re Namenda*, 2021 WL 100489, at *7 ("This Court is persuaded that a complete *Daubert* inquiry is necessary to analyzing a motion to exclude at the class-certification stage, and that only expert reports that would otherwise be admissible at trial under *Daubert* can be considered in support of class certification."); *see also In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *10 (D. Conn. Mar. 9, 2021) ("In my view, the Supreme Court and Second Circuit have hinted that district courts should undertake a full *Daubert* analysis at the class certification stage, when necessary . . . [f]or those reasons, I will undertake a full *Daubert* analysis.").[3]

Under either standard, Mr. Weir's Declaration is insufficient and should be excluded.

## IV. MR. WEIR'S THREE SENTENCE "OPINION" ON FULL REFUND DAMAGES IS INADEQUATE, UNRELIABLE, AND INADMISSIBLE.

Mr. Weir's conclusion regarding full refund damages is so inadequate that it is virtually impossible to perform a meaningful analysis under *Daubert*. The section of Mr. Weir's Declaration on full refund damages comprises only the following three sentences.

> If the Plaintiffs prove that the Product is unsafe and valueless, or should not have been sold, Full Refund Damages would be appropriate. Under a damages framework awarding full recovery to consumers, total damages to the Class are calculated as: Retail Units

---

[3] In addition to those Circuits which have held that the *Daubert* standard applies at the class certification stage (*see In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010)), at least one Circuit has explicitly held that the *Daubert* standard applies at the class certification stage as forcefully as at any other time in a case. *See Prantil v. Arkema Inc.*, 986 F.3d 570, 575 (5th Cir. 2021) ("And, we ask, when the cementing of relationships among proffered class members of liability or damages or both turns on scientific evidence *should we insist that the metric of admissibility be the same for certification and trial. We answer that question in the affirmative;* the *Daubert* hurdle must be cleared when scientific evidence is relevant to the decision to certify.") (emphasis added).

x Average Retail Price = Full Refund Damages. This methodology
can determine the damages across any prescribed time period, and
across geographic regions, given any of the possible liability
scenarios that may arise in this litigation.

Weir Decl., at ¶¶ 15–17. The inadequacy of this section speaks for itself. Mr. Weir makes no

attempt to explain whether full refund damages are appropriate on the economic and

advertising/consumer facts of *this* case, nor does he set forth a model or any basis for calculating

such damages beyond elementary arithmetic.

Indeed, Mr. Weir provides no insight into the fundamental question underlying Plaintiffs'

claim for full refund damages—whether from an economic/market perspective the product is

valueless such that full refund damages would be economically appropriate. Mr. Weir makes no

attempt to explain the incongruity in Plaintiffs' claim for full refund damages when their

products performed as advertised, and has "no plans to do that type of analysis." *See* Ex. A to

Marshack Decl. [Weir Depo.] at 199:9–16. In addition, Mr. Weir fails to consider the impact of

the U.S. Consumer Product Safety Commission's ("CPSC") carefully prescribed recall remedy,

in which two of the named plaintiffs have already participated and received cash or products.

Put simply, Mr. Weir offers no "scientific, technical, or other specialized knowledge" that

could assist "the trier of fact to understand the evidence or to determine a fact in issue" in regard

to full refund damages. *See* Fed. R. Evid. 702. He offers only third-grade multiplication.

Accordingly, this "opinion" on full refund damages should be excluded under any understanding

of either Rule 702 or *Daubert.*

## V.    MR. WEIR'S CONCLUSIONS ON DIMINUTION OF VALUE DAMAGES ARE PURE *IPSE DIXIT* AND SHOULD BE EXCLUDED.

Expert testimony should be excluded if it is not "sufficiently tied to the facts of the case

that it will aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591 (internal

citations omitted). Additionally, *Daubert* requires "a clear analytical connection between the

expert's methodology and his conclusions." *Jensen,* 372 F. Supp. 3d at 112.  In other words,

"when an expert opinion is based on data, a methodology, or studies that are simply inadequate

to support the conclusions reached, *Dauber*t and Rule 702 mandate the exclusion of that

unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.  "A district court must examine the

expert's conclusions in order to determine whether they could reliably follow from the facts

known to the expert and the methodology used." *Id*. (quoting *Heller v. Shaw Indus., Inc*., 167

F.3d 146, 153 (3d Cir. 1999)).  Hence "the law is clear that mere *ipse dixit* is not appropriate

expert testimony because it is not based on reliable methodology, as *Daubert* requires." *S.E.C. v.

Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013); *see also Gen. Elec. Co. v. Joiner*, 522 U.S.

136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered.").

  In violation of these basic tenets of the *Daubert* inquiry, Mr. Weir's opinion on

diminution of value damages rests on nothing but assumptions.  Mr. Weir opines that his

proposed methods can measure the price premium Plaintiffs claim exists in this case but has

undertaken no steps to illustrate that he is right.  He states that he *could* use a combination of a

conjoint survey, regression analysis, and a market simulation to find a price premium—a novel,

untested cocktail of disparate economic theories that does not appear to have been previously

applied in this context—but only assumes that he could reliably employ these methods as he

proposes them.  Further, he does not even attempt to show that his proposed methods could

produce sound results on the facts of *this* case.  Mr. Weir's opinion is thus a prototypical

example of the type of *ipse dixit* opinion that a *Daubert* inquiry is designed to exclude.  *Barban*

*v. Rheem Textile Sys.*, 01-CV-8475 (ILG), 2005 U.S. Dist. LEXIS 5996, at *19 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 Fed. App'x 222 (2d Cir. 2005) ("*Daubert* and its progeny require[] the Court to close the gate to opinion evidence . . . that is bottomed upon nothing more than speculation and guesswork.").

In *Weiner v. Snapple Beverage Corp.*, the court applied the more lenient *Daubert* standard than currently recognized by the Second Circuit, where the plaintiff's expert proposed certain approaches to measuring damages, but failed to perform sufficient work or analysis to confirm that his proposed approaches would be workable on the facts of the case.  07 Civ. 8742(DLC), 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010).  Even applying the more lenient standard, the Court recognized that while "an expert does not need to implement or test his methodology at the class certification stage, he must still provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand."  *Id.* at *9.  Because the expert's "bare-bones report" "provide[d] no details concerning the significant conceptual, implementation or data issues that would be encountered if his two approaches were adopted," failed to "explain how his approach would account for the various prices that putative class members actually paid in determining injury on a class-wide basis," and the expert "ha[d] not performed any empirical analysis or identified any relevant data," he could not yet know "whether his methodology will, in fact, be workable in this case." *Id.* at *7–9.  The Court also found the expert's testimony to be unreliable because it was "based on, at most, a cursory review of the underlying record in this action," given that the expert had reviewed the complaints but no other pleadings or testimony, including deposition transcripts and other documents that "would have provided critical context."  *Id*. at *8.

Where an expert has "yet to design the survey and method he will use in his conjoint

analysis," has not "collected any data" and "has not decided which attributes will be included in his model," the expert "ha[s] done worse than not even advancing a reliable method of calculating class-wide damages—[he] ha[s] advanced no damages model at all." *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (internal citations omitted); *see also Opperman v. Kong Technologies, Inc.,* No. 13-cv-00453-JST, 2017 WL 3149295, at *11 (N.D. Cal. July 25, 2017) (denying class certification and stating the expert's "failure to identify the specific attributes to be used in a conjoint survey prevents the Court from finding that it will adequately measure damages").

Like the expert in *Weiner*, Mr. Weir "in reality . . . has done nothing more than identify two possible approaches and assert that they will work in this case." *Weiner*, 2010 WL 3119452, at *9. Mr. Weir sets forth a series of steps he could or might employ in this case in the future— all are hypothetical. Indeed, he has not provided critical information about his proposed survey, including the selection of attributes and levels, sample selection, and planned pretest. *See* Expert Rebuttal Report of Dr. Olivier Toubia Ph.D. ("Toubia Report") at ¶ 49. Dr. Olivier Toubia, Ph.D., Professor of Business at Columbia Business School, the chair of Columbia Business School Marketing Division, and the author or co-author of more than two dozen book chapters, articles, and papers (many of which are on preference measurement) (Toubia Report, at ¶¶ 1–3), describes the many reasons why Mr. Weir's conjoint survey is unreliable and incomplete, and explains why the scant information Mr. Weir does include is insufficient or inaccurate. *See id*. at ¶ 19 ("Mr. Weir's proposed survey is unreliable as evidence of class-wide damages . . . his proposed survey does not match Plaintiffs' allegations, and does not follow accepted practices for conjoint surveys . . . Additionally, Mr. Weir's generalized description of his proposed survey is incomplete in numerous ways and fails to demonstrate that his method would provide reliable

estimates of willingness to pay.").  To give just one example, Mr. Weir does not discuss how he

identified his list of potential attributes that he *might* include, other than to say, "[t]he attribute of

interest is the Safety Warning.  The other attributes are distractor attributes, and will be selected

to be believable and understandable."  *See id.* at ¶ 55; *see also* Weir Decl., Ex. 3 at ¶¶ 24–25.

Such a cursory explanation of a critical part of any conjoint survey design is representative of the

entirety of Mr. Weir's diminution in value "methodology"—wholly insufficient and incomplete.

And not only has Mr. Weir failed to design or employ a survey, he has not taken any

preliminary steps towards the design of a survey, such as "exploratory research," which he says

is needed before implementing a survey (Weir Decl., Ex. 3 at ¶¶ 14–18), nor conducted any

pretesting (Weir Decl., Ex. 3 at ¶¶ 31–32); *see also* Toubia Report, at 70–72.  Critically, Mr.

Weir has also not sufficiently explained the population that he is trying to target or why his target

population is reasonable.  *See* Toubia Report, at ¶ 73–76.  Since he has done none of this work,

he has obtained no data, and thus he has not performed any analysis to support his opinions.  He

cannot say, then, whether his survey could or would reveal any premium attributable to any

alleged misrepresentations.  As the *Weiner* court explains, without adequate information or

analysis regarding the methods he proposes that are tailored to the case at hand, it is not possible

for the Court to determine if Mr. Weir's proposed methodology will work on the facts of this

case.  *Weiner*, 2010 WL 3119452, at *9.  Further, like the expert in *Weiner*, Mr. Weir has

performed at best, a cursory review of the case record, and has not done the very things the

*Weiner* court highlighted as necessary for an expert to do to form a reliable opinion.  For

example, Mr. Weir has not reviewed deposition transcripts of any of the Fisher-Price witnesses.

*See* Ex. A to Marshack Decl. [Weir Depo.] at 179:2–4.  Nor has he spoken to any of the

Plaintiffs.  *See id.* at 276:24–277:1.  And prior to preparing his report, he did not review

11

documents, such as consumer reviews or blogs posts regarding the product, that would provide him necessary context for this case. *Id.* at 180:19–24.

Even so, when asked if there was any other material that would have been helpful to review in preparing his report, Mr. Weir said that he was "very comfortable making the opinions" he had "set forth in the report based upon the present record." Ex. A to Marshack Decl. [Weir Depo.] at 180:25–181:06. In other words, Mr. Weir believes his Declaration is complete. Indeed, having been engaged in December 2019, he has had ample opportunity to provide a more complete analysis but has failed to do so.

Mr. Weir also knows the relevant *Daubert* and Rule 702 standards. He has been hired by Plaintiffs' attorneys in multiple other cases, and his testimony has been excluded under *Daubert* multiple times.[4] Mr. Weir cannot, therefore, claim inexperience or ignorance as to the high standards for the admissibility of expert testimony in litigation and it is reasonable to conclude that his Declaration represents his best effort at providing a reliable opinion on class-wide damages. Like the expert in *Weiner*, and for very similar reasons, Mr. Weir's Declaration— which reads more like a primer on the basics of conjoint analysis than an analysis regarding the case at hand—falls well short of what *Daubert* requires, and should be excluded. *Amorgianos*, 303 F.3d at 266.[5]

---

[4] *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (excluding Plaintiffs' damages model presented through Mr. Weir and another expert); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS-JPS, 2019 WL 7370374, at *6 (E.D. Wis. Dec. 31, 2019) (same); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (striking Mr. Weir's testimony on damages because his declaration was "so incomplete as to be inadmissible as irrelevant" and his damages methodology so lacking that he essentially left the court with "no damages model at all.").

[5] As explained in Dr. Toubia's report, Mr. Weir's Declaration is unreliable for several additional reasons. *See* Toubia Report, at ¶¶ 42–48 (explaining the multiple reasons that Mr. Weir's survey is not an accepted use of conjoint survey methodology and thus unreliable); ¶¶ 49–85 (setting forth the many insufficiencies and inadequacies of Mr. Weir's Declaration, rendering his

## VI. MR. WEIR'S DIMINUTION IN VALUE METHODOLOGY IS INACCURATE AND UNRELIABLE BECAUSE IT FAILS TO INCORPORATE SUPPLY-SIDE CONSIDERATIONS.

Mr. Weir's Declaration should also be excluded because his proposed methodology cannot accurately calculate any diminution in the market value of the RNPS in that it considers only demand and fails to account for supply-side factors that contribute to market price.

Dr. Peter Rossi, Ph.D., explains in depth the many reasons that Mr. Weir's analysis does not adequately consider the supply-side of the market, and thus cannot accurately measure diminution in value damages. *See* Expert Rebuttal Report of Peter E. Rossi, Ph.D. ("Rossi Report"), at ¶ 56–126. Dr. Rossi is the James Collins Professor of Marketing, Statistics and Economics at the Anderson School of Management, UCLA where he has taught doctoral and masters' levels courses in Econometrics and Data Analytics, among other subjects. *Id*. at ¶ 1–2. Dr. Rossi received his B.A. in 1976 from Oberlin College with a double major in mathematics and history and an MBA from the University of Chicago in 1980. *Id*. at ¶ 1. He then received a Ph.D. in Econometrics, also from the University of Chicago, in 1984. *Id*. Dr. Rossi has authored over 65 publications in leading journals in Statistics, Economics, Econometrics, and Marketing, is the author of multiple books, and has published research that has received more than 20,000 citations on Google Scholar. *Id*. at ¶ 3. He has been elected fellow of the American Statistical Association, the Journal of Econometrics, and the INFORMS Society of Marketing. *Id.* Moreover, Dr. Rossi has written articles and presented on conjoint analysis and has served as an expert in multiple cases involving conjoint surveys. *Id.* at ¶¶ 3–4.

As Dr. Rossi explains, a market price is determined by the intersection of the demand and supply curves. *See* Rossi Report, at ¶ 65. The demand curve shows the willingness to pay of

---

opinions unreliable); ¶¶ 31–40 (discussing the reasons that Mr. Weir's survey does not match Plaintiffs' allegations, and is therefore unreliable).

consumers for a given product. *Id.* But to calculate an accurate price, a model must also consider the price at which retailers and other sellers of the product would be willing to sell it. *Id*. at ¶ 16. Indeed, the fact that price is determined by both supply and demand is a basic tenet of economics and is widely accepted by scholars [6] and Courts alike, including the Second Circuit and the United States Supreme Court. *See, e.g.*, *Gillespie v. United States*, 23 F.3d 36, 40 (2d Cir. 1994) ("Fair market value is commonly defined as 'the price at which the property would change hands between a willing buyer and a willing seller.'") (citing *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).

Mr. Weir, however, disagrees with the fundamental premise that price is determined by supply and demand. When asked if the market price "is the intersection between the demand curve and the supply curve," Mr. Weir testified "[i]t's generally not. There are only the rarest of circumstances where the price is pushed to that 'X' marks the spot interaction of supply and demand," and said the only circumstance in which this occurs is "perfect competition, which exists only in economic textbooks and to my knowledge never in the real world." Ex. A to Marshack Decl. [Weir Depo.] at 190:22–191:12. Mr. Weir's dismissal of this basic premise of economics is not supported by economics, market realities, or any peer reviewed publication. The supply-side and market factors cannot be discounted just because economists use models more complicated than the model of "perfect competition" used to illustrate this concept in a basic economics class. *See* Rossi Report, at ¶ 70.

---

[6] Among others, Bryan Orme, the President of Sawtooth Software, the company whose software Mr. Weir plans to use in his analysis, has emphasized the importance of incorporating supply-side factors into conjoint analysis, stating "[t]he market simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply side and take the cost of producing different products/services into consideration[.]". Orme, Bryan K. "Getting started with conjoint analysis: strategies for product design and pricing research." (2014), p. 96.

Indeed, "district courts across the country have excluded conjoint analyses that fail to accurately account for supply-side considerations." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig*., 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (internal citations omitted). *In In re Volkswagon "Clean Diesel," Sales Pracs., & Prod. Liab. Litig*., a case in which Mr. Weir worked with another expert who designed the conjoint survey, the court described several aspects of the analysis "that stand out as flawed even to the untrained eye," including that the analysis "does not actually calculate a market price premium" and "examines only what consumers say they would be willing to pay for certain vehicles . . . ignor[ing] the 'supply' part of the supply/demand curve." *Id*.

*In re General Motors LLC Ignition Switch Litigation* illustrates precisely the issues with Mr. Weir's proposed methodology. *See* 407 F. Supp. 3d 212 (S.D.N.Y. 2019). In that case, the court excluded the opinions of the Plaintiffs' damages expert because his survey "calculated only how consumers' willingness to pay would be affected by the disclosure of the defects at issue" and did "not estimate any possible changes in the [manufacturer's] willingness to sell." *Id*. at 235–36. While "the survey measure[d] consumers' private valuations (on average) of certain hypothetical GM vehicles sold with fully disclosed defects," it did "not measure the *market value* of those vehicles," which "depends on supply and demand." *Id*. Accounting for supply-side considerations is particularly important, as the *In re General Motors* court explained, where the alleged misrepresentations or omissions concern alleged product defects. *Id*. at 238–39. Without consideration of the suppliers' willingness to sell, Mr. Weir's "conjoint analysis does not provide competent proof of Plaintiffs' damages." *Id*. at 236.[7]

---

[7] While a few district courts within the Ninth Circuit have approved the use of conjoint analysis with little or no consideration of market prices, these decisions are, respectfully, incorrectly decided and non-binding. *See* Rossi Report at ¶ 61–114. As the court in *In re General Motors*

Mr. Weir attempts to head off this argument by including a section in his Declaration called "Conjoint Analysis: Supply-Side Considerations." Weir Decl., Ex. 3 at ¶¶ 50–58. However, he merely pays lip-service to supply-side factors, and does not actually consider any. As described more fully by Dr. Rossi, Mr. Weir also improperly tries to justify ignoring supply-side considerations by holding the supply-side constant in his analysis, and stating that "the quantity of Rock 'n Plays supplied is a known quantity, and fixed as a matter of history." *See* Rossi Report, at ¶ 103; Weir Decl., Ex. 3 at ¶ 55. But, as described by Dr. Rossi, "the quantity sold being fixed as a matter of history in the actual world has no bearing on the market price and quantity in the but-for world. Rather, both quantity and price would adjust in the but-for world if there are changes in demand in the absence of the alleged false advertising." Rossi Report, at ¶ 103. Mr. Weir's method of keeping the supply-side constant fails to account for supply-side factors and also assures an inaccurate conclusion on any price premium.

Indeed, Mr. Weir has previously been faulted for his failure to consider the supply-side of the market and for his efforts to mask that failure by including statements regarding competition from suppliers. For example, in *Schechner*, the court found that "Mr. Weir did not adequately address . . . supply-side considerations." 2019 WL 4891192, at *7–8. The Court criticized Mr. Weir for "unconvincingly recit[ing] suppliers' statements about the competitive importance of prices and rel[ying] upon historical retail sales and market data as his supply-side considerations." The Court found that was "insufficient for his conjoint analysis exercise to be tailored to Plaintiffs' damages theory." *Id*. Here, Mr. Weir has repeated precisely what he was criticized for in *Schechner*.

---

explained, they are also "unpersuasive," and an expert report that does not actually consider supply-side factors in a meaningful way does not "cut it." *In re General Motors LLC Ignition Switch Litigation,* F. Supp. 3d at 238–39. That is exactly the case here.

## VII.  MR. WEIR'S PROPOSED METHODOLOGY IS INADMISSIBLE BECAUSE IT IS INCONSISTENT WITH PLAINTIFFS' THEORY OF LIABILITY.

Mr. Weir's damages model is disconnected from Plaintiffs' theory of liability and, under the Supreme Court's decision in *Comcast*, should be excluded on this ground alone.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").

Plaintiffs' claims are based on alleged misrepresentations regarding the RNPS's suitability for sleep (*see* Toubia Report, at ¶ 31–40; Opposition to Class Certification, Section H).  But Mr. Weir's proposed survey does not seek to measure the purported diminution in value attributable to any alleged misrepresentations regarding sleep.  His proposed methodology is thus irrelevant to Plaintiffs' claims, improper under *Comcast*, and should be excluded.

As an initial matter, Mr. Weir fundamentally misunderstands Plaintiffs' theory of liability.  Mr. Weir testified that Plaintiffs' theory of liability, as he understands it, is that the RNPS is unsafe for *all* purposes:

> Q. What is your understanding of Plaintiffs' liability—excuse me, Plaintiffs' theory of liability in this case?
>
> A. At the highest level—and I would certainly let Plaintiffs' own papers speak for themselves, they allege that people bought Fisher-Price Rock 'N Play Sleepers, they paid a retail price for those and that the products are, in fact, valueless or basically in the alternative that they were worth substantially less than the market value of those products at the time of purchase.
>
> Q. It's—in preparing a damages analysis, it's very important for you, as the expert to understand what Plaintiffs' theory of liability is. Would you agree with that?
>
> A. The level of importance has certainly changed over time.  But I would presently say, yes, one of the first thing[s] I do is ask a client to present to me or give me a complaint or something else that elucidates the theory of liability so I can think about that.
>
> Q.  And the theory of liability that you just articulated, where did

17

you get that information from?

A. Probably a combination of the complaint and my discussions with counsel.

Q. What is your understanding of why the product is valueless?

A. That there is a risk of infant mortality and other injury from the use of the product.

Q. What use of the product creates risk of mortality according to Plaintiffs' theory in the case?

A. If you are talking about what the plaintiffs allege, I believe that there is no safe use that they would support for this particular product.

Q. So is your understanding that Plaintiffs' theory of liability in this case is that the product is unsafe for all uses?

A. Yes.

Ex. A to Marshack Decl. [Weir Depo.] at 140:01–141:15.  As evidenced in this exchange, Mr. Weir failed to mention that Plaintiffs' theory of liability is premised upon the product being unsafe for sleep, despite having *multiple* opportunities to do so.

Mr. Weir's understanding of Plaintiffs' theory of liability is contrary to the allegations in the Consolidated Amended Complaint ("CAC"), the Motion for Class Certification, and multiple statements of Plaintiffs' counsel, who has plainly asserted "the whole underlying theory of our case is—is that this product is unsafe for infant sleep" and later again said, "this is about a product that is unsafe for infant sleep."  Ex. B to Marshack Decl. [December 9, 2019 Status Conference Transcript] 16:18–17:13; 21:12–21.  Counsel's description of the case, in their own words, is about as direct an answer on Plaintiff's theory of the case as there could be.  And even without such clear admissions, Plaintiffs' allegations overwhelmingly relate to alleged misrepresentations regarding sleep.  For example, Plaintiffs' Motion for Class Certification

claims that "[s]leep was [m]aterial to Fisher Price's [s]ale of the [Rock 'n Play Sleeper] in the United States."  *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, p. 9.[8]

The consequence of Mr. Weir's failure to comprehend and consider Plaintiffs' theory of liability is that he has proposed a methodology that has nothing to do with sleep, and would therefore result in inflated damages calculations that have no basis in fact.  Mr. Weir's proposed Safety Warning—the "attribute of interest," according to Mr. Weir—says nothing about sleep. Instead, it reads as follows: "[t]his inclined infant sleeper carries the risk of infant fatality or other serious health problems."  Weir Decl., Ex. 3 at ¶ 28.  Using this general language, Mr. Weir's methodology is not able to measure damages attributable to Plaintiffs' theory of liability—that Defendants made misrepresentations regarding the safety of the product regarding sleep.  *See* Toubia Report, at ¶ 31 ("[A] conjoint survey used as an input to damages in a false advertising matter should isolate the effect of the alleged misrepresentations and/or omissions. Mr. Weir's proposed survey does not match Plaintiffs' allegations. As a result, Mr. Weir's proposed survey is unreliable as evidence of damages.").

Moreover, Mr. Weir's proposed conjoint survey sets forth various attributes that he says he "might include" in the survey.  Weir Decl., Ex. 3 at ¶ 24.  None of the attributes relate to sleep.  Instead, Mr. Weir states "[t]hese attributes might include Brand, Padding, Frame,

---

[8] S*ee also, e.g.*, Consolidated Amended Complaint, at ¶ 1 ("T]he . . . Rock 'n Play Sleeper . . . is an inclined "sleeper" that Defendants . . . marketed and sold for ten years as suitable for *safe infant sleep, including prolonged and overnight sleep*.") (emphasis added); Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, p. 49 (seeking certification based on: (a) "whether a reasonable consumer would have been led to believe that the RNPS was *safe for infant sleep* when Defendants identified, marketed, advertised, and packaged the RNPS *as an infant sleeper that was safe for infant sleep*; and (b) whether a reasonable consumer would find the representations about the RNPS *as being an infant sleeper that was safe for infant sleep* to be material") (emphasis added).

Sounds/Vibrations, Risk of Mold, Risk of Rocking Mechanism Failure, Safety Warnings, and Price." *Id*; *see also* Toubia Report, at ¶ 49–69 (discussing the multiple issues and inadequacies regarding Mr. Weir's proposed attributes).

Accordingly, Mr. Weir's fundamental misunderstanding of Plaintiffs' theory of the case has produced a methodology that cannot achieve its stated goal of measuring the price premium attributable to the alleged false advertising. This error alone should result in the exclusion of Mr. Weir's analysis. *See Comcast*, 569 U.S. at 35 ("It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").[9]

## VIII.  MR. WEIR'S TESTIMONY IS UNRELIABLE AND NOT HELPFUL TO THE COURT BECAUSE HE HAS DEFERRED TO THE COURT FOR DIRECTION ON HIS PURPORTED SURVEY METHODOLOGY.

Mr. Weir's testimony is both unreliable and not helpful to the Court because he misunderstands his role as an expert—to "assist the trier of fact to understand the evidence or to determine a fact in issue"—and instead believes the Court should give him direction on how to design his conjoint survey. Fed. R. Evid. 702. When asked when he will make a decision as to what attributes he will use in his conjoint survey, Mr. Weir stated that he would look to the Court for assurances as to the propriety of the survey, stating "I would always suggest to the Court that I want to get this right and if information comes to light that would suggest a change in the survey, I would do that but if the judge said this all looks good, let's go tomorrow I would use these attributes." Ex. A to Marshack Decl. [Weir Depo.] at 275:2–14. Similarly, when asked if the safety warning proposed as part of his survey should be consistent with the plaintiff's theory

---

[9] *See also Hughes v. The Ester C Company*, 317 F.R.D. 333 (E.D.N.Y. 2016) (denying class certification and holding that *Comcast* dictated the result because none of Mr. Weir's proposed methods isolated the premium attributable to Plaintiffs' theory of the case").

of liability, Mr. Weir stated that it should and that he would "assure the court that if they believe

there's alternate language that would be more appropriate to test, that I can make a change to the

design before the survey is fielded." *Id*. at 290:3–12.

He has it exactly backwards. Mr. Weir should be endeavoring to create a methodology to

*assist the Court* in evaluating whether damages can be measured on a class-wide basis based on

his methodology, not the other way around. Accordingly, Mr. Weir's "analysis" is unreliable,

not helpful to the trier of fact, and should be excluded.

## IX.    BOTH OF MR. WEIR'S PROPOSED METHODOLOGIES ARE UNRELIABLE BECAUSE THEY DO NOT INCORPORATE NECESSARY INDIVIDUALIZED ANALYSIS.

Mr. Weir's proposed damages methodologies are unreliable because they do not take into

account the unique circumstances of the class members. *See* Rossi Report, at ¶ 41–55.

As Dr. Rossi explains, Plaintiffs' deposition testimony and other evidence demonstrates

that some class members resold the product, offsetting any amount allegedly overpaid. *Id.* at ¶

45 ("When an owner of a Rock 'n Play Sleeper resold the product, they recouped some of the

original purchase price. Therefore, a proposed class member who has resold the product would

not be due full refund damages, as those damages would need to be offset by the amount they

received from its resale. If this offset were not made, then a purchaser would end up receiving

more in damages than the amount that they purchased for, net of the resale price, which is

economically unreasonable."). Other class members gifted the product to someone who may

have then resold it, and indeed, by Plaintiffs' own admissions, it is quite common to receive

baby-related durables as a gift. *See* CAC ¶¶ 24–45 (stating that approximately half of the named

Plaintiffs received the Rock 'n Play Sleeper as a gift); *see also* Rossi Report, at ¶ 46, n. 61 (citing

survey by Mintel Group in which 28 percent of parents received a majority of their baby-related

durables as a gift). These circumstances add an additional and important wrinkle to a damages

analysis, but Mr. Weir does not even attempt to factor these considerations into his analysis.  *See* Rossi Report, at ¶ 46, n. 61 ("The receipt of Rock 'n Play Sleepers as a gift does not by itself pose conceptual issues for full refund damages calculations; however, when the product was gifted by the purchaser and then resold by the recipient of the gift, there is an additional complexity of whether the resale amount is an offset to the initial purchase amount.").  Such considerations are rampant and complex.  But Mr. Weir does not consider any of these variations and in fact testified that "I can't speak to what any one person would be entitled to" and "because I haven't been asked to figure out a claims administration regime I have not laid forth such a method."  Ex. A to Marshack Decl. [Weir Depo.] at 218:17–23; 219:5–7.  Mr. Weir's failure to account for these substantial—and individual—considerations renders his methodology inaccurate and unreliable.

## X.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court strike the Weir Declaration in its entirety.[10]

Dated:    June 16, 2021                        Respectfully submitted,

By:  */s/ Matthew P. Kanny*
      Matthew P. Kanny

**MANATT, PHELPS & PHILLIPS, LLP**
CRAIG J. DE RECAT (Bar No. CA 105567)
 Email: *cderecat@manatt.com*
MATTHEW P. KANNY (Bar No. CA 167118)
 Email: *mkanny@manatt.com*
ADRIANNE E. MARSHACK (Bar No. CA 253682)
 Email: *amarshack@manatt.com*
2049 Century Park East # 1700
Los Angeles, CA 90067

---

[10] The Weir Declaration should plainly be excluded, but if the Court has any doubt, Defendants respectfully request that the Court hold a *Daubert* hearing so that the Court may assess the reliability of Mr. Weir's opinions live.

Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

**GOLDBERG SEGALLA, LLP**
Cheryl A. Possenti
  Email: *cpossenti@goldbergsegalla.com*
65 Main Street
Buffalo, NY 14203
(716) 566-5400

Patrick B. Naylon
  Email: *pnaylon@goldbergsegalla.com*
2 State St., Suite 1200
Rochester, New York 14614
(585) 295-5400

Attorneys for Defendants
FISHER-PRICE, INC., and MATTEL, INC.